JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITY OF TAYLOR GENERAL
EMPLOYEES RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

                         Plaintiff,

      vs.

MAGNA INTERNATIONAL INC., FRANK
STRONACH, DONALD J. WALKER, and
VINCENT J. GALIFI,

                        Defendants.

---

12 CV 3553

Civil Action No.

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**



Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Magna International Inc. ("Magna" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of Magna between January 12, 2011 and August 5, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities market located in this district.

## PARTIES

6.       Plaintiff City Of Taylor General Employees Retirement System, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Magna during the Class Period and has been damaged thereby.

7.       Defendant Magna is a one of the largest and most diversified suppliers of automotive components, systems and modules world-wide.  Defendant Magna maintains manufacturing and engineering and sales operations in 26 countries around the globe.  The Company's principal executive offices are located in Ontario, Canada.

8.       Defendant Frank Stronach ("Stronach") is the founder of Magna and served as Chairman of the Company's Board of Directors until May 4, 2011.

9.       Defendant Donald J. Walker ("Walker"), at all relevant times, served as Magna's Chief Executive Officer.

10.       Defendant Vincent J. Galifi ("Galifi"), at all relevant times, served as Magna's Executive Vice President and Chief Financial Officer.

11.       Defendants Stronach, Walker, and Galifi are collectively referred to herein as the "Individual Defendants."

12.       During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Magna, were privy to confidential and proprietary information concerning Magna, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Magna, as discussed in detail below.  Because of their positions with Magna, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of

- 2 -

directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Magna's business.

14.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Magna's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct

any previously issued statements that had become materially misleading or untrue, so that the market price of Magna common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Magna common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Magna's business, operations and management and the intrinsic value of Magna common stock; (ii) allowed the Individual Defendants and certain Company insiders to collectively sell their personally-held Magna common stock for proceeds in excess of $578 million; and (iii) caused Plaintiff and members of the Class to purchase Magna common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Magna between January 12, 2011 and August 5, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Magna common stock was actively traded on the both the NYSE and Toronto Stock Exchange in Canada. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and

other members of the Class may be identified from records maintained by Magna or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Magna;

(c)     whether the price of Magna common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

23.     Defendant Magna designs, develops and manufactures automotive systems, assemblies, modules and components.  The Company's capabilities include designing, engineering, testing and manufacturing interior automotive systems; seating systems; closure systems; metal body and chassis systems; mirror systems; exterior systems; roof systems; electronic systems; power-train systems.  Magna also engineers and assembles complete vehicles, primarily for sale to original equipment manufacturers, in its three geographic segments - North America, Europe, and Rest of World (primarily Asia, South America and Africa).

24.     The Class Period begins on January 12, 2011.  On that date, Magna issued a press release announcing its 2011 financial outlook, stating, in pertinent part, as follows:

> Don Walker, Magna's Chief Executive Officer commented: "As 2011 begins, vehicle production is poised for future growth in a number of important markets for us, including North America.  Accordingly, our outlook reflects significant sales growth, including expansion in high-growth markets in the next few years.  We also have the balance sheet, cash flow generation, engineering and manufacturing footprints, technologies and motivated workforce to support our growth initiatives around the world.  These factors combined leave us confident about Magna's future."

> For the full year 2011, we expect consolidated total sales to be between $25.6 billion and $27.1 billion, and expect consolidated production sales to be between $21.7 billion and $22.7 billion, based on full year 2011 light vehicle production volumes of approximately 12.9 million units in North America and approximately 13.3 million units in Western Europe.  We expect full year 2011 production sales to be between $12.7 billion and $13.2 billion in North America, between $7.8 billion and $8.1 billion in Europe and between $1.2 billion and $1.4 billion in Rest of World.  We expect full year 2011 complete vehicle assembly sales to be between $2.4 billion and $2.7 billion.  We expect our 2011 effective income tax rate to be approximately 20%.

> In addition, we expect that our full year 2011 spending for fixed assets will be between $900 million and $1.0 billion.  This amount reflects continuing investment to support new and replacement business in our traditional markets as well as investment to expand in a number of high-growth markets.

Finally, in addition to our 2011 sales outlook above, we expect a net increase in total production sales over the two-year period from 2011 to 2013 of approximately $3 billion, based on assumed full year 2013 light vehicle production volumes of approximately 14.8 million units in North America and approximately 14.1 million units in Western Europe. We expect the net increase in total production sales to be split approximately equally among our North America, Europe and Rest of World segments.

