UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x

CITY OF TAYLOR GENERAL
EMPLOYEES RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

               Plaintiff,

    vs.

MAGNA INTERNATIONAL INC., FRANK
STRONACH, DONALD J. WALKER, and
VINCENT J. GALIFI,

               Defendants.

———————————————— x

Civil Action No. 12-cv-3553 (NRB)

AMENDED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Boilermaker-Blacksmith National Pension Trust ("Plaintiff") alleges the following based upon the investigation of its counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Magna International Inc. ("Magna" or the "Company"), as well as other regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.　　This is a securities class action on behalf of all purchasers of the common stock of Magna between August 6, 2010 and August 5, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.　　As detailed below, Magna and several of its highest level insiders – including founder and Chairman, Defendant Frank Stronach ("Stronach," defined further below), and Chief Executive Officer ("CEO"), Defendant Donald J. Walker ("Walker") – downplayed the extent and magnitude of problems affecting Magna's European operations during the Class Period, while emphasizing the favorable financial results resulting from those operations. In response to these representations, the stock price reached as high as $59.99 per share in January 2011, near the middle of the Class Period.

3.　　As the truth leaked out during the Class Period, however, the stock price, which was artificially inflated as a result of the fraud, declined – ultimately falling to $39.42 on August 5, 2011. While ordinary investors were damaged by this scheme, Defendants (defined below) profited from it, selling more than $940 million of their personally held shares. In fact, Stronach, via a trust in his name, sold nearly $907 million of stock in connection with his exit from the Company, the proceeds of which he used to shore up his personal finances to fund other business pursuits. Accordingly, the Individual Defendants (defined below) were motivated to commit the fraud alleged.

## JURISDICTION AND VENUE

4.     The claims asserted herein arise under and pursuant to Sections 10(b), 20(a) and 20A of the Exchange Act [15 U.S.C. §§78j(b), 78t(a) and 78t-1] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

6.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

7.     In connection with the acts alleged herein, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities market located in this District.

## PARTIES

8.     Plaintiff, as set forth in the certification previously filed and incorporated by reference herein, purchased the common stock of Magna during the Class Period and has been damaged thereby.  On July 31, 2012, the Court appointed Plaintiff to serve as Lead Plaintiff.

9.     Defendant Magna is one of the largest and most diversified suppliers of automotive components, systems and modules worldwide.  Its operations are, and at all relevant times were, segmented on a geographic basis between North America, Europe and Rest of World (primarily Asia, South America and Africa).  The Company's principal executive offices are located in Ontario, Canada.  During the Class Period, Magna's common stock was actively traded on the NYSE and the Toronto Stock Exchange.

10. Defendant Stronach is the founder of Magna and served as Chairman of its Board of Directors (the "Board") until May 4, 2011.

(a) At all relevant times, Stronach and certain members of his immediate family were trustees of the Stronach Trust (sometimes referred to with Stronach as "Stronach"), a trust formed under the laws of the Province of Ontario, and were potential beneficiaries thereof. Prior to August 31, 2010, the Stronach Trust indirectly held all of the 726,829 issued and outstanding Class B shares of Magna common stock. The Class B shares carried 300 votes per share, representing approximately 66% of the voting rights attached to Magna's securities. Through a transaction completed on or about August 31, 2010, Magna purchased for cancellation all of the outstanding Class B Shares, and, in exchange, the Stronach Trust indirectly received nine million newly issued Class A subordinate voting shares and $300 million in cash. As described more fully below, the restructuring transaction established a single class of voting equity securities, called common shares, each having one vote per share. As a result of this transaction, the Stronach Trust indirectly held 7.44% of the outstanding common shares. During the Class Period, Stronach sold more than $900 million in Magna stock.

(b) In addition, Stronach, through various affiliated entities, was a party to certain consulting, business development and business services contracts with Magna or entities affiliated with Magna (collectively, the "Stronach Agreements"). The Stronach Agreements consisted of: (i) a consulting agreement dated August 1, 1997, as amended, between Stronach and Magna International Europe AG; (ii) a business development agreement dated August 1, 1997, as amended, between Stronach & Co. and Magna International Investments S.A.; (iii) a business services agreement dated January 1, 2004, as amended, between Magna and Stronach Consulting Corp.; and (iv) a consulting agreement dated August 1, 1994, as amended, between Stronach & Co. and New Magna Investments

N.V. In connection with the Company's August 31, 2010 transaction referenced above, the Stronach Agreements were amended, as described more fully below. As with Stronach's divestiture of voting control of Magna, the amendments to the Stronach Agreements were made in furtherance of his exit from Magna and his pursuit of opportunities in the electric vehicle industry, including a partnership involving Magna formed in connection with the Company's restructuring transaction.

11. Defendant Walker, at all relevant times, served as Magna's CEO. In that capacity, Walker assumed oversight responsibility for Magna's European operations and he confirmed that, during the Class Period, he personally visited those operations and would continue to do so.

12. Defendant Vincent J. Galifi ("Galifi"), at all relevant times, served as Magna's Executive Vice President and Chief Financial Officer ("CFO").

13. Defendants Stronach, Walker and Galifi are collectively referred to herein as the "Individual Defendants," and, together with Magna, as "Defendants."

14. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Magna, were privy to confidential and proprietary information concerning Magna and its operations, finances, financial condition and present and future business prospects. As discussed below, the Individual Defendants had access to material adverse non-public information concerning Magna via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

15. The Individual Defendants are liable as direct participants in the wrongs alleged, and, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein, and did so. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Magna's business.

16. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

17. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Magna's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Magna common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Magna common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived investors regarding Magna's business, operations and management and the intrinsic value of Magna common stock; (ii) allowed the Individual Defendants and certain Company insiders to collectively sell their personally-held Magna common stock for proceeds in excess of $940 million; and (iii) caused Plaintiff and members of the Class (defined below) to purchase Magna common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

19.     This action is brought as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the common stock of Magna between August 6, 2010 and August 5, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Magna, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, Magna common stock was actively traded on the both the NYSE and Toronto Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Magna or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21. Plaintiff's claims are typical of the claims of the members of the Class because all members of the Class were similarly affected by Defendants' wrongful conduct, alleged herein.

22. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

23. Common questions of law and fact apply equally to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

      (a)    whether the federal securities laws were violated by Defendants' conduct, as alleged herein;

      (b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Magna;

      (c)    whether the price of Magna common stock was artificially inflated during the Class Period; and

      (d)    whether and to what extent the members of the Class have sustained damages, and the proper measure of damages.

24. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it highly unlikely for members of the Class to individually seek redress for the wrongs alleged.

25. There will be no difficulty in the management of this action as a class action.

A.     **Background of the Company and Stronach's Influence on It**

26.     At all relevant times, Magna designed, developed and manufactured automotive systems, assemblies, modules and components, including, but not limited to: interior automotive systems; seating systems; closure systems; metal body and chassis systems; mirror systems; exterior systems; roof systems; electronic systems; and power-train systems. Magna also engineered and assembled complete vehicles, primarily for sale to original equipment manufacturers, in three segments: North America, Europe, and Rest of World.

27.     From 1978 until the restructuring transaction completed in August 2010, Defendant Stronach, via the Stronach Trust, retained voting control of Magna, as described more fully below. During that time, Stronach served as Magna's Chairman, and, in that capacity and as the Company's founder, maintained a tight grip on the Company's operations and the management team he selected. In a section of Magna's 2010 Annual Report called "The Chairman's Message," Stronach called the cultivation of Magna's management team one of his greatest achievements, stating, in part:

> Over the years, one of the achievements I am proud of is the strong management team that I cultivated. The key members of Magna's executive management are seasoned, widely respected within the automotive industry, and committed to the principles that have made Magna a great company.

28.     And, in an interview published by Canadian newspaper *The Globe and Mail* on June 23, 2011, in which he was asked what Magna would look like without him, Stronach responded: "I think most of the guys were a long time with me, and I think my philosophy has rooted itself."

29.     As a result of his involvement in and founding of the Company, Defendant Stronach exercised control over the management team, who sought to further his financial interests in Magna

---

[1]     All emphasis is added, unless otherwise noted.

via the restructuring transaction. Two key aspects of the transaction, detailed below, reportedly had a value of approximately $943 million to Stronach. However, a March 30, 2012 article published by *The Globe and Mail*, entitled "Magna International's controversial chairman on way out," reported that Michael Harris ("Harris"), the lead director of Magna's Board at the time of the transaction (its Chairman, after Stronach's departure), had declined to counter Stronach's demands, in contravention of advice given by the Board's advisors, which would have cut the value of the deal to $470 million. And, a January 24, 2012 article published by *The Globe and Mail*, entitled "Magna revamps its governance," indicated that Harris "led an independent committee of directors that examined the buyout but did not commission an independent evaluation of the deal to determine whether it was fair to minority shareholders."

30.     Moreover, Stronach's influence over the Company persisted even after he resigned as Chairman during the Class Period. In a May 4, 2011 press release concerning Magna's financial results for the first quarter of 2011 (the period ended March 31, 2011), Magna disclosed that it had sold to Stronach and his affiliates a group of real estate assets he had expressed interest in acquiring. According to the release, "the Company recorded a $9 million impairment charge in the quarter related to this asset group . . . [b]ecause the appraised fair value range of the group of properties was less than their $52 million carrying value" and Stronach paid for the assets "within the appraised fair value range . . . ."

31.     This deal featured prominently in the 2012 annual meeting vote on the election of Magna's directors, and Glass Lewis & Co. ("Glass Lewis"), a leading proxy firm, recommended that shareholders withhold their votes from Stronach's reelection as a director. An April 24, 2012 article published by *The Globe and Mail*, entitled "Proxy firm slams Stronach's real-estate deals with Magna," reported on the controversy, in part, as follows:

Frank Stronach gave up control of Magna International Inc., but he has not lost his ability to stir up controversy at Canada's biggest auto parts company.

Magna's founder has raised the ire of a leading investor-advisory firm over a series of transactions in which the company sold property to him and a former executive at a loss. The firm, Glass Lewis & Co., is recommending that shareholders withhold their votes from Mr. Stronach as a director – essentially a protest vote – because of the deals and his absence at 30 per cent of board meetings last year.

Magna disclosed in its recent proxy circular that it sold $43 million worth of "non-core" corporate real estate in the first quarter of 2011 to entities affiliated with Mr. Stronach and Siegfried Wolf, Magna's former co-chief executive officer. Magna took a $9-million loss on the sale.

32.     Referring to Stronach's persistent influence over Magna as the "Stronach overhang," the article also reported that Harris, who had earlier acceded to Stronach's demands for remuneration in connection with the restructuring transaction, participated in negotiating the real estate deal but would not stand for reelection as a director:

> Mr. Stronach's compensation at Magna, where he regularly pulled in tens of millions of dollars while also holding a controlling ownership stake, has long been a flashpoint for shareholders and corporate governance advocates. After a contentious deal to buy out his controlling shares in 2010, Magna has been moving into a post-Stronach era, with his compensation arrangements set to expire at the end of 2014.

> But the disclosure of the land deals, and Glass Lewis' opinion, indicate that Magna may still have a "Stronach overhang" in the eyes of the governance community.

> The company said it obtained two appraisals for each of the five properties, and the sales prices "reflected the mid-point of the appraised fair value range." The board's corporate governance and compensation committee – which included former Ontario premier Mike Harris and two other directors – negotiated the deals. None of those directors is standing for re-election at the annual meeting next month.

33.     Finally, the article reported Glass Lewis's incredulous response, contained in a report to shareholders, to the notion that the real estate deals were appropriate, as follows:

> "We are somewhat surprised and concerned to see that the board would sell properties to former executives at a loss to shareholders," Glass Lewis wrote in a report to shareholders. "While these properties may indeed have been 'non-core,' the board should disclose why it was deemed necessary to sell them at a loss, particularly since the company does not appear to have an immediate need for cash."

34.     Analysts also acknowledged Stronach's pervasive influence over Magna's leadership. In a November 18, 2011 analyst research report, for example, Credit Suisse Securities (USA) LLC ("Credit Suisse") expressed concern that the Company would commit additional funds to the E-Car business, a venture shared with Stronach, at Stronach's insistence.  As Credit Suisse wrote:

> We continue to believe that part of MGA's valuation discount (3.6x '12 EV/EBITDA vs 4.8x group avg) reflects investor concern about the potential for future cash injections into money-losing E-Car systems business (at Frank Stronach's request). And while Magna has insisted it will not put in [sic] any more cash into E-Car, we (and the market) remain skeptical.

35.     Credit Suisse also explained that Magna's common stock assumed a valuation on par with its peers soon after Stronach's exit, but commented that a "retreat" from that valuation occurred when it appeared that Magna might continue to fund the money-losing E-Car business, as follows:

> Immediately following Frank Stronach's sale of his super-voting B shares last year, Magna's multiple swiftly moved to parity with the supplier peer group. That lasted all of 4 months. In our view, one of the reasons for the valuation retreat (the other being dismal performance in Europe) was the market's realization that E-car systems was losing meaningful money and would continue to do so for the foreseeable future – thus creating the risk of future cash injections. This ultimately has kept alive the ability for Frank to divert shareholder value for his personal gain (which is the underlying reason for the valuation discount in the first place).
>
> Magna has insisted, frequently and publicly, that it will not inject more cash into E-car systems. We're not sure we believe this, and the valuation suggests the market doesn't buy it either.

36.     As it turns out, Credit Suisse's concern was not unfounded, as the E-Car business lost tens of millions of dollars during (and after) the Class Period.

37.     These issues reflect the enduring influence that Stronach exerted over the Company's executive management team and operations both during and after the Class Period, including certain of the Individual Defendants whom he selected to serve in management.

**B.    The August 6, 2010 Statements; Start of the Class Period**

38.     The Class Period begins on August 6, 2010. On that date, Magna issued a press release announcing its financial results for its 2010 fiscal second quarter, the period ended June 30, 2010. For the quarter, the Company reported net income of $293 million, as compared to a net loss of $205 million for the second quarter of 2009. Excluding unusual items recorded in the second quarters of 2010 and 2009, net income for the second quarter of 2010 increased $458 million.