In this 2011 outlook, in addition to 2011 and 2013 light vehicle production, we have assumed no material acquisitions or divestitures. In addition, we have assumed that foreign exchange rates for the most common currencies in which we conduct business relative to our U.S. dollar reporting currency will approximate year end 2010 rates.

25.     That same day, January 12, 2011, Magna presented at Deutsche Bank Securities Global Auto Industry Conference. Defendants Galifi and Walker discussed the Company's European operations and margins, both as part of their prepared remarks and in response to questions by various audience members, stating, in part:[1]

Defendant Galifi's prepared remarks:

Our European segment has -- underperforming recently, and we're taking some actions to improve results there and we're going to see some improvements in '11 and in the coming years. We have a strong balance sheet -- lots of cash that we intend to deploy. And we expect to continue our expansion significantly in a number of fast-growing markets.

\*          \*          \*

In Europe, while we have returned to profitability, margins in total have not met our expectations. That's an opportunity I'll address in a moment. And we continue to grow rapidly in rest-of-world, and are also generating good margins on this business, particularly in established operations.

There are four broad elements to our plan to improve our results in Europe. The first relates to launches. Over the next couple of years, we expect to launch a number of new facilities in Eastern Europe, including Russia. While we will ultimately benefit from the launch of new business in these facilities, our results will also be hampered by start-up costs for the facilities. In addition, we have indicated that, following a

---

[1]     Due to microphone inaccessibility, the questions by audience members are not available.

busy launch year in 2010, Magna Steyr should benefit from a more stable year in 2011.

Second, operational improvements are planned in a number of our European facilities. This represents basic blocking and tackling that we have done in a number of North American operations over the past few years to improve results. It takes time, but can add up to a significant improvement in results.

Third, in some areas, where our footprint is not optimal, we will continue to shift our footprint into more cost-competitive facilities, including into the new Eastern European facilities I just noted, as programs allow us, or existing programs end.

And finally, while we're not anticipating massive restructuring costs in Europe, there will be incremental restructuring over the next three years in a number of facilities. The net result of these four elements of our plan is that we expect steady improvement each year in Europe over the next few years; some in 2011, further improvements in 2012, and, again, further improvements in 2013.

Defendant Galifi's and Walker's statements in response to analyst questions:

Defendant Galifi:

When you look at our business model in Europe and compare that to North America, it's not identical. And a big part of that is Magna Steyr, where we assemble complete vehicles for our customers. We purchase all the components and assemble the vehicle, and sell back the complete vehicle to a car company. So you have high sales, high cost of sales, low margins. So when you put that into the mix of European margins, that has a negative impact.

If you strip that away and you look at our production division, and you compare some of our good operating divisions in Europe to some good operating divisions in North America, margins are about the same -- some better, some worse, but pretty well in line.

And so, I think the question you're asking -- can you get to North American margins? If the mix of business is identical in Europe, I don't think there's any reason why we can't get there. I think it's going to take us some time, and it's not going to happen in '11. It's not going to happen in '12. It won't happen in '13.

It's going to require us to (inaudible) business, look at the way we're program managing the programs, where we're manufacturing the product. But over time, we certainly believe there's significant improvement possible in our European production division.

Defendant Walker:

We grew a lot in Europe through acquisitions of relatively weak companies, and the footprint's probably not optimal. So, we have a number of things that we're going to

have to improve over there.  It'll be difficult in the foreseeable future to get North American margins, but we can certainly improve them over there.

*     *     *

<u>Defendant Galifi:</u>

I think when you look at -- first of all, in Europe, some of the headwinds are going to be some commodity costs, and, obviously, some give-backs.  And the other thing that's going to hurt us in Europe is the launch of some new facilities, as we continue to draw manufacturing footprint and begin to launch or facilities in Russia.

However, offsetting that -- more than offsetting that is going to be improvements at existing operations and with continual improvements again to take place throughout '11 and continued beyond 2011.  As I noted in my speech, Magna Steyr has now launched the assembly program, so the launch costs that we had in 2010 won't repeat themselves in 2011.  So if you add up pluses and minuses, overall, we're expecting European margins to improve '11 versus '10.

*     *     *

Yes, I don't really like talking about margins too much, because, obviously, we're in Detroit, and our customers have their view of what the margin should be.  And to really understand it, you almost need to break it down internally by segment to see how sustainable they are.

*     *     *

So I would think, with all the give and take, then hopefully we can keep our margins sort of where they are.  And we're not saying that we can get Europe to the same margins in North America in three years.  We will give some guidance in awhile. But we can certainly move them up.