39.     In addition, Magna reported that its Earnings Before Interest and Taxes ("EBIT") in Europe increased $115 million to $75 million for the second quarter of 2010, "substantially due to increased margins earned on higher sales as a result of significantly higher vehicle production volumes," as compared to a loss of $40 million for the second quarter of 2009. For the six months ended June 30, 2010, EBIT in Europe increased $228 million to $69 million, also "substantially due to increased margins earned on higher sales as a result of significantly higher vehicle production volumes," as compared to a loss of $159 million for the six months ended June 30, 2009.

40.     Magna also disclosed that positive factors influencing EBIT in Europe were "partially offset" by: (i) "employee profit sharing, as no profit sharing was recorded in 2009"; (ii) "operational inefficiencies and other costs at certain facilities"; (iii) "increased commodity costs"; (iv) "higher warranty costs"; (v) "higher development and launch costs in our vehicle electrification business"; (vi) "higher affiliation fees paid to corporate"; and (vii) "net customer price concessions subsequent to the second quarter of 2009." Yet, Magna did not disclose the full extent and magnitude of the "operational inefficiencies" plaguing those operations or provide additional detail concerning them.

41.     During a conference call with investors and analysts that also took place on August 6, 2010 concerning the Company's second quarter 2010 financial results, Defendants Walker and Galifi downplayed the European operations problems. In opening remarks, for example, Walker indicated

that "vehicle sales in a number of European markets remain relatively strong in the second quarter as have imports of European built vehicles in [sic] to North America." Moreover, Walker linked the Company's favorable second quarter results directly to *improving* operations in Europe as a result of ongoing restructuring activities, as follows:

> Beyond the improved level of light vehicle production North America, Western Europe which drove our higher sales, *our strong second quarter results reflect, among other things, the benefit of our efforts over the past few years to restructure, right size and other wise reduce costs across the organization and the benefit of our efforts to improve under performing operations around the world.* With respect to Europe specifically, recall we expected our Magna Steyr business to improve as we move towards the end of the launches of new vehicles in Graz. Magna Steyr improved sequentially in Q2 from Q1 as the Peugeot RCZ and Aston Martin Rapide continue to ramp. Graz is beginning the launch of the MINI Countryman this quarter. We should see further improvements in Magna Steyr's results as we continue to ramp. Additionally, our European business exes. Magna Steyr improved in Q2, 2010, relative to Q1. *We continue to focus on improving our overall operating results in this region. Given Magna's continued profitability and higher expectation for vehicle production in our key markets, our Board of Directors yesterday increased our quarterly dividend* to $0.30 for Class A Subordinate Voting or Class B share and respect of the second quarter of 2010.

42.     For his part, Galifi indicated that "European production sales increased $331 million, or 23% from the comparable quarter" and, further, that "European vehicle production increased 13%, to 3.5 million units, while European content increased 8% . . . ." As he explained, "[t]hese factors were partially offset by the weakening of the Euro and British pound each against the US dollar, unfavorable production relative to industry volumes and or lower content on certain programs in the second quarter of 2010, including . . . programs that ended production during or subsequent to Q2 2009 and ongoing customer price concession." Thus, while Galifi indicated that "we continue to be cautious about the European economy[,]" he noted that Magna's "increase [in] full year vehicle production expectations in Europe . . . is due to stronger second quarter production volumes than we expected." However, he made no mention of the "operating inefficiencies" generally referenced in the press release, and, in fact, Walker only mentioned the phrase "operating issues" once, in passing.

43.     Ultimately, Galifi explained that "[a]s a result of the increase[d] expectations for vehicle production and content in both North America and Europe, as well as higher vehicle assembly sales, we now expect total sales to be in the range of $22 to $23 billion, up a $1 billion from our previous outlook." He also assured investors that the Company's financial position remained strong, stating, in part, as follows:

> As Don [Walker] noted, the Board moved up our dividend to $0.30, representing a 67% increase from the first quarter, when we reinstated our dividend. This positive action reflects the confidence our Board has in our ability to generate strong earnings going forward. Our balance sheet remains strong with $1.5 billion in cash, net of debt as of June 30, 2010. We also have an additional $1.8 billion in unused credit available to us from a credit facility that extends until July 2012.

44.     Moreover, in response to questions from analysts, Defendants Walker and Galifi explained that they believed Magna's restructuring efforts would improve European margins. For example, Galifi indicated that "if you look at incremental margin in Europe, ex the significant items that were positive to bottom line, the incremental on margins quarter over quarter, was about 28%, so *we are seeing some good pull through. That's a very positive sign for us.*"

45.     In turn, Walker indicated that "[t]here's no fundamental reason why the margins in North America or Europe or rest of the world should be different." As he explained:

> We made some acquisitions, bought them inexpensively and there was [sic] some operating issues in Europe so it takes a while to turn some of those around. So I don't think we are going to see the margins in the near-term the same but *we do have some very good operations in Europe and that run as good or better margins than the average North America*. So there is no fundamental reason why we can't get there.

46.     In response to Defendants' assurances to the market that any problem experienced by the European operations was not materially affecting Magna's financial results, the Company's stock price increased on August 6, 2010 by $2.00 (or more than 5%) to $39.50 per share, on heavy volume of approximately 3.8 million shares traded. Subsequently, securities analysts following Magna also responded favorably to the news, and some of them increased their target price for Magna stock.

- 14 -

47.    The statement referenced above that "operational inefficiencies and other costs at certain facilities" partially offset the positive factors influencing EBIT in Europe was misleading in the absence of disclosure concerning the extent and magnitude of those problems and the manner in which they were currently impacting, and reasonably expected to impact, Magna's financial results, including its margins in Europe and its earnings per share.  Moreover, by failing to disclose the extent and magnitude of those problems by providing additional detail concerning their underlying cause – e.g., quality control issues facing the interiors/exteriors business, brought about by an influx of work – and instead focusing on Magna's positive financial results, Defendants caused investors to overlook or disregard the significance of the European operational problems.

48.    Further, by combining the representation that "there was [sic] some operating issues in Europe so it takes a while to turn some of those around," with the statement that "we do have some very good operations in Europe and that run as good or better margins than the average North America," Defendants portrayed a misleading picture of the risks posed by the problems plaguing the European operations, which, in any event, were far more extensive than Defendants had implied. This, in turn, deprived investors of the ability to gauge the risks associated with investing in Magna.

49.    Additionally, the representations referenced in the preceding two paragraphs were false and misleading when made because the problems affected Magna's core European operations, for which Defendants had the responsibility to, and did, oversee.  Moreover, the underlying quality control issues facing those operations required Magna to outsource a significant amount of business to service existing orders and satisfy customer demand.  Accordingly, even if Defendants were not directly aware of the extent and magnitude of those problems, the magnitude of outsourced business and other matters would have placed them on notice of the significance of the problems such that they knew or should have known that their public statements were materially misleading when made.

## C.    The August 31, 2010 Restructuring Transaction

50.    On August 31, 2010, Magna completed the controversial restructuring transaction, whereby the Company's dual-class share structure was collapsed and Stronach relinquished voting control of the Company in furtherance of his planned exit. Specifically, the arrangement established:

(a)    A single class of voting equity securities, called common shares, each having one vote per share, instead of the Class A shares (which carried one vote each) and Class B shares (which carried 300 votes each) that existed previously. Before the arrangement was completed, the Stronach Trust, which indirectly held all Class B shares, controlled 66% of Magna's voting rights despite ownership of only 0.6% of Magna's total equity. As a result of the transaction, the Stronach Trust received $300 million in cash and nine million newly issued common shares (formerly Class A shares), representing an equity ownership and voting interest of 7.4% as of August 31, 2010.

(b)    A five-year term on, and revised fee schedule for, the Stronach Agreements. The original agreements had paid Stronach and his affiliates, under a formula tied to Magna's Pre-Tax Profits Before Profit Sharing (as defined in Magna's corporate constitution, contained in its Restated Articles of Incorporation dated August 28, 2008), aggregate annual fees of $37,783,000 in 2007, $8,152,000 in 2008, and nothing in 2009. Each of the original contracts also had a one-year term, renewable annually. The amended agreements, which would expire on December 31, 2014 pursuant to a new five-year term (beginning on December 31, 2010), would pay Stronach and his affiliates aggregate annual fees of 2.75% of Magna's Pre-Tax Profits Before Profit Sharing in 2011, 2.5% in 2012, 2.25% in 2013, and 2.0% in 2014.

(c)    A partnership with Stronach to engineer, develop and manufacture electric vehicles, with Magna contributing $220 million for a 73.33% interest and Stronach contributing $80

million for a 26.67% interest, yet receiving effective control of the partnership via a right to appoint three of the five members of the management committee of general partners.

51.     The elements of the transaction involving the purchase of Stronach's Class B shares, together with the formation of the electric car partnership, were valued at nearly $943 million based on the closing price on the NYSE of Magna's Class A shares as of May 5, 2010. As *The Globe and Mail* reported, the value of the deal represented a premium of more than 1,800% to the market value of Stronach's shares. However, as noted above, neither the directors nor management made any effort to reduce the value of the buyout in accordance with the advice of the Board's advisors, which would have cut the value of the deal to $470 million.

**D.     The November 4, 2010 Statements**

52.     On November 4, 2010, Magna issued a press release announcing its financial results for its 2010 fiscal third quarter, the period ended September 30, 2010. For the quarter, the Company reported net income of $241 million, as compared to $51 million for the third quarter of 2009. Magna also reported that EBIT in Europe increased $58 million to $11 million for the third quarter of 2010, due to, among other things, "lower costs incurred related to launches or for programs that have not fully ramped up production; . . . lower warranty costs; and lower restructuring and downsizing costs," as compared to a loss of $47 million for the third quarter of 2009.

53.     In addition, Magna disclosed that positive factors influencing EBIT in Europe were "partially offset" by: (i) "operational inefficiencies and other costs at certain facilities, in particular at certain electronics, and exteriors and interiors systems facilities"; (ii) "employee profit sharing, as no profit sharing was recorded in 2009"; (iii) "higher management compensation"; and (iv) "net customer price concessions subsequent to the third quarter of 2009." Yet, the Company did not disclose the full extent of the "operational inefficiencies" plaguing the interiors/exteriors business.

54. Finally, Magna disclosed that its Board had: (i) approved a two-for-one stock split of its outstanding common shares, implemented by a stock dividend that would provide shareholders with one additional common share of Magna for each common share held; and (ii) declared a cash dividend of $0.36 per share, which equaled $0.18 per share after giving effect to the stock split.

55. During a conference call with investors and analysts that took place on November 4, 2010 concerning the Company's third quarter 2010 financial results, Defendants Walker and Galifi again downplayed the European operations problems. In his prepared remarks, for example, Walker indicated that the Company had a handle on the European operations because, among other things, the Company had made favorable changes to its operating structure and he had visited the operations and would continue to do so, stating, in part:

> Earlier this year we changed our operating structure to global product groups, which has given group management a global mandate and thus full responsibility for all aspects of their business globally. Our global product group presence, along with strong European group managers, have significant experience in the industry and at Magna. As a result I believe we have a strong team to profitably grow Magna's European business.
>
> I'm currently in Europe and in the coming months will spend more time here visiting a number of our European operations, some of which have been underperforming, as well as meeting high-level customers at a number of our European customers.

56. In fact, Walker continued to downplay these operational problems, representing that Magna "ha[s] many operating units that, even at a relatively low production volume, are generating profits and reasonable returns," and that the underperforming "interiors/exteriors operating unit" in Europe had "some strong performing divisions that generate acceptable earnings and returns . . . ." Moreover, he once again represented that he would personally survey the issue, "visiting a number of these plants to better understand the nature of the underperformance . . . ." Specifically, he stated, in part:

We have indicated over the past quarters that our European business has been underperforming and that some restructuring was necessary. I would like to provide some more color on our European operations. *We have many operating units that, even at a relatively low production volume, are generating profits and reasonable returns.* We have Magna Steyr, which, as we have said previously, has undergone a complete relaunch of programs with all but the Mercedes G Class being brand new. Results at Magna Steyr as expected have improved and should continue to improve as we complete the new program launches. In Russia, we announced this past quarter the opening of three new facilities. These facilities will start generating sales in 2011 and will ramp up in 2012, *so right now we're in investment mode and as you know, we each pens running costs as incurred.*

Our electronics business, which has been merged with our powertrain unit, has experienced some launch inefficiencies in its European operations over the past couple of quarters *however we expect to make progress with these issues in the next few quarters.* Our largest areas of underperformance in Europe is in our in interiors/exteriors operating unit. *Even within this unit there are some strong performing divisions that generate acceptable earnings and returns,* however there are a few facilities that are generating significant losses. Our interiors and exteriors team is getting a handle on the issues and developed a plan of action for these divisions. *As I said, I will be visiting a number of these plants to better understand the nature of the underperformance* and I expect that by early in the New Year we'll have a much better position to articulate the action plan for Europe.

57.     In his own prepared remarks, Galifi indicated that Magna had increased its guidance

for the rest of 2010, based, in large part, on the performance of the Company's European operations,

emphasizing that:

- "We expect 2010 European light vehicle production to be approximately 12.6 million units compared to our August outlook of 12 million units."

- "Content per vehicle in Europe is now expected to be in the range of $545 to $555 compared to our previous outlook range of $520 to $545."

- "[W]e now expect complete vehicle assembly sales to be between $2.05 billion and $2.15 billion, up from $1.8 billion to $2.1 billion in our last outlook, due to a higher average Euro than our previous outlook and higher anticipated volumes on assembly programs at Magna Steyr."

58.     Further, Galifi indicated that, "[a]s a result of the increased expectations for vehicle

production and content in both North America and Europe, as well as higher vehicle assembly sales,

we now expect total sales to be in the range of $23.5 billion to $24.0 billion, up from our previous outlook."

59.     In response to an analyst question, Walker confirmed that he assumed responsibility for overseeing the Company's European operations in the wake of the departure of Siegfried Wolf, who formerly held the title of co-CEO along with Walker.  The exchange took place as follows:

Peter Sklar – Nesbitt Burns – Analyst:

Okay. And I just -- with the departure of the co-CEO, Ziggy Wolf, I just want to understand how the management of the European operations has changed. *I believe that operating management before was under Ziggy Wolf and not under Don and now with Don being the sole CEO, that would come under his jurisdiction*. Is that how we should think about it?