26.     On February 23, 2011, Magna issued a press release announcing its financial results for its 2010 fourth quarter and year end, the periods ended December 31, 2010.  The press release announced that the Company's revenues for the 2010 fourth quarter and year end totaled $6.6 billion and $24.1 billion respectively, and that its net income for such periods respectively totaled $216 million and $973 million.  With respect to Magna's European margins, for both the 2010 fourth quarter and year end periods, the press release stated, in part, that the "increase in EBIT [earnings before interest and taxes] was substantially due to increased margins earned on higher sales as a result of higher vehicle production volumes."

- 9 -

27.     Following the Company's 2010 fourth quarter and year end earnings announcement,

Defendants made positive statements about the Company and its earnings and outlook on a

conference call with analysts and investors.  With respect to Magna's 2011 outlook, Defendant

Galifi, as part of his prepared remarks, stated, in part:

> Next, I would like to review our 2011 full-year outlook.  We expect consolidated
> total sales to be between $25.6 billion and $27.1 billion, and expect consolidated
> production sales to be between $21.7 billion and 22.7 billion, based on light vehicle
> production of 12.9 million units in North America and 13.3 million units in Europe.
> We expect the 2011 production sales to be between $12.7 billion and $13.2 billion in
> North America; between $7.8 billion and $8.1 billion in Europe; and between $1.2
> billion and $1.4 billion in rest-of-world.
>
> *       *       *
>
> Lastly, we indicated earlier this year that we would provide an operating margin
> outlook, starting with the release of our fourth-quarter results.  We expect our 2011
> operating margin, excluding unusual items, to be approximately 5%.

28.     In response to these and other statements by Defendants, analysts posed questions

about the Company's operations and margins.  Defendants indicated that the Company's overall

direction of Magna's 2011 European margin would increase, notwithstanding new facility and higher

commodity costs, stating, in part:

> Peter Sklar - BMO Capital Markets - Analyst:
>
> And if my calculations are correct, I think that margin before unusual, what you
> would characterize as unusual items, was 5.1% in 2010.  So it looks to me that you're
> looking for about a flat margin in 2011 versus 2010, notwithstanding that your
> underlying assumptions in your guidance of North American vehicle production will
> be 1 million units higher.  You're looking for flat production in Europe.  And I
> believe you're looking for Steyr to continue to improve.
>
> So I would have thought that just the additional 1 million units in North America
> would have carried you to a higher margin.  There must be some offsets here,
> considering.  Can you talk a little bit about your guidance and what -- some of those
> themes I've raised?

<u>Defendant Walker</u>:

Sure, Peter. Your analysis is accurate in terms of operating margin for 2010 being 5.1% and our guidance being approximately 5% for 2011. And there's a number of moving pieces in the guidance.

We'll start with North America. We look at North America in terms of operating margins, just a couple of things going on there. We will benefit from an incremental pull-through on additional sales, so those will be coming in. Our expectation is certainly at above our average operating margin in North America, but offsetting that, just a couple of things. One is headwinds with respect to commodity costs in North America, both steel and resin. And the other thing is actually new facility costs. We have a number of new facilities that are in the works globally, and including North America. So that's a headwind.

So when you look at the pluses and the minuses, North America expecting operating margins between '10 to '11 to be roughly flattish. In Europe, we have a couple of things going on there. We're actually overall -- the direction for operating margin is up and we've got a couple things happening there. One is, we should benefit from additional sales and pull-through on those additional sales. We've got commodity costs, as we talked about earlier, being a potential headwind in Europe. But we also have a number of brand-new facilities that are ramping up in Europe, which is going to be a headwind to us.

Certainly, Steyr -- launch costs at Steyr on the complete vehicle assembly side, are going to be less in '11 versus '10. But I think when you start to think about some of the other launches going on, that may more than offset what's happening at Steyr. So overall, we've got some actions in place in Europe. We expect to see some improvement. I think Europe is going to be step-by-step improvement in margins. It's not going to happen overnight. But what we see, at least in Europe, is heading in the right direction. So that's positive. . . .

*     *     *

<u>David Lim - Wells Fargo Securities - Analyst</u>:

This is David Lim for Rich. I guess the question that I have is, we saw a quarter-over-quarter Q3 to Q4 jump in sales in Europe, but your margins were -- the incremental margins from quarter-to-quarter was not exactly what we expected. Can you provide a little more color surrounding that?

<u>Defendant Galifi</u>:

Sure. When you look at production assembly sales, if you back out tooling and engineering, sales in Europe were up about $390 million. And the pull-through to the bottom line, there's a number of things that are impacting what's happening. A couple of things -- one is we've got additional warranty costs, which I think you can track through the notes of the financial statements, in Europe in Q4 versus Q3.