Defendant Walker:

Yes, Peter, we had changed our operating group so that each group President had global responsibility last April. A few of them already had global responsibility, *we went to global responsibilities for everybody so they have control of the operations, the capital, the quoting, everything*. So at that point in time, the group Presidents really reported to both Ziggy and I. *Ziggy would focus more on what was going on in the European area*. So we haven't changed that, but what we have done is [Gunther Oppalter] and Manfred Eibeck, two long-term Magna managers are both involved in overseeing the region, supporting activities with the – interfacing with the customers and looking at optimizing the efforts of the group President, [s]o we were already in a transition so this is more just fine tuning.

60.     In response to an analyst question regarding whether European margins could match North America's, Walker again cited the favorable performance of the European operations, again stated that he would personally assess the situation along with the group presidents, and deferred a more complete response until the following quarter, stating, in part:

We do have a number of issues, which affect the margins. We have the launch of the programs in Russia. *We had some electronics launch issues, as well as we had [sic] some underperforming divisions. We also have very good operations here*, so I'm spending the next month here going through the divisions, the group Presidents have [been] involved, as well, so I can give you more detail at the next quarterly call.

61.    In response to an analyst's request for "a rough idea of the magnitude of the drag [Europe is] putting on your operations," Galifi also deferred a meaningful response. Instead, he conveyed the message that the operations were not problematic to the Company's bottom line and that the issue would be revisited in the following quarter, stating, in part:

> [W]hen we look at some of the operations that Don referred to, they're in the red and they're a drag on profitability, but in terms of quantifying that I'm not going to do that for you. *Our focus, as Don talked about, is developing plans to focus on improving overall efficiencies and operating performance and see those operations start to generate some bottom-line results for us.* And the plans are still being worked on. We're right in the middle of business plans and a number of decisions need to be made from a production standpoint or otherwise. I think we're going to be in a better position in the next – I'd say probably next two to three months and the target of giving you an update as we speak through our outlook for 2011.

62.    In response to Defendants' assurances to the market that any problem experienced by the European operations was not materially affecting Magna's financial results, the Company's stock price increased on November 5, 2010 by $2.93 (or 6.26%) to $49.73 per share, on heavy volume of approximately 2.8 million shares traded.

63.    The statements referenced above – that Magna "ha[s] many operating units that, even at a relatively low production volume, are generating profits and reasonable returns," and that the "interiors/exteriors operating unit" in Europe had "some strong performing divisions that generate acceptable earnings and returns" – were misleading in the absence of disclosure concerning the extent and magnitude of the problems that were continuing to affect the interiors/exteriors business and the manner in which they were currently impacting, and reasonably expected to impact, Magna's financial results. Without disclosure of those issues or the true extent of the problems, Defendants painted a misleading picture of the significance and extent of these operational problems, depriving investors of the ability to reasonably ascertain the cause and magnitude of the problems and hence the risk associated with investing in Magna.

64.     Moreover, Defendants misleadingly downplayed the significance of the problems affecting the interiors/exteriors business, by, among other things: (i) coupling the representation that Magna "had some electronics launch issues, as well as we had some underperforming divisions" with the statement "[w]e also have very good operations here," which conveyed the message that any operational problems were meaningfully offset by favorable operations; and (ii) claiming that Magna was focused on "improving overall efficiencies and operating performance," when, in fact, the interiors/exteriors business was, and had been, encountering significant operational problems that were not easily resolved and were becoming increasingly worse.

65.     Further, as a result of Defendants' statements, analysts and the market believed that the Company's European operations problems primarily derived from mispriced contracts cultivated during the global economic downturn in 2008 and 2009. In a November 18, 2011 analyst research report, for example, Credit Suisse noted that "Magna conceded at its analyst day that a 'significant' part of the problem in Europe is a function of mis-priced contracts" taken on "during the downturn." Yet, mispriced contracts alone were not the actual issue; having an overabundance of work that the interiors/exteriors business units could not timely and adequately service, as revealed by the end of the Class Period, was the problem.

66.     Additionally, the statements referenced above in which Walker and Galifi conveyed that Magna had a handle on the problems were false and misleading, because Defendants knew that the issues were worsening. At the same time, however, Defendants' acknowledgement that they had personally visited plants in Europe and would continue to do so confirmed that they had the means to ascertain the true condition of the interiors/exteriors business and used those means, and, therefore, that they knew or should have known that their statements concerning Magna's operational problems in Europe were false and materially misleading when made.

**E.     While the Magnitude of the European Problems is Concealed,
Stronach Continues to Sell Stock and the Media Takes Note**

67.     In a December 20, 2010 article entitled "Stronach sells $124-million of Magna shares," *The Globe and Mail* reported that Stronach had engaged in substantial stock sales, while representing that he would not sell all of his shares. The article provided, in part, as follows:

> Frank Stronach has sold more than two million Magna International Inc. shares in recent weeks to cut his stake in the company to about 6.4 per cent from 7.4 per cent, but says he has no plans to sell all his shares in the auto parts giant that he founded 53 years ago.
>
> Mr. Stronach sold 2.449 million shares between Dec. 7 and Dec. 16 at prices ranging between $50.40 (U.S.) and $51.86 for a total of $124-million. He remains the largest shareholder and chairman of Magna.
>
> The shares are among nine million common shares in Magna he received earlier this year along with $300-million in cash as part of a controversial $860-million buyout of the multiple-voting shares through which he controlled the company since 1978.

68.     The article also reported that Stronach had confirmed that a purpose of the stock sales was to raise cash to fund operations associated with his electric car partnership with Magna, as well as to fund his pursuit of other business prospects, including the buyout of a real estate and racetrack company, MI Developments Inc. ("MID"), launched in October 2010. The article reported, in part:

> As part of the [restructuring] deal, he received part of Magna's E-Car electric vehicle business, which is now a joint venture between Mr. Stronach and Magna.
>
> "I need money for E-Car, I need money for other things I have an interest in," he said Monday.
>
> Among those other things is his planned buyout of the minority shareholders of MI Developments Inc., a real estate and racetrack company that he controls through multiple-voting shares and of which he is also chairman.
>
> Minority shareholders of MI Developments have battled him for years, mainly over loans the company made to Magna Entertainment Corp. (MEC), a racetrack and gambling company in which MI Developments held 59 per cent until MEC tumbled into Chapter 11 bankruptcy protection in the United States in 2009. MI Developments picked up several racetracks and other gambling assets as part of the bankruptcy process.

Mr. Stronach has made a $600-million bid to buy out the minority shareholders of MI Developments at a price of $13 a share.

69.     At that time, however, it was unclear whether Stronach would have to raise his bid to acquire MID, thus naturally raising the question of whether his stock sales would have to continue to generate additional proceeds to fund the acquisition. As the article reported:

Since the bid was launched, however, shares of the company [MID], which owns the land underneath many Magna auto parts plants, have risen to more than $18. They closed at $18.47 (Canadian) on the Toronto Stock Exchange on Monday.

Appraisals and valuations of assets of MI Developments are being performed now, Mr. Stronach said.

He said he's not sure if he'll have to boost his $13-a-share offer to the minority shareholders in light of the increase in the share price since he announced his bid in October. "I have to think about it," he said.

70.     Lastly, the article reported that Stronach's stock sales, and a donation of common shares to the University of Florida, nevertheless left him with a significant remaining investment in Magna, as follows:

Mr. Stronach also donated 29,600 common shares to the University of Florida. The sales and donation leave him with 15.5 million common shares and options to purchase another 2.7 million common shares, of which 183,332 have vested and can be exercised within 60 days.

71.     Accordingly, as the magnitude of Magna's European problems remained concealed, Defendant Stronach engaged in significant stock sales that continued as he took steps to shore up his finances to pursue other business opportunities. Stronach's stock sales during the Class Period are set forth in detail below.

F.     **The January 12, 2011 Statements**

72.     On January 12, 2011, Magna issued a press release announcing its 2011 financial outlook, reporting favorable expectations, as follows:

For the full year 2011, we expect consolidated total sales to be between $25.6 billion and $27.1 billion, and expect consolidated production sales to be between $21.7 billion and $22.7 billion, based on full year 2011 light vehicle production volumes of approximately 12.9 million units in North America and approximately 13.3 million units in Western Europe. We expect full year 2011 production sales to be between $12.7 billion and $13.2 billion in North America, between $7.8 billion and $8.1 billion in Europe and between $1.2 billion and $1.4 billion in Rest of World. We expect full year 2011 complete vehicle assembly sales to be between $2.4 billion and $2.7 billion. We expect our 2011 effective income tax rate to be approximately 20%.

73.     In addition, the Company reported that it expected sales to remain strong, with "the net increase in total production sales *to be split approximately equally* among [its] North America, Europe and Rest of World segments." In fact, Magna "expect[ed] a net increase in total production sales over the two-year period from 2011 to 2013 of approximately $3 billion, based on assumed full year 2013 light vehicle production volumes of approximately 14.8 million units in North America and approximately 14.1 million units in Western Europe."

74.     Commenting on the Company's promising 2011 financial outlook, Defendant Walker expressed confidence in the Company's future prospects, stating:

As 2011 begins, vehicle production is poised for future growth in a number of important markets for us, including North America. Accordingly, our outlook reflects significant sales growth, including expansion in high-growth markets in the next few years. We also have the balance sheet, cash flow generation, engineering and manufacturing footprints, technologies and motivated workforce to support our growth initiatives around the world. These factors combined leave us confident about Magna's future.

75.     Defendants did not mention the European operations problems in the press release.

76.     Also on January 12, 2011, Defendants Walker and Galifi gave a presentation on the Company's behalf, and responded to questions from the audience, at the Deutsche Bank Securities Inc. Global Auto Industry Conference. During the conference, Walker and Galifi downplayed the magnitude and impact of the problems affecting the European operations.

77.     In his prepared remarks, for example, Galifi indicated that Magna's "primary markets of North America and Western Europe are recovering" and commented that although its European

segment was "underperforming recently," the Company was "taking some actions to improve results there and we're going to see some improvements in '11 and in the coming years." In fact, Galifi identified "four broad elements . . . to improve our results in Europe," none of which directly related to addressing issues facing the interiors/exteriors business that were the central source of Magna's problems. According to Galifi:

- "The first relates to launches. Over the next couple of years, we expect to launch a number of new facilities in Eastern Europe, including Russia."

- "Second, operational improvements are planned in a number of our European facilities. This represents basic blocking and tackling that we have done in a number of North American operations over the past few years to improve results."

- "Third, in some areas, where our footprint is not optimal, we will continue to shift our footprint into more cost-competitive facilities, including into the new Eastern European facilities I just noted, as programs allow us, or existing programs end."

- "And finally, while we're not anticipating massive restructuring costs in Europe, there will be incremental restructuring over the next three years in a number of facilities."

78.     Yet, Galifi nevertheless confirmed Magna's guidance, as stated in the press release, that, "[f]rom 2011 to 2013, we expect a net increase in production sales of approximately $3 billion *split roughly equally amongst our three reporting segments* of North America, Europe, and rest-of-world." In fact, he emphasized Magna's expectations for Europe, indicating that "European production sales are expected to be between $7.8 billion and $8.1 billion for 2011, compared to a range of $6.8 billion to $7 billion from our last 2010 outlook." And, he closed his remarks with the following overwhelmingly positive statement:

In summary, *our global positioning is as strong as it has been*, and will get stronger in the years to come. We expect the automotive market's dynamics to benefit us going forward, our performance has been strong, and *our outlook is positive in all key markets*.

79.     Further, in their prepared remarks, Walker and Galifi cited Magna's strong balance sheet and cash flow as a sign of confidence in the Company's current condition and future prospects, with Walker referencing Magna's "very solid balance sheet" and Galifi stating, in part, as follows:

> We continue to have an excellent balance sheet, and we have generated strong cash flow from operations over the past number of years. Even faced with severe production declines in 2009, we were able to generate good, albeit lower cash from operations. Our cash flow bounced back in 2010 at almost $1.3 billion after only three quarters. We had a net cash balance of $1.5 billion, and an additional $1.9 billion in unused credit line at September 30th of 2010.

80.     In response to an analyst's question, Galifi reaffirmed Walker's comments on August 6, 2010 concerning parity between the margins of the North American and European operations, but went a step further. Specifically, Galifi distinguished the North American and European operations on the basis of the inclusion of the Magna Steyr manufacturing facilities in Europe, noting that "[i]f you strip that away and you look at our production division, and you compare some of our good operating divisions in Europe to some good operating divisions in North America, *margins are about the same – some better, some worse, but pretty well in line*." As Galifi remarked: "And so, I think the question you're asking – can you get to North American margins? If the mix of business is identical in Europe, I don't think there's any reason why we can't get there."

81.     Notably, neither Galifi nor Walker acknowledged that operational problems in Europe would adversely affect margins. Rather, they attributed difficulty to achieving parity between North American and European margins to Magna's "footprint" in Europe and the launch of additional facilities there. As Walker explained: "We grew a lot in Europe through acquisitions of relatively weak companies, and the footprint's probably not optimal." Galifi concurred, stating, in part:

> I think when you look at – first of all, in Europe, some of the headwinds are going to be some commodity costs, and, obviously, some give-backs. *And the other thing that's going to hurt us in Europe is the launch of some new facilities*, as we continue to draw [a] manufacturing footprint and begin to launch [our] facilities in Russia.

However, offsetting that – *more than offsetting that is going to be improvements at existing operations and with continual improvements again to take place throughout '11 and continued beyond 2011.* As I noted in my speech, Magna Steyr has now launched the assembly program, so the launch costs that we had in 2010 won't repeat themselves in 2011. So if you add up pluses and minuses, overall, we're expecting European margins to improve '11 versus '10.