When we start to look at new facilities and launch costs in Europe from Q3 to Q4, we've seen a jump in those costs as we're looking at -- we're launching and ramping up a number of new programs, including facilities in Russia. We've seen -- so it's been a negative. The positive has certainly been on the assembly side, as Magna has gone through the launch of them has ramped up production, we've seen positive contribution.

But keep in mind, when I talk about $390 million of additional production assembly sales quarter-to-quarter, the impact of foreign exchange is about $120 million. So the real growth [until] is $270 million on the $120 million. Europe is not really generating a lot of bottom line right now, so you can take sales and move them up for translation, but if operating income is $0, it doesn't matter what the currency translation is going to do. There won't be any change in profitability. So really the incremental sales ex-translation is about $270 million. So Steyr is positive on the assembly side, offset warranty and potentially new facility costs and ramp-up of launches.

*       *       *

Michael Willemse - CIBC World Markets - Analyst:

That North America margins about similar; European margins should go up, that's just E-Car and rest-of-world where we're seeing the margin drag next year or in 2011?

Defendant Galifi:

That's directionally accurate, Mike.

*       *       *

Rod Lache - Deutsche Bank – Analyst:

Yes, I'm just looking -- historically, you've been able to convert that kind of earnings on revenue growth. But obviously, there's some headwinds here. So we're just trying to get a sense of what they are and in rough order of magnitude, just some brackets around them.

Defendant Galifi:

Well, I think if you think through our disclosure on segments and my comments -- I'll start with the segments in North America. What I did say is we are expecting additional production sales in North America. The pull-through on that is going to be about -- we expect it to be above our average operating income percentage. Offsetting that is going to be -- the biggest item is going to be commodity costs year-over-year and startup of new facilities. But commodity costs by far is the largest part of that equation.

In Europe, we are expecting margin improvement. We do see pull-through on incremental sales, that's significantly higher than our average EBIT in -- or average operating income in Europe in 2010. But even when we look at the incremental operating margin in Europe, it's below the pull-through in North America. And part of that relates to our complete vehicle assembly business, where our margins are lower than our production business, and in part reflects that we still need to focus on improving our operations in Europe.

And offsetting that, the biggest thing there is going to be the additional costs for these facilities in Europe that we're ramping up.

29.     On March 31, 2011, Magna filed its Form 40-F (the "Form 40-F") with the SEC that included the Company's Annual Report for the year ended December 31, 2010 (the "2010 Annual Report"). In the 2010 Annual Report, Defendant Stronach indicated that, while he was stepping down as Magna's Board Chairman, he "will continue to be involved in an advisory capacity" and that "Magna is well positioned to rebound strongly now that the automotive industry is recovering." Similarly, Defendants Walker and Galifi noted in the 2010 Annual Report that "Magna entered 2011 riding a wave of momentum that started in 2010 and has continued to build as the global automotive industry experiences a solid recovery in vehicle production and sales."

30.     The 2010 Annual Report also included the following representations about the Company's disclosure and internal controls and the Form 40-F included Defendants Walker's and Galifi's certifications thereon:

Disclosure controls and procedures are designed to provide reasonable, but not absolute, assurance that material information required to be publicly disclosed by a public company is communicated in a timely manner to senior management to enable them to make timely decisions regarding public disclosure of such information. We have conducted an evaluation of our disclosure controls and procedures as of December 31, 2010 under the supervision, and with the participation of, our Chief Executive Officer and our Chief Financial Officer. Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures (as this term is defined in the rules adopted by Canadian securities regulatory authorities and the United States Securities and Exchange Commission) are effective in providing reasonable assurance that material information relating to Magna is made known to them and information required to be disclosed by us is recorded, processed, summarized and reported within the time periods specified under applicable law.

- 13 -

\*      \*      \*

I, [Defendants Walker and Galifi], certify that:

1.      I have reviewed this annual report on Form 40-F of Magna International Inc. (the issuer");

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4.      The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

        a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)      Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d)      Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5.      The issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

31.      On April 20, 2011, Magna presented at the Bank of America Merrill Lynch New York Auto summit with analysts and investors where Defendant Galifi gave positive statements about the Company and its earnings and outlook.

32.      On May 4, 2011, Magna issued a press release announcing its financial results for its 2011 first quarter, the period ended March 30, 2011.  For the quarter, the Company reported sales of $7.2 billion and net income of $322 million, or $1.30 per diluted common share.  The press release noted that increase in Magna's operating income was due substantially to higher margins ensuing from greater vehicle production, which offset certain operational inefficiencies and facility costs in Europe.