82.     Moreover, far from singling out European operational problems, Galifi explained that North American margins would *also* decrease as a result of commodity costs, give-backs, and costs associated with new facilities, as in Europe:

In North America, we do have some headwinds – *commodity costs*, seal and resin, year-over-year is going to be a negative, *incremental give-backs* are going to be a negative. *Again, we've got some costs for some new facilities that'll be a negative*. But offsetting that is going to be the benefit from higher production volumes and the pull through of margin on those higher sales.

So when you, again, put it all together, the North American margins will probably be a little higher in '11 versus '10 as a result of better capacity utilization. In rest-of-world, at this point, relatively small, margins will probably be flat, plus or minus to where they're going to end up in 2010.

83.     Accordingly, Defendants did not provide enough detail about European operational problems for investors to appreciate the full extent, magnitude and cause of the issues or how they would reasonably affect Magna's financial condition. Rather, Defendants continued to mislead the investing public by representing that European margins could achieve parity with North American margins, and that Magna's financial outlook was reasonably achievable, despite the problems facing the interiors/exteriors unit.

84.     For example, as noted above, Defendants claimed, among other things, that: (i) "our global positioning is as strong as it has been"; (ii) "[w]e expect the automotive market's dynamics to benefit us going forward, our performance has been strong, and our outlook is positive in all key markets"; and (iii) excluding Magna Steyr and comparing "good operating divisions in Europe to some good operating divisions in North America, margins [for Europe] are about the same – some

better, some worse, but pretty well in line" with North America's. Yet, Defendants once again failed to fully or fairly describe the operational problems facing the interiors/exteriors business in Europe, which would have placed investors on notice that the problems were more significant than Magna had let on. Consequently, Defendants' representations were false and materially misleading because, again, they did not tell the whole story about Europe or portray it in a non-misleading way.

85. Further, Galifi's representation that "commodity costs," "give-backs" and "the launch of some new facilities" provided Magna with a less-than-optimal footprint that presented challenges for European margins was misleading when made, as was his statement that "more than offsetting that is going to be improvements at existing operations and with continual improvements again to take place throughout '11 and continued beyond." In truth, the operational problems plaguing the European interiors/exteriors business – which Galifi and Walker knew about, but did not mention in their January 12, 2011 statements – presented the most significant challenge to Magna's ability to achieve North American-like margins for its European operations. Moreover, the North American operations did not suffer from the same deficiencies facing Europe's interiors/exteriors business.

86. Additionally, it was misleading (if not false) for Walker to state that "improvements at existing operations" and "continual improvements" during 2011 would offset commodity costs, give-backs and the launch of new facilities in Europe, because those issues were exacerbated by the increasingly worsening problems facing the interiors/exteriors business.

**F.    The February 23, 2011 Statements**

87. On February 23, 2011, Magna issued a press release announcing its financial results for its 2010 fourth quarter and year end, *i.e.*, the periods ended December 31, 2010. Magna reported that revenues for the fourth quarter and year end totaled $6.6 billion and $24.1 billion, respectively, and that its net income for such periods totaled $216 million and $973 million, respectively.

88.     Magna also reported that "EBIT in Europe increased $0.5 billion to $0.1 billion for 2010 compared to a loss of $0.4 billion for 2009," reflecting a $201 million quarterly increase to $4 million, as compared to a $197 million loss for the 2009 fourth quarter. Excluding "unusual items," the increase "was substantially due to increased margins earned on higher sales as a result of higher vehicle production volumes."

89.     According to the Company, factors contributing to the increase in Europe EBIT were "partially offset" by: (i) "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities"; (ii) "employee profit sharing, as no profit sharing was recorded in 2009"; (iii) "higher costs incurred related to launches at our components business, including Russia"; (iv) "higher affiliation fees paid to Corporate"; (v) "increased commodity costs"; (vi) "higher warranty costs"; (vii) "higher incentive compensation"; and (viii) "net customer price concessions subsequent to 2009."

90.     In addition, the Company announced that "[d]ue to continuing strong operating and cash flow performance," its Board had declared a dividend of $0.25 per share for the fourth quarter of 2010, "representing an increase of 39% over the third quarter of 2010 dividend and the third consecutive dividend increase since the reintroduction of the dividend in the first quarter of 2010."

91.     In comments quoted in the press release, Defendant Walker attributed these results to the "strong recovery in vehicle production" in North America and Europe, stating as follows:

> In 2010, Magna benefitted from a strong recovery in vehicle production, both in our primary markets of North America and Western Europe as well as globally. We are positioned to capitalize on continued growth in global vehicle production in 2011 and beyond, as we further expand our manufacturing footprint in a number of growing regions of the world.

92.     During a conference call with investors and analysts that also took place on February 23, 2011 concerning the Company's fourth quarter and year end 2010 financial results, Defendants

Walker and Galifi again downplayed the European operations problems. In his prepared remarks, for example, Walker again indicated that Magna had a handle on those issues, representing that, "as we have stated over the past few quarters, we see a significant earnings opportunity for improving our financial performance in Europe" and, further, promising that "[w]e will see some improvements as a result of the actions being taken over the next few quarters . . . ." And, he confirmed that he was personally aware of the issues, noting that "[f]or some other facilities . . . where we have operational inefficiencies and poorer pricing, the fix is going to be longer-term."

93.     In turn, Galifi reiterated certain financial information reported in the press release, including the following regarding Magna's increase in margins:

> The increase in gross margin percentage was substantially due to the higher vehicle production in both North America and Europe, as well as productivity and efficiency improvements at certain facilities, lower warranty costs, and of significant items in Q4 2009. These factors were partially offset by operational inefficiencies and other costs at certain facilities – in particular, at our exteriors and interiors systems facilities in Europe; additional losses in E-Car; employee profit sharing, as no profit sharing was reported in 2009; and ongoing customer price concessions.

94.     Further, Galifi emphasized that the Company's "balance sheet remains strong, with $2 billion in cash net of debt as of December 31, 2010" and "an additional $1.9 billion in unused credit available . . . from a credit facility that extends until July 2012." In this way, Galifi shifted the focus away from the "operational inefficiencies," which were actually far more significant than mere "inefficiencies" or inconveniences, as his statements implied.

95.     Finally, Galifi outlined Magna's 2011 financial outlook, noting "[a]ll of these ranges are unchanged from our initial 2011 outlook provided in January of this year." He stated, in part:

> We expect consolidated total sales to be between $25.6 billion and $27.1 billion, and expect consolidated production sales to be between $21.7 billion and $22.7 billion, based on light vehicle production of 12.9 million units in North America and 13.3 million units in Europe. We expect the 2011 production sales to be between $12.7 billion and $13.2 billion in North America; between $7.8 billion and $8.1 billion in Europe; and between $1.2 billion and $1.4 billion in rest-of-world.

We expect our 2011 operating margin [earnings before taxes and minority interest], excluding unusual items, to be approximately 5%.

96.     In response to an analyst's comment that Magna was "looking for flat production in Europe" and a request for further guidance regarding the Company's margins, Walker explained that Magna expected its European margin to increase, despite new facility and higher commodity costs, stating, in part:

> In Europe, we have a couple of things going on there. *We're actually overall – the direction for operating margin is up* and we've got a couple things happening there. One is, we should benefit from additional sales and pull-through on those additional sales. We've got commodity costs, as we talked about earlier, being a potential headwind in Europe. But we also have a number of brand-new facilities that are ramping up in Europe, which is going to be a headwind to us.
>
> Certainly, Steyr – launch costs at Steyr on the complete vehicle assembly side, are going to be less in '11 versus '10. But I think when you start to think about some of the other launches going on, that may more than offset what's happening at Steyr. *So overall, we've got some actions in place in Europe. We expect to see some improvement. I think Europe is going to be step-by-step improvement in margins.* It's not going to happen overnight. But what we see, at least in Europe, is heading in the right direction. So that's positive.

97.     In response to analyst questions, Galifi also repeatedly confirmed the expectation that European margins would rise. For example, in response to an analyst's statement that "European margins should go up," Galifi responded: *"That's directionally accurate . . . ."* In response to another question, Galifi elaborated, in part, as follows:

> *In Europe, we are expecting margin improvement.* We do see pull-through on incremental sales, that's significantly higher than our average EBIT in – or average operating income in Europe in 2010. But even when we look at the incremental operating margin in Europe, it's below the pull-through in North America. And part of that relates to our complete vehicle assembly business, where our margins are lower than our production business, and in part reflects that we still need to focus on improving our operations in Europe.
>
> *And offsetting that, the biggest thing there is going to be the additional costs for these facilities in Europe that we're ramping up.*

98.     Yet, Defendants did not acknowledge that Magna had outsourced work as a result of operational problems in Europe until nearly halfway through the conference call – and, even then, they misrepresented *why* Magna was forced to outsource work. The first acknowledgment of these problems – and Magna's efforts to address them – occurred during the following exchange involving Defendants Walker and Galifi:

> Rod Lache – Deutsche Bank – Analyst:
>
> One of the items you cited as a negative was the exterior and interior businesses. You mentioned that as a headwind in your prepared remarks. Are you suggesting that those businesses actually deteriorated in 2010 versus 2009? What exactly is happening there?
>
> Defendant Walker:
>
> There's a couple of facilities and when you look at them, it's a combination of launch costs; it's a combination of new programs, where pricing is not appropriate.
>
> *        *        *
>
> Defendant Galifi:
>
> We're talking about – so we're talking about Europe, Rod – a couple of facilities in Europe – and some inadequate pricing. *We have a bunch of new business coming on, so we're having some operational inefficiencies as we launch those programs. As a result of that, we're outsourcing some work.*
>
> *So what the team is focused on right now is to improve the operational efficiencies that flow through into the facilities. We'll start to insource some of the work, which should help.* And over time, we're going to have to try to deal with pricing. The pricing situation isn't going to be resolved in the short-term. It's going to be a longer-term matter to try to deal with that.

99.     Separately, Walker acknowledged: "We've outsourced some work and I think we're getting our arms around that. By the end of the year, I would hope that, for the most part, we'll have a pretty good handle on them."

100.    Yet, as the above statements demonstrate, Defendants did not publicly acknowledge the full extent or magnitude of the operational problems plaguing the interiors/exteriors business in

Europe or Magna's efforts to address those problems. Nor did Defendants provide any color on the amount of business that Magna was outsourcing as a result of those problems. Rather, Defendants attempted to downplay the significance of those problems by shifting the focus to other, comparably less serious issues affecting the European operations, on one hand, and Magna's favorable financial results and outlook, on the other.

101. For example, the following exchange took place involving Galifi in response to an analyst's request for "a little more color" on why the quarter-over-quarter increase in sales in Europe did not translate into margins as expected:

> David Lim – Wells Fargo Securities – Analyst:
>
> This is David Lim for Rich. I guess the question that I have is, we saw a quarter-over-quarter Q3 to Q4 jump in sales in Europe, but your margins were – the incremental margins from quarter-to-quarter was not exactly what we expected. Can you provide a little more color surrounding that?
>
> Defendant Galifi:
>
> Sure. When you look at production assembly sales, if you back out tooling and engineering, *sales in Europe were up about $390 million*. And the pull-through to the bottom line, there's a number of things that are impacting what's happening. A couple of things – *one is we've got additional warranty costs*, which I think you can track through the notes of the financial statements, in Europe in Q4 versus Q3.
>
> When we start to look at new facilities and launch costs in Europe from Q3 to Q4, *we've seen a jump in those costs as we're looking at – we're launching and ramping up a number of new programs, including facilities in Russia*. We've seen – so it's been a negative. *The positive has certainly been on the assembly side*, as Magna has gone through the launch of them has ramped up production, we've seen positive contribution.

102. Explaining that the $390 million sales in Europe were offset by $120 million due to the impact of foreign exchange rates, Galifi summarized his statements as follows: "[I]ncremental sales ex-translation is about $270 million. So Steyr is positive on the assembly side, offset warranty and potentially new facility costs and ramp-up of launches."

103.     In response to the partial disclosure regarding problems facing the interiors/exteriors

business, Magna's stock price declined from $55.73 per share on February 23, 2011, to $50.42 per

share on February 24, 2011 – a decline of $5.43 per share (or 9.7%) that occurred on extremely

heavy trading volume of more than nine million shares, nearly seven times the prior day's volume.

In fact, the stock reached a low of $47.65 per share during trading on February 24, 2011 – a decline

of $8.08 per share (or 14.5%) – rising slightly before the close of the market.

104.     The statements referenced above regarding the upward direction of operating margins

for the European segment were false and materially misleading when made, because Defendants

knew or should have known, for the reasons previously described, that operational issues affecting

the European interiors/exteriors business were having a materially adverse impact on margins and,

further, that there was a reasonable likelihood that these issues would prevent Magna from achieving

its forecasted financial results.  Moreover, although Defendants acknowledged the need to outsource

work as a result of "operational inefficiencies" in Europe, they misleadingly portrayed the source of

the issue as "new business" and resulting inefficiencies arising from "launch[ing] those programs."

105.     In view of the significance of problems facing the interiors/exteriors business, it was

also misleading for Defendants to represent that "the biggest thing" offsetting positive margins were

"the additional costs" associated with launching "facilities in Europe . . . ."  Likewise, in the absence

of further disclosure concerning the scope, magnitude and reasonably likely impact of issues facing

the interiors/exteriors business, it was misleading for Defendants to reference "additional warranty

costs" and "launching and ramping up a number of new programs" as factors that would negatively

impact margins.  Further, it was misleading for Defendants to claim that "[t]he positive has certainly

been on the assembly side" in the absence of disclosure about the nature of the specific operations

exhibiting the "inefficiencies."

**G.     The March 31, 2011 Statements**

106.     On or about March 31, 2011, Magna issued its 2010 Annual Report, which provided detail concerning its operations for the year ended December 31, 2010. Magna also filed with the SEC on Form 40-F its Annual Report to Shareholders for the year ended December 31, 2010 (the "2010 Form 40-F"), to which a copy of Magna's Annual Information Form for the year ended December 31, 2010 was attached.