33.      Following the Company's 2011 first quarter earnings announcement, Defendants held a conference call with analysts and investors wherein Defendants explained that the results in Europe were negatively impacted by increasing commodity and facility costs, with the top four underperforming facilities generated a combined loss of about $50 million (1.6% margin effect), but were essentially in line with expectations, nonetheless.  Defendants also noted that they "continue to believe our European operations will steadily improve over the next two years."

34.      During the question and answer session of the conference call, Defendants also indicated that, while some of its European business was "underpriced," Magna had completed a "pretty deep dive" and that they were not anticipating anything of significance with respect to that issue, stating, in part:

<u>Rod Lache - Deutsche Bank – Analyst</u>:

Good afternoon everyone. It's Pat [Nowlan] on for Rod. Most of my questions have been answered. I just wanted to follow up about the European business. Can you talk about your existing book of business and what's the key drivers there to actually fix that business, whether it's cost? Doesn't appear to be capacity utilization, considering you're launching all these new facilities, so doesn't look like you're going to put new business into existing facilities. So, is it the fact that we have to close facilities or is it just that we have to re-price existing contracts? I'm just trying to get a feel for how quick the existing business could improve

<u>Defendant Walker</u>:

We talked about 3 significant underperforming divisions. We had another one which we've dealt with just in the past month. The issues are a number of different issues. One is that we have some business that was under priced so we have the need to go back and fix the pricing or work it out. Another one of the issues was we were over-booked on production so we have had some difficult launches. We've had some excess scrap, premium freight, we've had to outsource some business and we're going through some more launches right now and some of those facilities. So, it's a combination of inefficient operations, higher costs being associated with outsourcing product, high scrap rates, a lot of things that we can get our arms around but doesn't happen overnight. And some clarity on what the loss were, what we expect them to be at the end of the year. So, I think from a time line standpoint, Vince already talked about what the loss was in Q1. We expect to cut that essentially in half by the end of the year. By next year I would hope by the middle of next year, hopefully we've got them all back to breakeven but I've really only got clarity at this point in time with the action plans we have in place, take us out to the end of this year.

*        *        *

<u>Michael Alenzy - CIBC World Markets – Analyst</u>:

Okay. And then just going back to Europe. Looks like there were quite a few issues, you mentioned earlier the poor pricing on some contracts, some overbooked business. Just wondering in North America coming out of the downturn, you're able to hit some pretty good margins very quickly. What happened in Europe, from a managerial operational standpoint that these problems weren't recognized earlier and how do we know issues don't come out in 2012, 2013 in a similar nature? Just any kind of color you can add there.

<u>Defendant Walker</u>:

Okay. We have a lot of operations in Europe that are quite good, good management teams, they've got good control of their business. We had a number of divisions that for whatever reason didn't properly quote or book business or get ready for the launch. I'm not sure whether that's because we cut some of the overhead out to effectively launch this business but we certainly had --we've had some issues.

We've done a pretty deep dive across the plants. I'll never say never but I'm not anticipating any brand-new issues coming out of the woodwork. We've been back up. Production's picked back up for a while now. We do have a lot of new launches going on which hopefully is good. So, I don't anticipate anything major beyond what we're already working on there. As I say, a lot of the divisions are quite good, good technology, they're running well. So, it's a handful of about 10, 11 divisions that we're really focused on. We talked about the 3 -- the 4 -- 3 big ones and the 1 that's already been dealt with.

35. On July 11, 2011, Magna announced that it had entered into a $2.25 billion four-year revolving credit facility with a group of lenders, which replaced an approximate $2.0 billion revolving credit facility that was set to expire on July 31, 2012.

36. The statements referenced above in ¶¶24-34 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that the Company had entered into long-term European customer contracts at steeply discounted prices;

(b) that the Company was experiencing ongoing undisclosed quality control issues at its European facilities that were resulting in higher production costs;

(c) that, as a result of the foregoing, Magna was experiencing a significant decline in its European margins;

(d) that Defendants' representations about the Company's disclosure controls were materially false and misleading; and

(e) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's European operations and business prospects during the Class Period.

37. On August 5, 2011, Magna issued a press release announcing its operating results for its 2011 fiscal second quarter, the period ended June 30, 2011. For the quarter, the Company

- 17 -

announced net income of $282 million, or $1.15 per diluted common share, significantly less than Wall Street estimates.