107.     In the "Chairman's Message" section of the 2010 Annual Report, Defendant Stronach indicated that, while he was stepping down as Chairman – a position he held "for nearly 40 years" – he would "continue to be involved in an advisory capacity with the Company, including with respect to the long-term strategic direction of Magna, as well as in the management and operation of Magna E-Car Systems." In addition, he noted that "[o]ver the years, one of the achievements I am proud of is the strong management team that I cultivated," and that he "firmly believe[d] that Magna will continue to do well provided that the Company adheres to the operating principles and unique corporate culture that are the foundation of our success."

108.     And, Stronach thanked the management team "*for steering the Company through a very turbulent period*" and commented that "Magna is well positioned to rebound strongly now that the automotive industry is recovering." In this respect, Stronach conveyed the misleading message to the public that the Company had weathered the economic downturn without incident, despite the operational problems that plagued the European interiors/exteriors business but whose magnitude, scope, cause and impact still remained at least partially concealed.

109.     In the "Management's Message to Shareholders" section of the 2010 Annual Report, Defendants Walker and Galifi also spoke favorably about the Company's operations and financial position, representing, in part:

Magna entered 2011 riding a wave of momentum that started in 2010 and has continued to build as the global automotive industry experiences a solid recovery in vehicle production and sales. Despite recent world events, we are confident that 2011 will be another strong year for our industry.

*     *     *

Also in 2010, as a result of our continuing strong operating and cash flow performance, our Board of Directors reinstated our quarterly dividend and subsequently increased the dividend three times since its reinstatement.

110. Commenting further on operations, Walker and Galifi represented that "2010 sales rose sharply – largely due to increases in North American and European vehicle production volumes. Magna sales in 2010 were $24.1 billion, an increase of 39% compared to the previous year." They also cited Magna's balance sheet, noting that Magna occupied "a strong financial position, with net cash of $2 billion and little debt." As Defendants represented: "With a new capital structure and a new global management structure in place, we believe we are now well-positioned to capitalize on business opportunities that arise in the year ahead."

111. Based on Magna's favorable condition, Walker and Galifi expressed optimism about the Company's future prospects, stating that "[g]iven the solid recovery of global vehicle sales and production during the past several quarters, *we are confident that Magna will post strong results again in 2011*." And, they noted that the Company would "also remain focused on increasing our profitability in Europe, through a combination of launching new programs and facilities, improving certain underperforming operations and increasing the competitiveness of our manufacturing footprint in Europe."

112. As with Stronach's comments, however, Walker and Galifi conveyed the misleading message to the public that the Company had weathered the economic downturn without incident, despite the operational problems that plagued the European interiors/exteriors business but whose magnitude, scope, cause and impact still remained at least partially concealed.

113.    In the 2010 Form 40-F, Magna represented that its disclosure controls and procedures

as of December 31, 2010 were "effective," based on an evaluation conducted "under the supervision,

and with the participation of," Walker and Galifi, as CEO and CFO, respectively, as follows:

Disclosure Controls and Procedures

The Registrant maintains disclosure controls and procedures designed to provide reasonable, but not absolute, assurance that material information required to be disclosed in reports under the Exchange Act is communicated in a timely manner to senior management to enable them to make timely decisions regarding public disclosure of such information. The Registrant has conducted an evaluation of the effectiveness of its disclosure controls and procedures as of December 31, 2010 under the supervision, and with the participation of, its Chief Executive Officer and its Executive Vice-President and Chief Financial Officer. ***Based on this evaluation, the Registrant's Chief Executive Officer and its Executive Vice-President and Chief Financial Officer have concluded that the Registrant's disclosure controls and procedures are effective*** in providing reasonable assurance that material information relating to it (including all consolidated subsidiaries) is made known to them and information required to be disclosed by the Registrant is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms.

114.    In the 2010 Form 40-F, Magna also represented that the Company's internal controls

over financial reporting as of December 31, 2010 were "effective," based on the assessment of

Walker and Galifi, as CEO and CFO, respectively.  Magna represented, in part, as follows:

Internal Controls Over Financial Reporting

Management of the Registrant is responsible for establishing and maintaining adequate internal control over financial reporting for the Registrant.

*        *        *

The Registrant's Chief Executive Officer and its Executive Vice-President and Chief Financial Officer have assessed the effectiveness of the Registrant's internal control over financial reporting and have concluded that, as at December 31, 2010, such internal control over financial reporting is effective and that there were no material weaknesses in the Registrant's internal control over financial reporting.

115.     In addition, the 2010 Form 40-F included signed certifications from each of Walker and Galifi, dated March 31, 2011, concerning the adequacy of Magna's disclosure controls and internal controls over financial reporting, as follows:

I, [Defendants Walker and Galifi], certify that:

1.     I have reviewed this annual report on Form 40-F of Magna International Inc. (the issuer");

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4.     The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)     Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)     Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5.     The issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

        a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

        b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

116.     Defendants' representations concerning Magna's compliance with its internal controls were false and misleading when made, because they knew or recklessly disregarded that problems affecting Magna's European interiors/exteriors business were more significant than were previously represented. In fact, as Walker admitted during the Class Period, Defendants visited the European plants at issue and saw firsthand the problems plaguing those operations. Yet, they failed to disclose additional information concerning the problems to render their statements non-misleading. Further, they knew or recklessly ignored that these problems would have a significant adverse impact on the Magna's financial condition, as they were forced to admit at the end of the Class Period.

117.     As a result, Defendants failed to make adequate disclosure in accordance with their stated obligations to do so and, contrary to the certifications that each of Walker and Galifi signed and caused to be publicly disseminated, Magna's disclosure controls were not, in fact, effective.

**H.     The April 20, 2011 Statements**

118.     On April 20, 2011, Defendant Galifi gave a presentation on the Company's behalf, and responded to questions from the audience, at the Bank of America Merrill Lynch New York Auto Summit. During the conference, Galifi reiterated many of the statements he made during the January 12, 2011 Deutsche Bank Securities Inc. Global Auto Industry Conference, and continued to downplay the magnitude and impact of the problems affecting the European operations.

119. For example, Galifi outlined the same four-element plan to improve Magna's results in Europe that he had described during the January 12, 2011 presentation, and, while noting that the European segment "has underperformed recently," he failed to mention the problems plaguing the interiors/exteriors business. Indeed, rather than address these problems, he cited "inefficiencies" and "pricing issues" as factors that attributed to such underperformance, noting that Magna had "moved to a global structure" and "made some management changes" with which he was "pleased."

120. Moreover, he characterized Magna's European operations as the Company's "biggest opportunity" to generate "improvements in earnings and our operating margin," as follows:

> [C]learly the best opportunity for us to generate some improvements in earnings and our operating margin is Europe. When we look at our performance in Europe in 2010, we were slightly above breakeven with a substantial amount of sales . . . . So if we can move up margins by 1% or 2% or 3%, that's significant leverage to the bottom line. That's our biggest opportunity.

121. Defendant Galifi's remarks concerning Magna's European operations were false and materially misleading when made, because he failed to present an accurate portrayal of the factors that were then affecting Magna's financial operations and results. Moreover, by laying out the same plan to improve Magna's results in Europe that he had described in January 2011, he conveyed to the market that the plan that the Company had adopted to improve the European operations *at that time* remained effective in April 2011 and later. Yet, that plan failed to directly address the issues facing the interiors/exteriors business that were the central source of Magna's problems in Europe.

**I. The May 4, 2011 Statements**

122. On May 4, 2011, Magna issued a press release announcing its financial results for its 2011 first quarter, the period ended March 31, 2011. For the quarter, the Company reported sales of $7.2 billion, net income of $322 million, and diluted earnings per share of $1.30, an increase of 34%, $98 million, and $0.31 per share, respectively, from the first quarter of 2010.

123. Magna also reported that "Adjusted EBIT" (*i.e.*, EBIT, excluding unusual items) in Europe increased $27 million to $29 million for the first quarter of 2011, as compared to $2 million for the 2010 first quarter, "primarily as a result of," among other things, "increased margins earned on higher sales as a result of higher vehicle production volumes" and "productivity and efficiency improvements at certain facilities."

124. According to Magna, the factors contributing to this increase in Adjusted EBIT were "partially offset" by: (i) "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities"; (ii) "higher commodity costs"; (iii) "pre-operating costs incurred at new facilities"; and (iv) "net customer price concessions subsequent to the first quarter of 2010."

125. During a conference call with investors and analysts that also took place on May 4, 2011 concerning the Company's first quarter 2011 financial results, Defendants Walker and Galifi provided more detail concerning the European problems, but again downplayed their impact. In his prepared remarks, for example, Walker generally noted the "underperformance in certain divisions" in Europe, but favorably described Magna's financial results in Europe, stating, in part:

> I'd like to take a moment to talk about our European operations. During the first quarter, we generated increased earnings in our European segment. Vince will take you through the details shortly, but the macro level, Magna Steyr improved year-over-year reflecting the stabilization of our assembly operations, which launched a number of new programs in 2010, including programs for new assembly customers. We also had some pull-through and increased sales in Europe. However, *we also continue to have significant underperformance in certain divisions*. Recall that we have indicated that some of the issues in certain of our facilities will not be fixed overnight, but we expect to make steady progress over the next couple of years.

126. Next, Walker indicated that the problems involving the interiors/exteriors business were more significant than Magna had initially let on, confirming for the first time that four facilities in the interiors/exteriors unit accounted for "a combined loss of approximately $50 million" during

the first quarter. Yet, Walker continued to assure analysts and investors that Magna "continue[s] to believe our European operating results will steadily improve over the next 2 years." Walker's comments regarding these issues are as follows:

> In the first quarter, 4 facilities in our Interiors, Exteriors unit generated a combined loss of approximately $50 million. 1 of those facilities has been closed. In addition, we expect the run rate of the loss of those facilities to decrease by almost half by the fourth quarter of this year. Our European results in 2011 are also being negatively impacted by increased commodity costs, as well as a new facility cost I referenced earlier. We have facilities under way, and we are adding a number of new facilities in Europe over the next 2 years. We continue to believe our European operating results will steadily improve over the next 2 years, and Vince will elaborate on our European results later.

127. In his prepared remarks, Galifi indicated that "European production sales increased $479 million, or 28%, to $2.2 billion, from the comparable quarter" and that "Western European vehicle production increased 10%, to 3.7 million units." He also stated, however, that gross margin had decreased for the quarter as compared to the same quarter of the previous year, attributing the decline to various issues facing the European operations, as follows:

> Gross margin in the quarter was 12.2% compared to 12.7% in the first quarter of 2010. The decline in gross margin percentage was substantially due to an increase in complete vehicle assembly sales, which have a lower gross margin than our consolidated average; an increase in tooling sales that have low or no margins; operational inefficiencies and other costs of certain facilities, in particular, at certain Exterior and Interior system facilities in Europe that Don discussed earlier; higher costs related to launches and new facilities; increased commodity costs; pre-operating costs incurred in these facilities; and net customer price concessions, subsequent to the first quarter 2010. These factors were partially offset by increased gross margin earned as a result of significantly higher vehicle production volumes, lower costs incurred related to launches at our complete vehicle assembly operations, and productivity and efficiency improvements at certain facilities.

128. Moreover, while Galifi represented that there was "much room for improvements in our European results," he noted that the business remained profitable, as follows:

> Our European results were hampered by higher commodity costs, higher new facility costs, and acquisition integration costs, partially offset by lower launch costs. So, there is much room for improvements in our European results, but we are making

some progress. One last point about our European business. ***While we are not happy about the overall level of operating performance in Europe, the business overall is profitable. In some business units run at good operating margins and returns on capital, simply getting the underperforming units Don referred to earlier back to breakeven, would add more than a full percentage point to our European operating margin***. In addition, our current operating margin in Europe is being negatively impacted by the significant investments for new facilities.

129.    Further, Galifi emphasized Magna's favorable cash position and balance sheet, noting that the Board had "declared a quarterly dividend of $0.25 per share with respect to our common shares" and indicating that "[o]ur balance sheet remains strong with $1.4 billion in cash net of debt as of March 31, 2011" and "an additional $1.9 billion in unused credit available to us."

130.    Finally, notwithstanding the problems facing the European operations, Galifi affirmed Magna's prior financial guidance, and indicated, in fact, that Magna had increased sales guidance due to "increased expectations for production sales in all segments," stating, in part:

> As a result of the increased expectations for production sales in all segments, lead to higher volumes and the strengthening of certain currencies against the US dollar, as well as higher complete vehicle assembly sales, we now expect total sales to be in the range of $27.1 billion to $28.5 billion. This is up from our previous outlook of $24.8 billion to $26.3 billion. We expect our consolidated operating margin percentage to remain in the low to mid-5% range, and our effective tax rate to be approximately 20%. Both of these are in line with our previous outlook.

131.    In response to an analyst's question, Walker provided further detail on the problems facing the European operations, but again downplayed the issues involving the interiors/exteriors business that resulted in the outsourcing of business by shifting the focus to "a number of different issues." The exchange took place, in pertinent part, as follows:

Pat Nowlan – Deutsche Bank – Analyst:

I just wanted to follow up about the European business. Can you talk about your existing book of business and what's the key drivers there to actually fix that business, whether it's cost? Doesn't appear to be capacity utilization, considering you're launching all these new facilities, so doesn't look like you're going to put new business into existing facilities. So, is it the fact that we have to close facilities or is it just that we have to re-price existing contracts? I'm just trying to get a feel for how quick the existing business could improve[.]

- 44 -

<u>Defendant Walker:</u>

*We talked about 3 significant underperforming divisions. We had another one which we've dealt with just in the past month. The issues are a number of different issues.* One is that we have some business that was under priced so we have the need to go back and fix the pricing or work it out. Another one of the issues was we were over-booked on production so we have had some difficult launches. We've had some excess scrap, premium freight, *we've had to outsource some business* and we're going through some more launches right now and some of those facilities. So, *it's a combination of inefficient operations, higher costs being associated with outsourcing product, high scrap rates, a lot of things that we can get our arms around* but doesn't happen overnight. And some clarity on what the loss were, what we expect them to be at the end of the year. So, I think from a time line standpoint, Vince already talked about what the loss was in Q1. We expect to cut that essentially in half by the end of the year. By next year I would hope by the middle of next year, hopefully we've got them all back to breakeven but I've really only got clarity at this point in time with the action plans we have in place, take us out to the end of this year.