38.     Following the Company's 2011 second quarter earnings announcement, Defendants held a conference call with analysts and investors wherein Defendant Walker explained that, while Magna's year-over-year sales increased by 24%, the Company's weaker than expected results were primarily caused by long standing, under-priced European customer contracts and quality control issues in Europe, stating in part:

> Despite the increase in total sales, our operating income decreased $5 million to $362 million in the second quarter of 2011, compared to $367 million in the second quarter of 2010. Operational inefficiencies and other costs, in particular at our exteriors and interiors systems business in Europe, higher commodity costs, new facility costs incurred to support our growth around the world, as well as the favourable settlement of certain commercial items during the second quarter of 2010 were the primary factors behind the decrease, more than offsetting the operating income earned on the increased sales in the second quarter of 2011 combined with the net positive impact from the unusual items in the second quarters of 2010 and 2011.

*     *     *

> Richard Kwas - Wells Fargo Securities - Analyst:
>
> Okay, that's helpful. And then, Don, could you just a little more color on Europe? Just as we think about it with the interior and exteriors business. How much of this is related to supplier issues? How much of it is related to just bad pricing with the contracts that were signed a few years back? And then, how much – it sounds obviously like there's some issues with the operations, the core operations, but if you could just kind of break out the buckets of what's impacting you the most over there?
>
> Defendant Walker:
>
> I won't even try and do it by dollars but the biggest impact is, in the downturn, there was an effort to -- rather than aggressively restructure was to try and keep our plants full, and I won't go through the reasons why but we've got some under priced product in a number of our plants. So that's the number one reason. And then we've got some raw material increases which doesn't help.
>
> We've also, because the market came back faster and stronger than people had anticipated a couple of years ago, we've actually got a couple of plants where we've

got more than 100% capacity and they are mainly in the couple of plants that -- painting.

So we've had some quality problems, we haven't been able to meet the expectations of some customers and that's driven a downward spiral. So if you have quality issues getting containment, containment, mean we have outside people checking the parts, you have two or three people looking at it which means scrap rates go up, which means you have to repaint, throws your schedule off.

We've had to outsource because of that, that's a very expensive piece price standpoint and transportation standpoint, extra handling. So in a paint job, you're either sort of continually improving or going in a downward spiral. We've been in a downward spiral in a couple of our facilities. I think we are getting our arms around it. We're having a lot of discussion with customers, looking at battery samples, trying to reduce the logistics, trying to [insort,] get the product back inside our plants and it's a staggering amount of money and a lot of extra people, so that is the biggest single factor in the major facilities we've been talking about.

Richard Kwas - Wells Fargo Securities – Analyst:

Okay, so on the pricing piece, though, I thought you said pricing was number one? Or was it more kind of the inefficiencies with the excess capacity utilization?

Defendant Walker:

Well, it probably depends on what month we are talking about I would say the pricing is probably the big one of the long term because that takes a while to get through. Shorter term, the last month or two, it's been probably the last three or four months it has been more operationally driven. But they are both significant.

Richard Kwas - Wells Fargo Securities – Analyst:

Okay. And then, just on the pricing -- lease contracts were signed during the downturn, so you really got another two or three years of kind of suffering through this before you really gets better right? Is that the way to think about it?

Defendant Walker:

In theory, yes, but I think him at the same time, we need to be able to sit down and have discussions with our customers because customers understand pricing as well. So if we have made a mistake in pricing they don't want to have the discussion, obviously, but they are asking for price reductions where we make improvements and where we aren't keeping, coming close to our expectations should be then we need to have those discussions as well. But it does take -- it's typically longer to resolve those issues than if you can get your arms around operational issues and fix them.

39.    Thereafter, securities analysts who follow Magna commented on the Company's results, stating in part:

<u>J.P. Morgan</u>:

**European Interiors: Wider losses, seeking OEM price hikes, and potential eventual exit:**

While MGA continues to make some initial strides in its struggling European Interiors/Exteriors business unit by divesting non-performing facilities, management's most recent commentary suggests that underlying losses of the business may be getting slightly worse than earlier anticipated. In fact, management seemed to go out of its way to highlight that the business had missed MGA's internal profitability metric, suggesting a desire to communicate as such to OEM customers (MGA identified underwater contract pricing as the main issue at this business) and perhaps also to signal a medium-term desire to shrink or all together exit this business.

<u>CANACCORD | Genuity</u>:

**Q2/11: BELOW EXPECTATIONS DUE TO EUROPE**

**Good sales, poor margins in Q2/11.** Magna's adjusted EPS fell significantly short of our and consensus expectations (Figure 1), largely due to surprisingly weak European margins.