132.     By referencing a raft of other issues in the following exchange with an analyst, Galifi

also downplayed the significance of problems affecting the interiors/exteriors business:

<u>Himanshu Patel – JPMorgan – Analyst:</u>

I wanted to go back to the Europe question. If you take the $50 million loss you mentioned in the four interior, exterior facilities and just kind of assume that's breakeven in Q1 that would kind of get the European margins to 2.5%. I guess the question is, that's better, but definitely still significantly short of North American margins. *Is this really the biggest piece of margin improvement or are there other big buckets that you just haven't quantified* but collectively the impact of some of the other items like launch costs or Russia or whatever could still allow the margins to get a lot better than the 2.5% would imply.

<u>Defendant Galifi:</u>

*I think you're missing a couple of things.* First of all, if you just look at the four operations that Don referred to, one's been closed so we're now left with three. And as Don indicated I think in his formal comments, we had $50 million of losses. So, just getting them to breakeven helps us. Our objective is not to get them to breakeven, it's to generate a positive margin on them. *The next thing that's impacting Europe is new facility costs for a number of facilities.* We have I think just seven or eight facilities, some have been under way in '09 and '10 and are going to be launching at some point, particularly in Russia, in late '11. Some others are going to be launching in '12 and '13.

So, there is a significant amount of investment for new facilities. And again, when you look at Europe's profits and you impact that by new facility costs, that's going to have a negative impact. *And finally, you have Magna. I noted in my formal comments that this year all of contracts right now are on a fully costed basis* which means that we had high sales and high cost of sales and lower margins. That's going to disproportion impact Europe's reported margins versus consolidated margins or North American margins. But having said all that, when if you can back all that out, European margins right now are less than where they are in North America.

133. Moreover, as Galifi spoke about plans to address the three remaining plants suffering from quality control issues (in light of the fourth plant's closure), he acknowledged that the problems had persisted since at least the fourth quarter of 2010, yet claimed that the Company had a "handle" on quality and delivery issues, as follows:

I don't want to say too much about it. Some of it can be operational improvement, getting through some launches, in-sourcing business, reduced premium, freight. *We do have a handle now on the quality and the delivery because we were fighting with that Q4.* So, at least once we get that under control, we're supporting our customer and we can focus on cost optimization. So, we're looking at the various options but don't want to say too much more at this point in time.

134. As a result of Defendants' efforts to downplay problems facing Magna's European operations and the future impact that those issues might have on the Company, an analyst asked why management had not identified the problems earlier and how management knew that similar issues would not arise in the future. In response, Walker represented that the management teams had "good control of their business" and that Magna had "done a pretty deep dive across the plants" to rule out "any brand-new issues coming out of the woodwork," as the following exchange demonstrates:

Michael Alenzy – CIBC World Markets – Analyst:

Okay. And then just going back to Europe. *Looks like there were quite a few issues, you mentioned earlier the poor pricing on some contracts, some overbooked business.* Just wondering in North America coming out of the downturn, you're able to hit some pretty good margins very quickly. *What happened in Europe, from a managerial operational standpoint that these problems weren't recognized earlier and how do we know issues don't come out in 2012, 2013 in a similar nature?* Just any kind of color you can add there.

- 46 -

Defendant Walker:

Okay. *We have a lot of operations in Europe that are quite good, good management teams, they've got good control of their business.* We had a number of divisions that for whatever reason didn't properly quote or book business or get ready for the launch. I'm not sure whether that's because we cut some of the overhead out to effectively launch this business but we certainly had – we've had some issues. *We've done a pretty deep dive across the plants. I'll never say never but I'm not anticipating any brand-new issues coming out of the woodwork. We've been back up. Production's picked back up for a while now.* We do have a lot of new launches going on which hopefully is good. So, I don't anticipate anything major beyond what we're already working on there. As I say, a lot of the divisions are quite good, good technology, they're running well. So, it's a handful of about 10, 11 divisions that we're really focused on. We talked about the 3 – the 4 – 3 big ones and the 1 that's already been dealt with.

135. In response to the partial disclosure regarding problems facing the interiors/exteriors business, Magna's stock price declined from $51.39 per share on May 4, 2011, to $50.25 per share on May 5, 2011 – a decline of $1.14 per share (or 2.2%) – on heavier-than-normal trading volume.

136. By representing that the interiors/exteriors business in Europe was "underperforming" yet "profitable," and listing "operational inefficiencies" as a factor that, along with several others, caused a "decline in gross margin percentage," Defendants downplayed the significance of the problems affecting the interiors/exteriors business. Moreover, Defendants' description of the issues facing the production facilities, while more detailed than previous disclosures, were incomplete and thus misleading in the absence of additional information regarding the scope and magnitude of the problems, and, by extension, how those problems were reasonably likely to affect the Company's financial results and future earnings. Further, Defendants' statements were false and misleading when made because, by their admission, Defendants personally monitored the performance of the European interiors/exteriors business and had "done a pretty deep dive across the plants."

137. As a result, the extent and magnitude of the problems facing the European operations remained concealed, as Defendants' statements convinced investors and analysts to focus on positive aspects of Magna's financial results.

138.    In a May 5, 2011 research report, for example, Credit Suisse commented that "MGA reported solid 1Q11 adjusted EPS of $1.34, well above the Street estimate of $1.14 and our forecast of $1.07." Further, while Credit Suisse recognized that "European margins were once again anemic at 0.9% vs 0.7% last qtr (on a 9% q/q increase in revenues)," it nevertheless concluded that "Magna does appear to be getting a better handle on its [sic] some of its poorly performing facilities." Ultimately, Credit Suisse raised its 12-month target price for Magna stock from $59 to $61 per share.

## J.    While the Full Extent of the European Problems Remains Concealed, Stronach Continues to Sell Stock and the Media Again Takes Note

139.    On June 21, 2011, *The Globe and Mail* published an article entitled "Frank Stronach sells large stake in Magna," in which it reported that Stronach continued selling stock to fund other business pursuits, including his electric car partnership with Magna.  The article reported, in part:

> Frank Stronach, who held an iron grip on Magna International Inc. for more than three decades through multiple-voting shares, has sold off so much of his holding that he is no longer one of the largest shareholders in the auto parts giant.

> Mr. Stronach has sold more than six million shares of Magna this month, slashing his stake to just one million shares and giving him a position considerably smaller than the institutions he battled with for years at Magna and two other publicly traded companies he controlled, MI Developments Inc. and Magna Entertainment Corp.

> ***The sale of 6.1 million shares in June at prices ranging from $45 (U.S.) to $48.05 has given him slightly less than $300-million cash as he pursues new opportunities since resigning as chairman of Magna earlier this year***. The sale of shares was revealed in filings with securities regulators.

> He has been selling shares gradually since last fall when a controversial $863-million deal to buy out his multiple-voting shares in Magna was approved by regulators and the Ontario Superior Court.

> He agreed to sell the multiple-voting shares back to Magna for $300-million in cash, nine million common shares and control of a joint venture with Magna that will develop electric vehicles. Since then, Magna has split its stock and increased its dividend.

In interviews before and after Magna's annual meeting last month, **Mr. Stronach noted that the electric vehicle business requires infusions of cash, in part because the costs of developing vehicles and components are so high.**

140.     The article also explained that Stronach continued to pursue opportunities in the horse racing business and other industries, as follows:

> In a deal scheduled to close at the end of this month and similar to the Magna transaction, Mr. Stronach will surrender his multiple-voting shares in MI Developments for that company's interests in the tracks and horse racing assets.
>
> Penn National Gaming Inc., the joint venture partner in the Maryland tracks, said last week that it has agreed to sell its interest in them to Stron-MJC LP, an entity controlled by Mr. Stronach.
>
> In addition to the horse racing business and the electric vehicle venture, Mr. Stronach told The Globe and Mail last month that he plans to invest in several other businesses now that he is free of oversight from securities regulators and challenges from minority shareholders.
>
> Among those ventures are organic beef farming, health care clinics and a business developing electric bicycles and boats that was started by his long-time colleague and former Magna senior executive Fred Gingl.

141.     The next day, on June 22, 2011, *Bloomberg News* ran an article entitled "Magna's Stronach Sells $837.9 Million Stake Since Dec. 9," in which it also reported that Stronach had significantly reduced his stake in Magna in the wake of the restructuring transaction.  The article provided, in part, as follows:

> Magna International Inc. (MG)'s founder and director, Frank Stronach, has sold about 16.9 million shares, or $837.9 million, of the company since December, reducing his stake to 1 million shares as he cedes control of North America's largest auto-parts supplier.
>
> Stronach sold the shares through 446 Holdings Inc. [which, in turn, is owned by the Stronach Trust] from December 9 to June 17 at prices ranging from $45 to $52.56, according to the System for Electronic Disclosure by Insiders, a Canadian website used to file insider reports to provincial securities regulators.

*     *     *

Magna simplified its corporate structure last year, consolidating the role of chief executive officer in Don Walker and eliminating its dual-class share structure. The changes ended Stronach's control of the company and gave the Stronach trust cash and shares valued at $970 million when shareholders approved the change in July 2010.

*    *    *

Magna had 241.9 million shares outstanding as of March 31, according to data compiled by Bloomberg. As of January, he was Magna's largest shareholder.

142.    Further, in a June 28, 2011 article entitled "Stronach sells $850 million worth of stock ahead of takeover of MI Developments racing assets," *The Daily Racing Forum* linked Stronach's stock sales to efforts to shore up his personal finances in case additional funding was needed to finance his gaming and horse racing ventures upon acquiring MDI. The article provided, in part, as follows:

Frank Stronach, who is set to take over the racing and gambling assets owned by MI Developments on Thursday, has sold approximately $850 million of stock in the auto-parts company he founded since December, according to regulatory filings.

The massive series of sales underlines Stronach's financial strength on the eve of the transfer, which will give the 78-year-old billionaire total control of some of racing's most high-profile tracks, including Santa Anita Park in California and Gulfstream Park in Florida. In a deal approved by shareholders of MI Developments earlier this year, Stronach will take over the assets in exchange for giving up his control of MI Developments, satisfying stockholders who had been critical of the company's commitment to assets that had already led one publicly traded company, Magna Entertainment, into bankruptcy, wiping out hundreds of millions of dollars in shareholder equity and bad debt.

143.    As the article further reported, Stronach's personal finances were intended to serve as a "backstop" to the company formed to operate the ventures – named the Stronach Group – despite that it was expected to "rely" on the cash flow generated by the properties it owned. In view of the "decade of losses" associated with the assets, however, the article reported that it was unlikely that the Stronach Group could endure based on the cash flow generated by those properties. Specifically, the article provided, in part, as follows:

The new company, which is being called the Stronach Group, will rely entirely on the cash flow generated by the properties, which also include a casino at Gulfstream Park; Laurel Park and Pimlico Racecourse in Maryland; an account-wagering company, XpressBet; and a half-stake in the racing broadcaster HRTV. *Given the history of the assets – more than a decade of losses, even after being propped up by generous loans from Stronach-controlled companies – the outlook for the new company can't be considered positive*, especially when considering the significant financial strains of the racing industry at large.

*However, Stronach's personal fortune also will provide a substantial backstop to the company should the businesses falter. In fact, Stronach has recently indicated in interviews that he is willing to invest heavily in the new racing business as part of his legacy*, in part because he will not have shareholders to push back against his proposals.

"I've still got 1,000 ideas, and I feel so constrained," Stronach said in an interview with the Globe and Mail in Toronto, where Magna International and MI Developments are headquartered. "For every tiny little thing [to get approved], it's an enormous waste of energy. We're killing entrepreneurship."

144.    Further, according to the article, management of the Stronach Group believed that Stronach would provide additional funding, if needed. In this respect, the article provided, in part, as follows:

The new company will be headed up by Greg Avioli, the former chief executive of Breeders' Cup. Avioli has said that the Stronach Group considers the racetracks to be "well-capitalized," but *he also said that he expects Stronach to provide funding to the company if its cash needs run short*.

*"If we do need additional capital, I'm fully confident for good reasons that we will be able to get that capital from the Stronach Group,"* Avioli said.

Stronach's daughter, Belinda, a former member of the Canadian House of Commons from 2004 to 2008, also will be part of the Stronach Group's management, Avioli said. She is currently the vice chairman of Magna International and the chair of the Belinda Stronach Foundation, a charitable group.

145.    Thus, Stronach continued to shore up his personal finances to fund his other business pursuits through massive stock sales as Magna slowly revealed the truth about its troubled European operations, and his influence on Magna remained strong even toward the end of the Class Period.

**K.  The July 2011 Credit Facility**

146.    On July 11, 2011, Magna announced that it had entered into a $2.25 billion four-year revolving credit facility, "available to Magna and its subsidiaries in North America, Europe and Asia," which replaced a $2 billion revolving credit facility scheduled to expire on July 31, 2012.

**L.  The August 5, 2011 Statements; End of the Class Period**

147.    The Class Period ends on August 5, 2011. On that date, Magna issued a press release announcing its financial results for its 2011 fiscal second quarter and the first six months of 2011, *i.e.*, the periods ended June 30, 2011. For the quarter, the Company announced net income of $282 million and diluted earnings per share of $1.15, representing decreases of $12 million and $0.15 per share, respectively, for the second quarter of 2010 – significantly less than Wall Street estimates.

148.    In addition, Magna reported that Adjusted EBIT in Europe decreased $96 million to a loss of $13 million for the second quarter of 2011, as compared to income of $83 million for the second quarter of 2010, "primarily as a result of": (i) "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities"; (ii) "favourable settlement of certain commercial items in the second quarter of 2010"; (iii) "pre-operating costs incurred at new facilities"; (iv) "higher commodity costs"; (v) "recovery, in the second quarter of 2010, of receivables previously provided for"; and (vi) "net customer price concessions subsequent to the second quarter of 2010." Magna also reported that Adjusted EBIT in Europe decreased $69 million to $16 million for the first six months of 2011, as compared to $85 million for the first six months of 2010, "primarily as a result" of similar, if not the same, factors.