\*       \*       \*

**What's going amiss at the European plants.** Problems include pricing (hard to change) and operational issues.

On the operational side, problems are occurring at two plastic moulding/painting facilities. It appears that these plants have quality issues, which are resulting in excess scrap and poor first-time yield. These are creating a downward spiral as intense delivery pressure has resulted in increased product rework, greater labour costs, increased outsourcing and greater use of expedited shipping

<u>Wells Fargo</u>:

**No easy fix to Europe.** The company's major underperforming facilities in Europe lost approximately $60MM in Q2 (vs. $50MM in Q1 with one more facility). The company plans to sell one of the underperforming facilities in Q3. Management anticipates loss generated by the two remaining underperformers should approximate $20-25MM by Q4. We note the company signed unfavorably-priced contracts during the recession that are likely to be difficult to unwind.

- 20 -

Credit Suisse:

Nevertheless, the focus for most investors was on Europe, with Magna posting much weaker than expected results this quarter. Europe revs were $2.26 bln (vs our forecast of $2.3 bln) with an adjusted EBIT loss of $13 mln vs our estimate of +$49 mln.

The biggest problem in Europe was the underperformance of 3 (was 4 in 1Q11) interiors/exteriors facilities, which posted combined losses of $60 mln in 2Q (vs a combined $50 mln loss in 1Q on 4 facilities). The underperformance at these facilities primarily relates to under-pricing on some of its existing business, overbooked production (thus leading to excess scrap/freight costs), and quality control issues.

CIBC:

**Poorly Priced Contracts & Overcapacity**: During the conference call, Magna referenced some underperforming contracts it holds in Europe that were priced too aggressively during the automotive downturn in 2008/2009. Recent raw material price increases have resulted in the profitability of these contracts deteriorating further. Magna also has a couple of plants in Europe that were overbooked during the downturn in 2008/2009 and are now running at overcapacity (these plants are in the paint area). Magna has encountered some quality issues which has resulted in customers checking the parts (requires additional costs), higher scrap rates, re-production runs, and outsourcing – all of these factors resulted in significantly higher costs in Q2/11.

40.    In response to the revelations about the Company's European operations, the price of Magna common stock dropped from $44.24 per share on August 4, 2011 to $39.42 on August 5, 2011, as the artificial inflation came out of the price of Magna stock.

41.    The market for Magna common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Magna common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Magna common stock relying upon the integrity of the market price of Magna common stock and market information relating to Magna, and have been damaged thereby.

42.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Magna common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

43.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Magna's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Magna and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

44.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts

regarding Magna, their control over, and/or receipt and/or modification of Magna's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

45.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

46.    Individual Defendants, because of their positions with Magna, controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of these Defendants is responsible for the accuracy of Magna's corporate statements and are therefore responsible and liable for the representations contained therein.

47.    Defendants were further motivated to engage in this fraudulent course of conduct in order to allow high-level Company officers to sell shares of their personally-held Magna common stock at inflated prices that yielded them proceeds in excess of $578 million during the Class Period.

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Demel, Herbert Hubert | Senior Officer of Issuer | 04-Mar-2011 | 33,333 | $50.29 | $1,676,317 |
| Eibeck, Manfred | Senior Officer of Issuer | 02-Mar-2011 | 33,334 | $49.89 | $1,663,033 |