149.    Magna disclosed that negative factors influencing Adjusted EBIT in Europe for the second quarter of 2011 were "partially offset" by: (i) "lower costs incurred related to launches at our complete vehicle assembly operations"; (ii) "increased margins earned on higher production sales";

(iii) "productivity and efficiency improvements at certain facilities"; and (iv) "higher equity income." Further, Magna disclosed that similar, if not the same, factors influenced Adjusted EBIT in Europe for the first six months of 2011.

150. In the press release, Magna confirmed that problems facing its European operations were a significant cause of the Company's unfavorable financial results, stating, in part:

> Despite the increase in total sales, our operating income decreased $5 million to $362 million in the second quarter of 2011, compared to $367 million in the second quarter of 2010. Operational inefficiencies and other costs, in particular at our exteriors and interiors systems business in Europe, higher commodity costs, new facility costs incurred to support our growth around the world, as well as the favourable settlement of certain commercial items during the second quarter of 2010 were the primary factors behind the decrease, more than offsetting the operating income earned on the increased sales in the second quarter of 2011 combined with the net positive impact from the unusual items in the second quarters of 2010 and 2011.

> Our top priority continues to be the improvement of our underperforming operations in Europe.

151. During a conference call with investors and analysts that also took place on August 5, 2011 concerning the Company's second quarter 2011 financial results, Defendants Walker and Galifi finally came clean about the extent and magnitude of the problems facing the interiors/exteriors business. In his prepared remarks, Walker was forced to admit that the European segment had missed Magna's "internal forecast for the quarter" and that the interiors/exteriors business "lost even more in the second quarter on higher sales," stating, in part:

> Our Europe segment under performed again in the second quarter, missing our internal forecast for the quarter. *The exteriors and interiors facilities that lost approximately $50 million in the first quarter, lost even more in the second quarter on higher sales*. In addition, certain other exteriors and interiors operations struggled in the quarter.

152.    In addition, Walker explained that Magna had chosen to take the extraordinary step of

selling one of the underperforming facilities, with the transaction to close during the third quarter, at

a loss of approximately $100 million *on top of* the facility's operating loss of $25 million:

> Improving results at our underperforming divisions in Europe remains our number-
> one priority and we are taking appropriate steps to address the issues. Specifically,
> we announced today that we reached an agreement to sell one of these 3 remaining
> facilities, one of these three significant underperforming exterior and interior
> operations. The purchaser will assume the business effective July 1, and we will
> incur a charge of approximately $100 million in the transaction. The sale is expected
> to close later this quarter. The year-to-date sales of the operation to be sold were over
> $100 million, and the year-to-date loss amounted to approximately $25 million.

153.    In his prepared remarks, Galifi confirmed that the failing interiors/exteriors business

primarily accounted for the decline in Europe EBIT, and also noted that the three remaining facilities

had resulted in combined losses of nearly $60 million in the second quarter alone, stating, in part:

> The largest factor negatively impacting our EBIT sequentially was the under
> performance of certain facilities, particularly in our exteriors, interiors businesses.
> The 4 identified last quarter lost approximately $50 million in Q1 and about $60
> million in Q2.

154.    In turn, Louis Tonelli, Magna's Vice President, Investor Relations, echoed this point,

noting that the Company now expected its operating margin to be approximately 5%, down from its

prior outlook of the low-to-mid 5% range, explaining: "*The reduced margin outlook relates entirely

to our under performance in Europe, including the second quarter under performance*."

155.    In response to an analyst's request for additional detail concerning the revised margin

outlook, Galifi similarly confirmed that "[t]he deterioration in margin from sort of our prior outlook

to where we are today is attributable entirely to Europe."

156.    Moreover, in response to an analyst's request for more detail concerning the source

and extent of the operations problems, Walker finally confirmed that the most significant problem

affecting the interiors/exteriors businesses concerned quality control issues, brought about by an

- 54 -

overabundance of "underpriced product" that Magna could not properly process. He also confirmed that Magna was forced to outsource business, which increased the cost of the work. The exchange took place, in pertinent part, as follows:

Richard Kwas – Wells Fargo Securities – Analyst:

And then, Don, could you just [give] a little more color on Europe? Just as we think about it with the interior and exteriors business. How much of this is related to supplier issues?

How much of it is related to just bad pricing with the contracts that were signed a few years back? And then, how much – it sounds obviously like there's some issues with the operations, the core operations, but *if you could just kind of break out the buckets of what's impacting you the most over there*?

Defendant Walker:

I won't even try and do it by dollars but the biggest impact is, in the downturn, there was an effort to – rather than aggressively restructure was to try and keep our plants full, and I won't go through the reasons why but we've got some under priced product in a number of our plants. So that's the number one reason. And then we've got some raw material increases which doesn't help.

We've also, because the market came back faster and stronger than people had anticipated a couple of years ago, *we've actually got a couple of plants where we've got more than 100% capacity and they are mainly in the couple of plants that – painting. So we've had some quality problems, we haven't been able to meet the expectations of some customers and that's driven a downward spiral.*

So if you have quality issues getting containment, containment, mean we have outside people checking the parts, you have two or three people looking at it which means scrap rates go up, which means you have to repaint, throws your schedule off. *We've had to outsource because of that, that's a very expensive piece price standpoint and transportation standpoint, extra handling.* So in a paint job, you're either sort of continually improving or going in a downward spiral. We've been in a downward spiral in a couple of our facilities. I think we are getting our arms around it. We're having a lot of discussion with customers, looking at battery samples, trying to reduce the logistics, trying to [insort,] get the product back inside our plants *and it's a staggering amount of money and a lot of extra people, so that is the biggest single factor in the major facilities we've been talking about.*

157.    As the exchange continued, Walker admitted that operational problems affecting the interiors/exteriors businesses had occurred for at least "three or four months." In addition, during the

course of the question-and-answer session, Walker revealed that the sold facility handled carpet, while the other two (the fourth was closed earlier) handled molding/paint. And, Galifi indicated that Magna expected to lose between $20 million and $25 million at the two remaining facilities as late as the fourth quarter.

158.     In closing, Walker acknowledged the significance of the European problems, stating:

> I just want to reiterate, it was a tough quarter for us in Europe. We've got a lot of people focused on it. We do have a lot of very good operations and a lot of very good people in Europe as well. So we will continue to address the under performers and we expect to improve our results in Europe going forward.

159.     In response to Defendants' disclosure of the extent and magnitude of the problems affecting Magna's interiors/exteriors operations in Europe and the financial impact associated with those problems, the price of Magna common stock dropped, on extremely heavy volume of more than 6.3 million shares traded, from $44.24 per share on August 4, 2011 to $39.42 on August 5, 2011 – a $4.82 per share (or 10.9%) drop – as the artificial inflation came out of the price of Magna stock. In fact, the stock price had dropped to a low of $33.60 per share on August 5, 2011 – a decline of $10.64 per share – before climbing to its closing price.

160.     And, Magna's stock price continued to decline on August 6, 2011 in response to this news, dropping $4.34 (or 11%), on volume of nearly 2.4 million shares traded, to $35.08 per share.

**M.     Concerns Mount As a Result of the August 5, 2011 Revelations**

161.     After Magna's August 5, 2011 earnings announcement and conference call, the media and securities analysts reported mounting concern as a result of the problems plaguing Magna's European operations.

162.     For example, an August 5, 2011 article published by *The Globe and Mail* entitled "Magna shares tumble on second-quarter report," reported that "[a] feeble showing at its European unit hampered Magna International Inc. in the second quarter, rattling investors and raising concerns

about the auto parts giant's escalating expenses." As the article further reported, "Magna's second-quarter profit slipped 4 per cent to $282-million (U.S.) or $1.15 a share, down from $294-million or $1.30 a year earlier. Its latest adjusted share profit of $1.11 fell short of analysts' expectations for $1.36." The article attributed the Company's disappointing results – and ensuing stock drop – to the European operations, notwithstanding a significant increase in sales:

> Magna shares tumbled as much as 25 per cent on Friday morning, before regaining some of the lost ground to finish down nearly 12 per cent to $38.80 (Canadian). The cost of goods sold surged $1.4 billion (U.S.), or 27 per cent, to $6.5-billion in the second quarter.

> Magna, founded in a Toronto garage in 1957 by Frank Stronach, saw its second-quarter revenue jump 24 per cent to $7.3-billion, *but the struggles in Europe – where the company suffered a $60-million loss in its exteriors and interiors business – overshadowed those gains*.

163. On August 8, 2011, Wells Fargo Securities, LLC ("Wells Fargo") issued a research report, based on Magna's August 5, 2011 earnings announcement and conference call, noting that "Q2 profit results were materially below estimates." As Wells Fargo explained: "MGA reported Q2 EPS of $1.11 (ex one-time gain of approximately $0.04) versus our $1.53E and the Street consensus of $1.36." In response, Wells Fargo revised its estimates for the Company, as follows:

> We have lowered our 2011E EPS to $4.46 (from $5.13) and reduced [its] 2012E EPS to $5.05 (from $5.60). Our new valuation range is $43-45 (from $57-61) which applies an EV/EBITDA multiple of 3.2-3.4x to our 2012 EBITDA estimate. Our multiple range is below historical median due [sic] given the lack of visibility in the company's European operations.

164. In addition, Wells Fargo reported that it had reduced its pre-tax margin estimate to 4.9%, as compared to 5.7% previously (and Magna's then-current estimate of 5%), resulting in an impact to earnings per share of minus $0.62.

165. Also on August 8, 2011, Credit Suisse issued a report in which it noted that Magna's earnings per share of $1.11 fell "well below our forecast of $1.50 and the Street estimate of $1.36."

As Credit Suisse explained: "While MGA's North America division put up a decent 9.5% operating margin in 2Q, *the focus for most investors was the weak European results*, with revs of $2.26 bln (vs our $2.30 bln) with an adjusted EBIT loss of $13 mln vs our est. of +$49mln." It further noted:

> The biggest problem in Europe was the underperformance of 3 (was 4 in 1Q11) interiors/exteriors facilities, which posted combined losses of $60 mln in 2Q (vs a combined $50 mln loss in 1Q on 4 facilities). The underperformance at these facilities primarily relates to under-pricing on some of its existing business, overbooked production (thus leading to excess scrap/freight costs), and quality control issues.

> After selling one of these facilities in 1Q, Magna announce [sic] the sale of a second facility, which is set to close at the end of 3Q. MGA is expected to post an $100 mln charge related to sale of this facility, indicating that the company had to essentially pay another purchaser to help unload this plant.

> By 4Q11, Magna expects the combined losses at the remaining 2 facilities will be $20-$25 mln, compared to its 1Q forecast of $25 mln. However, MGA's first quarter forecast was based on the company having 3 underperforming facilities by 4Q, indicating that losses are actually going to get worse at the remaining 2 facilities in 2H11.

166.    As a result, Credit Suisse lowered estimates for Magna across-the-board by, among other things, reducing its estimate for Magna's fiscal year 2011 operating margin from 5.4% to 4.6% (below Magna's 5% estimate), and lowering its target price for Magna from $61 to $60 per share.

167.    Additionally, Canaccord Genuity ("Canaccord") issued a report on August 8, 2011, noting that "Magna's adjusted EPS fell significantly short of our and consensus expectations . . . largely due to surprisingly weak European margins." As Canaccord explained:

> Magna's (MGA's) Q2/11 adjusted EPS of $1.11 was well below our $1.35 forecast and the consensus mean of $1.38. Margin guidance was also cut a bit. European operational problems were the main culprits.

> \*       \*       \*

> Things got worse at MGA's underperforming European plants, and other European operation results also deteriorated. These problems also caused the company to reduce its operation (pre-tax) margin guidance to roughly 5% from its previous low-mid 5% range.

168.    Moreover, although Canaccord concluded in the report that the "European situation went backward in Q2/11" based on Magna's description of problems affecting two of the facilities, it acknowledged that management had largely kept investors in the dark about the third:

> On the operational side, problems are occurring at two plastic moulding/painting facilities. It appears that these plants have quality issues, which are resulting in excess scrap and poor first-time yield. These are creating a downward spiral as intense delivery pressure has resulted in increased product rework, greater labour costs, increased outsourcing and greater use of expedited shipping.

> We are less clear about what is going wrong at the third remaining problem facility (a carpet plant, we believe), but that should not matter as MGA is selling the facility.

169.    On August 9, 2011, J.P.Morgan issued its own report, indicating that Magna made "perhaps the most direct statement yet that [it] is most likely seeking to sell or totally exit its European interiors business . . . ." J.P.Morgan further noted that management had suggested that Magna's losses from these businesses were worsening, commenting, in part, as follows:

> [M]anagement's most recent commentary suggests that underlying losses of the business may be getting slightly worse than earlier anticipated. *In fact, management seemed to go out of its way to highlight that the business had missed MGA's internal profitability metric,* suggesting a desire to communicate as such to OEM customers (MGA identified underwater contract pricing as the main issue at this business) and perhaps also to signal a medium-term desire to shrink or all together [sic] exit this business.

170.    Moreover, J.P.Morgan expressed surprise that Magna expected losses to increase now that only two problem plants remained, stating, in part:

> By way of background, MGA sold off one of its four underperforming plants earlier this year and announced on its conference call that it plans to sell an additional one in 4Q. In 2Q, the three facilities in MGA's profile reported a loss of ~$60MM, higher than the earlier guided $50MM, and management expects losses to worsen on a per-plant basis. Previously, MGA had talked about a loss of $25MM in the year for three facilities; *however, now management expects 3Q and 4Q to be impacted more with two plants generating $20-$25MM losses.*

171.    Accordingly, these and other analysts reduced their estimates of Magna's financial

performance based on the August 5, 2011 revelation that problems facing the European operations –

and, in particular, the interiors/exteriors facilities – directly resulted in a reduction of the Company's

earnings per share and other key financial metrics.

**N.    Subsequent Developments**

172.    Subsequently, Defendant Walker admitted that the Company's European operations

had been struggling "all year." During the November 3, 2011 conference call following the 2011

third quarter earnings announcement, Walker confirmed that "we've been struggling all year on a

number of issues" related to those operations. As he explained: "We had quality problems which

was [sic] delivery problems . . . . The customers were drawing the product faster than we could

make it. So they are asking us for higher volumes." He also confirmed that Magna had a team in

place to address the issues, stating, in part: "I think we have a pretty good handle on what the issues

are. We're pretty well on top of all the quality issues and the delivery issues . . . . I'm relatively

comfortable that we understand what the issues are, *we put the team in place to try and deal with*

*these*, we have got a lot of action plans going forward."