| | | | | | |
|---|---|---|---|---|---|
| Skudutis, Tommy Joseph | Director or Senior Officer of Insider | 01-Mar-2011 | 32,634 | $49.76 | $1,623,868 |
| | | 01-Mar-2011 | 600 | $49.77 | $29,862 |
| | | 01-Mar-2011 | 100 | $49.78 | $4,978 |
| | | 09-Mar-2011 | 50,000 | $50.90 | $2,545,000 |
| | | | 83,334 | | $4,203,708 |
| Stronach (Francis) | Director of Issuer | 18-Mar-2011 | 55,216 | $50.33 | $2,779,021 |
| | | 21-Mar-2011 | 646,398 | $50.29 | $32,507,355 |
| | | 22-Mar-2011 | 5,146 | $50.25 | $258,587 |
| | | 24-Mar-2011 | 505,114 | $50.03 | $25,270,853 |
| | | 25-Mar-2011 | 23,005 | $50.00 | $1,150,250 |
| | | 09-May-2011 | 616,837 | $52.53 | $32,402,448 |
| | | 09-May-2011 | 616,837 | $52.53 | $32,402,448 |
| | | 10-May-2011 | 600,000 | $52.04 | $31,224,000 |
| | | 11-May-2011 | 16,480 | $52.00 | $856,960 |
| | | 12-May-2011 | 450,000 | $51.19 | $23,035,500 |
| | | 13-May-2011 | 284,308 | $50.20 | $14,272,262 |
| | | 19-May-2011 | 95,385 | $50.06 | $4,774,973 |
| | | 27-May-2011 | 917,350 | $48.44 | $44,436,434 |
| | | 30-May-2011 | 18,100 | $48.46 | $877,126 |
| | | 31-May-2011 | 494,759 | $48.52 | $24,005,707 |
| | | 01-Jun-2011 | 15,363 | $48.05 | $738,192 |
| | | 02-Jun-2011 | 104,100 | $47.06 | $4,898,946 |
| | | 03-Jun-2011 | 85,598 | $47.03 | $4,025,674 |
| | | 06-Jun-2011 | 533,063 | $46.06 | $24,552,882 |
| | | 07-Jun-2011 | 1,000,000 | $46.56 | $46,560,000 |
| | | 09-Jun-2011 | 978,496 | $46.13 | $45,138,020 |
| | | 13-Jun-2011 | 218,212 | $45.00 | $9,819,540 |
| | | 14-Jun-2011 | 1,356,945 | $46.00 | $62,419,470 |
| | | 15-Jun-2011 | 900 | $46.00 | $41,400 |
| | | 16-Jun-2011 | 428,229 | $46.02 | $19,707,099 |
| | | 17-Jun-2011 | 877,212 | $46.75 | $41,009,661 |
| | | 21-Jun-2011 | 747,000 | $49.40 | $36,901,800 |
| | | | 11,690,053 | | $566,066,607 |
| Walker (Donald J) | Director of Issuer | 17-May-2011 | 50,000 | $48.50 | $2,425,000 |
| | | 18-May-2011 | 50,000 | $49.59 | $2,479,500 |
| | | | 100,000 | | $4,904,500 |
| Worrall (Lawrence D) | Director of Issuer | 15-Jun-2011 | 8,200 | $45.23 | $370,886 |
| | Total | | 11,948,254 | | 578,885,051 |

## Loss Causation/Economic Loss

48.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Magna common

stock and operated as a fraud or deceit on Class Period purchasers of Magna common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Magna common stock fell precipitously as the prior artificial inflation came out.

49.     As a result of their purchases of Magna common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Magna common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $61.55 per share on January 27, 2011.

50.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Magna's business and prospects.  When the truth about the Company was revealed to the market, the price of Magna common stock fell precipitously.  These declines removed the inflation from the price of Magna common stock, causing real economic loss to investors who had purchased Magna common stock during the Class Period.

51.     The declines in the price of Magna common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Magna common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Magna common stock and the subsequent

significant decline in the value of Magna common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

<b>Applicability of Presumption of Reliance:<br>Fraud on the Market Doctrine</b>

52.     At all relevant times, the market for Magna common stock was an efficient market for the following reasons, among others:

(a)     Magna common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Magna filed periodic public reports with the SEC and the NYSE;

(c)     Magna regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Magna was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

53.     As a result of the foregoing, the market for Magna common stock promptly digested current information regarding Magna from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Magna common stock during the Class Period suffered similar injury through their purchase of Magna common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Magna who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

58. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Magna common stock. Plaintiff and the Class would not have purchased Magna common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

59. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Magna common stock during the Class Period.

### COUNT II

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

60. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61. The Individual Defendants acted as controlling persons of Magna within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Magna, and their ownership of Magna common stock, the Individual Defendants had the power and authority to cause Magna to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  May 4, 2012                 ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
                                                    SAMUEL H. RUDMAN
                                                    DAVID A. ROSENFELD


                                                    _____
                                                    DAVID A. ROSENFELD

                                                    58 South Service Road, Suite 200
                                                    Melville, NY  11747
                                                    Telephone:  631/367-7100
                                                    631/367-1173 (fax)

                                                    VANOVERBEKE MICHAUD & TIMMONY, P.C.
                                                    MICHAEL J. VANOVERBEKE
                                                    THOMAS C. MICHAUD
                                                    79 Alfred Street
                                                    Detroit, MI  48201
                                                    Telephone:  313/578-1200
                                                    313/578-1201 (fax)

                                                    Attorneys for Plaintiff

- 29 -

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Lighthouse Financial Group v. The Royal Bank of Scotland Group, plc.,* No. 1:11-cv-00398 (S.D.N.Y.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

MAGNA

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _3rd_ day of _May_, 2012.

CITY OF TAYLOR GENERAL
EMPLOYEES RETIREMENT SYSTEM

By: _Cecilia A. Pace_

Its: _Chairperson_

- 2 -

MAGNA

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 03/21/2011 | 642 | $50.48 |
| 04/28/2011 | 390 | $49.93 |