173.    The problems described in the preceding paragraph and above were of such a nature

as to have been ongoing during the Class Period, because, as Walker recognized, such operational

problems do not materialize overnight. Moreover, the problems concerned Magna's core European

operations, about which the Company's management and/or directors knew or should have known.

In fact, Defendants made repeated representations during the Class period concerning the European

operations, which suggests that they knew or should have known about the problems affecting those

operations.

174.     The market for Magna common stock was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and omissions and the market's subsequent digestion of public information concerning Magna's business, prospects and operations, Defendants' conduct created in the market an unrealistically positive assessment of Magna and its business, prospects and operations. Consequently, Magna's common stock traded at artificially inflated prices during the Class Period.

175.     Plaintiff and other members of the Class purchased or otherwise acquired Magna's common stock in reliance on the integrity of its market price and market information relating to it, and were damaged thereby. Accordingly, Defendants' material misrepresentations and omissions directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.

### Additional Scienter Allegations

176.     Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the market during the Class Period were materially false and misleading. By virtue of their receipt of information reflecting the true facts regarding Magna and their control over, and/or receipt or modification of, Magna's allegedly materially misleading misstatements, they were active and culpable participants in the fraud alleged, which fraud could not have occurred without their knowledge and/or complicity. Moreover, each of the Individual Defendants is responsible for the accuracy of Magna's corporate statements and is responsible and liable for the representations contained therein. Thus, Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

- 61 -

177. Further, Defendants were motivated to engage in this fraudulent course of conduct in order to allow high-level Company officers to sell shares of their personally-held Magna common stock at inflated prices that yielded them proceeds in excess of $940 million during the Class Period, as the chart below, which is based on publicly available information, details:

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Demel, Herbert H. | Senior Officer | 04-Mar-2011 | 33,333 | $50.29 | $1,676,317 |
| Eibeck, Manfred | Senior Officer | 02-Mar-2011 | 33,334 | $49.89 | $1,663,033 |
| Neeb, Marc J. | Senior Officer | 08-Nov-2010 | 8,000 | $97.89 | $783,120 |
| | | 21-Dec-2010 | 50,000 | $52.56 | $2,628,000 |
| | | | 58,000 | | $3,411,120 |
| Palmer, Jeffrey O. | Senior Officer | 06-Dec-2010 | 63,225 | $51.49 | $3,255,455 |
| | | 07-Dec-2010 | 3,441 | $51.01 | $175,525 |
| | | 23-Dec-2010 | 50,000 | $52.08 | $2,604,000 |
| | | | 146,666 | | $7,763,343 |
| Skudutis, Tommy J. | Director or Senior Officer | 01-Mar-2011 | 32,634 | $49.76 | $1,623,868 |
| | | 01-Mar-2011 | 600 | $49.77 | $29,862 |
| | | 01-Mar-2011 | 100 | $49.78 | $4,978 |
| | | 09-Mar-2011 | 50,000 | $50.90 | $2,545,000 |
| | | | 83,334 | | $4,203,708 |
| Stronach, Frank, via the Stronach Trust | Founder/Chairman/Defendant | 07-Dec-2010 | 100,450 | $51.51 | $5,174,180 |
| | | 08-Dec-2010 | 274,459 | $50.70 | $13,915,071 |
| | | 09-Dec-2010 | 374,177 | $50.54 | $18,910,906 |
| | | 10-Dec-2010 | 100,029 | $50.51 | $5,052,465 |
| | | 13-Dec-2010 | 361,586 | $50.51 | $18,263,709 |
| | | 14-Dec-2010 | 621,463 | $50.20 | $31,197,443 |
| | | 15-Dec-2010 | 95,238 | $50.50 | $4,809,519 |
| | | 16-Dec-2010 | 522,268 | $50.73 | $26,494,656 |
| | | 17-Dec-2010 | 550,330 | $51.12 | $28,132,870 |
| | | 17-Dec-2010 | 423,281 | $51.14 | $21,646,590 |
| | | 20-Dec-2010 | 594,909 | $51.07 | $30,382,003 |
| | | 21-Dec-2010 | 141,000 | $51.03 | $7,195,230 |
| | | 22-Dec-2010 | 1,350,444 | $52.08 | $70,331,124 |
| | | 23-Dec-2010 | 434,772 | $52.01 | $22,612,492 |
| | | 27-Dec-2010 | 88,828 | $52.00 | $4,619,056 |
| | | 28-Dec-2010 | 3,800 | $52.04 | $197,752 |
| | | 29-Dec-2010 | 13,800 | $52.56 | $725,328 |
| | | 30-Dec-2010 | 237,648 | $52.02 | $12,362,449 |
| | | 31-Dec-2010 | 355,702 | $52.00 | $18,496,504 |
| | | 18-Mar-2011 | 55,216 | $50.33 | $2,779,021 |
| | | 21-Mar-2011 | 646,398 | $50.29 | $32,507,355 |
| | | 22-Mar-2011 | 5,146 | $50.25 | $258,587 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Stronach, Frank | | 24-Mar-2011 | 505,114 | $50.03 | $25,270,853 |
| (Continued) | | 25-Mar-2011 | 23,005 | $50.00 | $1,150,250 |
| | | 09-May-2011 | 616,837 | $52.53 | $32,402,448 |
| | | 09-May-2011 | 616,837 | $52.53 | $32,402,448 |
| | | 10-May-2011 | 600,000 | $52.04 | $31,224,000 |
| | | 11-May-2011 | 16,480 | $52.00 | $856,960 |
| | | 12-May-2011 | 450,000 | $51.19 | $23,035,500 |
| | | 13-May-2011 | 284,308 | $50.20 | $14,272,262 |
| | | 19-May-2011 | 95,385 | $50.06 | $4,774,973 |
| | | 27-May-2011 | 917,350 | $48.44 | $44,436,434 |
| | | 30-May-2011 | 18,100 | $48.46 | $877,126 |
| | | 31-May-2011 | 494,759 | $48.52 | $24,005,707 |
| | | 01-Jun-2011 | 15,363 | $48.05 | $738,192 |
| | | 02-Jun-2011 | 104,100 | $47.06 | $4,898,946 |
| | | 03-Jun-2011 | 85,598 | $47.03 | $4,025,674 |
| | | 06-Jun-2011 | 533,063 | $46.06 | $24,552,882 |
| | | 07-Jun-2011 | 1,000,000 | $46.56 | $46,560,000 |
| | | 09-Jun-2011 | 978,496 | $46.13 | $45,138,020 |
| | | 13-Jun-2011 | 218,212 | $45.00 | $9,819,540 |
| | | 14-Jun-2011 | 1,356,945 | $46.00 | $62,419,470 |
| | | 15-Jun-2011 | 900 | $46.00 | $41,400 |
| | | 16-Jun-2011 | 428,229 | $46.02 | $19,707,099 |
| | | 17-Jun-2011 | 877,212 | $46.75 | $41,009,661 |
| | | 21-Jun-2011 | 747,000 | $49.40 | $36,901,800 |
| | | | 18,334,237 | | $906,585,951 |
| Walker, Donald J. | Director/CEO/ Defendant | 06-Dec-2010 | 78,600 | $51.40 | $4,040,040 |
| | | 07-Dec-2010 | 121,400 | $51.24 | $6,220,536 |
| | | 17-May-2011 | 50,000 | $48.50 | $2,425,000 |
| | | 18-May-2011 | 50,000 | $49.59 | $2,479,500 |
| | | | 300,000 | | $15,165,076 |
| Worrall, Lawrence D. | Director | 15-Jun-2011 | 8,200 | $45.23 | $370,886 |
| | **TOTAL:** | | 18,997,104 | | $940,839,434 |

178.     Significantly, these insiders did not engage in similar trading before the Class Period, as explained below:

(a)     Herbert H. Demel did not make any sales of Magna stock during 2010, and only made sales of stock during 2011 as reflected in the above chart, in March 2011.

(b)     Manfred Eibeck did not make any sales of Magna stock during 2010, and only made sales of stock during 2011 as reflected in the above chart, in March 2011.

(c)     Marc J. Neeb did not make any sales of Magna stock during 2010 other than those reflected in the above chart, in November and December 2010.

(d)     Jeffrey O. Palmer sold Magna stock in three transactions in March 2010 for aggregate proceeds of $1,728,362, as compared to the only other sales he made during 2010 – which occurred during the Class Period – for aggregate proceeds of $6,034,980 (*i.e.*, nearly 3.5 times the size of his March 2010 sales).

(e)     Tommy J. Skudutis did not make in any sales of Magna stock during 2010, and only made sales of stock during 2011 as reflected in the above chart, in March 2011.

(f)     Neither Defendant Stronach nor the Stronach Trust made any sales of Magna stock during 2010 other than those reflected in the above chart, which occurred from December 2010 through June 2011, only two months before the end of the Class Period and revelation of the fraud.

(g)     Defendant Walker sold 50,000 shares of Magna stock collectively in two indirect transactions in March 2010 for aggregate proceeds of $2,863,900, as compared to his direct sales of 300,000 shares during the Class Period for aggregate proceeds of $15,165,076 – the only other sales he made during 2010, which exceeded his pre-Class Period sales by nearly 5.3 times.

(h)     Lawrence D. Worrall did not make in any sales of Magna stock during 2010, and only made sales of stock during 2011 as reflected in the above chart, in June 2011.

179.     Moreover, none of these insiders sold stock at or after the end of the Class Period (*i.e.*, in August 2011), when the full extent of Magna's operational problems in Europe was revealed.

180.     Accordingly, the insider sales that took place during the Class Period were unusual and suspicious because the transactions detailed herein departed from the insiders' normal trading activity.

181.   Additionally, Defendant Stronach had a strong personal incentive to engage in the fraud to facilitate the exit of his investment in Magna common stock and, concomitantly, to generate proceeds to fund his other business pursuits, as detailed above.

### Loss Causation/Economic Loss

182.   As alleged, Defendants perpetrated a fraud on the market that artificially inflated the price of Magna common stock and harmed Class Period purchasers of Magna common stock. When the misrepresentations and fraudulent conduct were revealed to the market, the price of Magna's common stock fell precipitously as the artificial inflation came out, causing real economic loss, *i.e.*, damages, to investors who had purchased such stock during the Class Period.

183.   The following chart reflects the rise and fall of Magna stock during the Class Period, from August 6, 2010 through August 5, 2011, as well as the average trading volume of the stock:



184. The declines in the price of Magna common stock after the corrective disclosures came to light were a direct result of the revelation to investors and the market of the nature and extent of Defendants' fraudulent misrepresentations and omissions. The timing and magnitude of the declines negate any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Magna common stock and the subsequent decline in the value of Magna common stock when Defendants' prior misrepresentations and other fraudulent conduct were publicly revealed.

## Applicability of Presumption of Reliance:
## Fraud on the Market Doctrine

185. At all relevant times, the market for Magna common stock was an efficient market for the following reasons, among others:

(a) Magna common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Magna filed periodic public reports with the SEC and the NYSE;

(c) Magna regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as, among other things, communications with the financial press and other similar reporting services; and

(d) Magna was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain of their customers. Each of these reports was publicly available and entered the public marketplace.

186.     As a result of the foregoing, the market for Magna common stock promptly digested current information regarding Magna from all publicly available sources and reflected it in the price of the stock.  Under these circumstances, all purchasers of Magna common stock during the Class Period suffered similar injury by purchasing the stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

187.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein.  Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Magna who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

188.     Plaintiff repeats and realleges each allegation above as if fully set forth herein.

189.     During the Class Period, Defendants disseminated or approved materially false and misleading statements, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

190. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

191. Plaintiff and other Class members have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Magna common stock; and would not have purchased such stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

192. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Magna common stock during the Class Period

193. By reason of such conduct, Defendants are liable pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

194. Plaintiff repeats and realleges each allegation above as if fully set forth herein.

195. The Individual Defendants acted as controlling persons of Magna within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions as officers and/or directors of Magna, and their ownership of Magna common stock, the Individual Defendants had the power and authority to, and did, cause Magna to engage in the wrongful conduct alleged.

196. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Magna common stock during the Class Period.

197.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## COUNT III

### Violation of Section 20A of the Exchange Act
### Against the Individual Defendants

198.    Plaintiff repeats and realleges each allegation above as if fully set forth herein.

199.    By virtue of their positions as officers and/or directors of Magna, the Individual Defendants had access to, and were in possession of, material non-public information about Magna at the time they engaged in their sales of common stock during the Class Period, as detailed above.

200.    Certain of the Individual Defendants' stock sales occurred contemporaneously with certain of Plaintiff's purchases of Magna common stock, as set forth in the certification previously filed and incorporated by reference herein. Certain of the Individual Defendants' sales also occurred contemporaneously with certain purchases of Magna stock by other Class members.

201.    As alleged above, Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

202.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Magna common stock during the Class Period.

203.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20A of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying the Class and Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: October 1, 2012         ROBBINS GELLER RUDMAN
                                                        & DOWD LLP
                                                       SAMUEL H. RUDMAN
                                                       JOSEPH RUSSELLO
                                                       WILLIAM J. GEDDISH

_____
                                           JOSEPH RUSSELLO

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
PATRICK W. DANIELS
NATHAN W. BEAR
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Joseph Russello, hereby certify that on October 1, 2012, I caused a true and correct copy of

the attached:

## AMENDED CLASS ACTION COMPLAINT

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail on the

following counsel:

Andrew W. Stern
Danny C. Moxley
James O. Heyworth, V
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Ave.
New York, NY 10019
Telephone: 212/839-5300
212/839-5599 (fax)

Jay B. Kasner
Rachel J. Barnett
SKADDEN, ARPS, SLATE MEAGHER
  & FLOM
Four Times Square, 42nd Fl.
New York, NY 10036
Telephone: 212/735-3000
212735-2000 (fax)

Joseph Russello