UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
CITY OF TAYLOR GENERAL EMPLOYEES
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                 Plaintiff,

       - against -

MAGNA INTERNATIONAL INC., FRANK STRONACH,
DONALD J. WALKER, and VINCENT J. GALIFI,

                Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

12 Civ. 3553 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    An actionable securities fraud claim requires more than a frustrated investor. Nevertheless, that is all we have here. Lead plaintiff Boilermaker-Blacksmith National Pension Trust ("plaintiff") filed this putative class action on behalf of all persons and entities that purchased the common stock of global automotive supplier Magna International Inc. ("Magna" or the "Company") between August 6, 2010 and August 5, 2011, inclusive (the putative "class period").

    Throughout the class period, Magna <u>repeatedly</u> warned its investors that four of the Company's European facilities were experiencing operational inefficiencies, and that such problems would take a number of years to resolve. In spite of these disclosures, plaintiff maintains that Magna and the individual defendants (collectively, "defendants") "downplayed" the

magnitude of problems facing the four European facilities and simultaneously sold Magna stock into an artificially-inflated market. According to plaintiff, this conduct violated sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

In the motions before the Court, defendants seek dismissal of plaintiff's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As detailed below, we find that the amended complaint fails to allege any material misstatements or omissions, does not adequately allege scienter, and, indeed, borders on the absurd. For those reasons and more, we grant defendants' motions and dismiss the amended complaint with prejudice.

**BACKGROUND**[1]

## I.   **The Defendants**

Magna is "one of the largest and most diversified" automotive suppliers in the world. AC ¶ 9. The Company

---

[1]   This background is derived from the Amended Class Action Complaint ("AC"), filed October 1, 2012; the Declaration of Andrew W. Stern in Support of the Magna Defendants' Motion to Dismiss the Amended Complaint ("Stern Decl."), filed January 11, 2013, and the exhibits annexed thereto; and the Declaration of Jay B. Kasner in Support of Defendant Frank Stronach's Motion to Dismiss the Amended Class Action Complaint ("Kasner Decl."), filed January 11, 2013, and the exhibits annexed thereto. Throughout the course of this Memorandum and Order, we also cite Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Pl.'s Opp'n"), filed February 22, 2013. To the extent the allegations in the amended complaint are well-pleaded, we take them as true for the purposes of this motion. See Fezzani v. Bear, Stearns & Co., 716 F.3d 18, 22 (2d Cir. 2013).

designs, develops, and manufactures automotive systems, including, but not limited to, interior systems, exterior systems, seating systems, closure systems, metal body and chassis systems, mirror systems, roof systems, electronic systems, and powertrain systems. Id. ¶ 26. Magna also engineers and assembles complete vehicles, primarily for sale to original equipment manufacturers of cars and light trucks. Id.; Stern Decl. Ex. A, at 1. At all relevant times, the Company's common stock traded on both the New York Stock Exchange and the Toronto Stock Exchange. AC ¶ 9.

Magna segments its operations on a geographic basis between North America, Europe, and "Rest of World" (including Asia, South America, and Africa). Id. As of December 2011, the Company employed 108,000 individuals in 286 manufacturing operations and 88 product development, engineering, and sales centers worldwide. Stern Decl. Ex. A, at "Global Operations." As relevant here, the Company's European operations consisted of 39,500 employees across 104 manufacturing and assembly facilities and 38 engineering, product development, and sales centers. Id.

Defendant Donald J. Walker ("Walker") is the Chief Executive Officer of Magna, AC ¶ 11, and defendant Vincent J. Galifi ("Galifi") is the Chief Financial Officer, id. ¶ 12. Defendant Frank Stronach ("Stronach") is the founder and former

Chairman of the Company.  Id. ¶ 10.  Historically, Stronach retained approximately 66 percent of the voting rights attached to Magna's securities.  Id. ¶ 10(a).  Starting in March 2010, however, Stronach began discussing the possibility of relinquishing his voting control "in furtherance of [a] planned exit" from the Company.  Id. ¶ 50; see also Kasner Decl. Ex. C, at 7.  On August 31, 2010, Magna completed a restructuring transaction that reduced Stronach's voting interest to 7.4 percent.  AC ¶ 10(a).  Approximately eight months later, Stronach resigned from his position as Chairman.  Id. ¶ 10.

## II.  **The Alleged Securities Fraud**

Throughout the putative class period, defendants revealed the existence of "operational inefficiencies" in a small segment of the Company's 286 manufacturing and assembly facilities.  See infra Section II(A)(2)(i).  Specifically, defendants disclosed that four of the Company's European facilities -- each of which produced interior and exterior automotive systems -- were experiencing production problems that would take a number of years to resolve.  Id.  On May 4, 2011, Magna reported that the four interior/exterior facilities sustained losses of approximately $50 million during the first quarter of 2011, AC ¶ 126, and on August 5, 2011, the Company revealed that the same underperforming units generated losses

of approximately $60 million during the second quarter of 2011, id. ¶ 153.

Despite these disclosures, plaintiff maintains that defendants violated section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[2]   Id. ¶¶ 188-93.   As detailed in Section II(A)(2), infra, plaintiff alleges that defendants misleadingly "downplayed" and/or "shifted the focus away from" the severity of problems facing the four interior/exterior facilities.   Id. ¶¶ 2, 94, 188-93.   Plaintiff submits that, as a result of these alleged misrepresentations and omissions, Magna's common stock traded at artificially inflated prices, id. ¶ 174, reaching $59.99 per share in January 2011, id. ¶ 2.

Plaintiff also asserts claims against the individual defendants pursuant to section 20A of the Exchange Act.   Id. ¶¶ 198-203.   During the 12-month class period, Stronach sold approximately $907 million of his personally held Magna shares "in connection with his exit from the Company."   Id. ¶ 3. Meanwhile, Walker and other non-party executives exercised employee stock options, see Stern Decl. Exs. T-Z, with Walker receiving approximately $7.4 million in net proceeds, see Stern Decl. Ex. Y.   Plaintiff maintains that, at the time these transactions occurred, the individual defendants possessed

---

[2]    In addition, plaintiff alleges that the individual defendants are independently liable for these alleged violations as "control persons" under section 20(a) of the Exchange Act.  AC ¶¶ 194-97.

material, non-public information concerning the alleged magnitude of problems facing the interior/exterior units. AC ¶ 199. According to plaintiff, when the "truth" about these problems emerged, the Company's stock price plummeted to $39.42 per share on August 5, 2011, the last day of the putative class period. Id. ¶ 3.

## III. **Procedural History**

On May 4, 2012, City of Taylor General Employees Retirement System filed the initial complaint in this action and published notice of the lawsuit to all putative class members in accordance with the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of Title 15 U.S.C.). See 15 U.S.C. § 78u-4(a)(3)(A)(i). On July 31, 2012, we granted plaintiff's motion to be appointed as lead plaintiff and approved its selection of Robbins Geller Rudman & Dowd LLP as lead counsel. See id. § 78u-4(a)(3)(B)(i). On October 1, 2012, plaintiff filed the amended complaint. On January 11, 2013, defendants moved to dismiss the amended complaint. Briefing was completed on March 12, 2013.

## DISCUSSION

## I. **Pleading Standards**

To survive a motion to dismiss, the pleadings must include "enough facts to state a claim for relief that is plausible on

its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible," dismissal is appropriate. <u>Id.</u> In applying these standards, we accept as true all factual allegations in the pleadings and draw all reasonable inferences in the non-moving party's favor.[3] <u>Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 185 (2d Cir. 2012). However, "we give no effect to assertions of law or to legal conclusions couched as factual allegations." <u>Id.</u> (internal quotation marks and alterations omitted).

A complaint alleging securities fraud must satisfy the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)") and the PSLRA. <u>Kleinman</u>, 706 F.3d at 152. To satisfy Rule 9(b), "the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Anschutz Corp. v. Merrill Lynch & Co.</u>, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted); <u>see also</u> <u>Kleinman</u>, 706 F.3d at 152 ("The circumstances

---

[3]    In conducting our analysis, "[w]e may also consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." <u>Kleinman v. Elan Corp., plc</u>, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation marks omitted).

constituting fraud must be stated with particularity." (internal quotation marks and alteration omitted)).

"The PSLRA expanded on the Rule 9(b) standard, requiring that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Anschutz, 690 F.3d at 108 (internal quotation marks and alterations omitted) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005)).

## II.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [U.S. Securities and Exchange Commission] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 implements section 10(b) by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

8

To sustain a private cause of action under section 10(b) and Rule 10b-5, a plaintiff must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 465 (2d Cir. 2013) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008)) (internal quotation marks omitted). Analyzing those factors here, we find that plaintiff has not sufficiently alleged any actionable misrepresentations or omissions, see infra Section II(A), or particularized facts giving rise to a strong inference of scienter, see infra Section II(B).

## A. Plaintiff Has Failed to Allege Any Actionable Misrepresentations or Omissions

### 1. *Legal Standards*

Under the PSLRA, a securities fraud complaint must "specify each statement alleged to have been misleading" and the "reasons why" that statement was misleading. 15 U.S.C. § 78u-4(b)(1). "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." Novak v. Kasaks,

216 F.3d 300, 309 (2d Cir. 2000).  Moreover, expressions of hope, opinion, or belief about future performance generally do not give rise to violations of the federal securities laws. Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).  However, such statements may be actionable "'if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.'"  In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 248 (S.D.N.Y. 2010) (quoting In re Int'l Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998)).

Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." Kleinman, 706 F.3d at 152 (quoting Matrixx Initiatives, Inc. v. Siracusano, -- U.S. --, 131 S.Ct. 1309, 1321 (2011)) (internal quotation marks omitted); see also Resnik v. Swartz, 303 F.3d 147, 154 (2d Cir. 2002) (noting that information need not be disclosed "simply because it may be relevant or of interest to a reasonable investor").  Rather, "[d]isclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Kleinman, 706 F.3d at 153 (quoting Matrixx, 131 S.Ct. at 1321) (internal quotation marks and ellipsis omitted).

2. ***Plaintiff's Allegations***

   a. *August 6, 2010*

On the first day of the putative class period, Magna issued a press release announcing its financial results for the second quarter of 2010.  AC ¶ 38.  The Company reported increases of $458 million in net earnings and $115 million in Earnings Before Interest and Taxes ("EBIT") in Europe, each compared to the second quarter of 2009.  Id.  ¶¶ 38-39.  As pertinent here, the Company explicitly stated that positive factors influencing EBIT in Europe were "partially offset" by, inter alia, "operational inefficiencies and other costs at certain facilities"; "increased commodity costs"; and "net customer price concessions subsequent to the second quarter of 2009."  Id. ¶ 40.

On the same date the Company issued the press release, Walker and Galifi participated in a conference call with analysts and investors.  Id. ¶ 41.  In his opening remarks, Walker noted that "vehicle sales in a number of European markets remain relatively strong in the second quarter as have imports of European built vehicles . . . to North America."  Id.  For his part, Galifi stated that "European production sales increased $331 million, or 23% from the comparable quarter," while "European vehicle production increased 13%, to 3.5 million units."  Id. ¶ 42.  Galifi noted that the Company

11

was "cautious about the European economy." Id. However, he said that Magna's "increase [in] full year vehicle production expectations in Europe" was "due to stronger second quarter production volumes than [the Company had] expected." Id.

In response to questions from analysts, Walker stated that there was "no fundamental reason why the margins in North America or Europe or rest of the world should be different." Id. ¶ 45. He explained:

> We made some acquisitions, bought them inexpensively and there was [sic] some operating issues in Europe so it takes a while to turn some of those around. So I don't think we are going to see the margins in the near-term the same but we do have some very good operations in Europe . . . that run as good or better margins than the average North America. So there is no fundamental reason why we can't get there.

Id. (emphasis omitted); see also id. ¶ 44 (quoting Galifi as stating that the Company was "seeing some good pull through" in Europe, which Galifi described as "a very positive sign" (emphasis omitted)).

On August 6, 2010, the Company's stock price increased by $2.00 (or more than 5 percent) to $39.50 per share. Id. ¶ 46. In the amended complaint, plaintiff attributes this increase to defendants' alleged "assurances to the market that any problem experienced by the European operations was not materially affecting Magna's financial results." Id. Plaintiff alleges that the Company's statements concerning operational

inefficiencies were misleading in the absence of further
disclosures concerning the extent and magnitude of those
problems. Id. ¶ 47. Moreover, plaintiff submits that Walker
portrayed a misleading picture of the risks facing the European
operations when he combined the representation that there were
"some operating issues in Europe" with the statement that the
Company did "have some very good operations" there. Id. ¶ 48.

### b. *November 4, 2010*

On November 4, 2010, Magna issued a press release
announcing its financial results for the third quarter of 2010.
Id. ¶ 52. The Company reported a $190 million increase in net
income and a $58 million rise in EBIT in Europe, each compared
to the third quarter of 2009. Id. Once again, the Company
noted that positive factors influencing EBIT in Europe were
"partially offset" by, among other things, "operational
inefficiencies and other costs at certain facilities, in
particular at certain electronics, and exteriors and interiors
systems facilities" and "net customer price concessions
subsequent to the third quarter of 2009." Id. ¶ 53.

During an earnings call with analysts and investors,
Walker stated that he "believe[d]" the Company maintained "a
strong team to profitably grow Magna's European business." Id.
¶ 55; see also id. ¶¶ 57-58 (alleging that Galifi indicated
that Magna's increased guidance for the remainder of 2010 was

based, in part, on favorable performance in Europe).  Walker noted that he was "currently in Europe" and would spend more time "in the coming months" visiting the Company's "European operations, some of which [were] underperforming."  Id. ¶ 55.

Walker acknowledged that the Company had "indicated over the past quarters" that its "European business [was] underperforming and that some restructuring was necessary." Id. ¶ 56.  Walker explained:

> We have many operating units that, even at a relatively low production volume, are generating profits and reasonable returns. . . . Our largest areas of underperformance in Europe is [sic] in our . . . interiors/exteriors operating unit.  Even within this unit there are some strong performing divisions that generate acceptable earnings and returns, however there are a few facilities that are generating significant losses.  Our interiors and exteriors team is getting a handle on the issues and developed a plan of action for these divisions.  As I said, I will be visiting a number of these plants to better understand the nature of the underperformance and I expect that by early in the New Year we'll have a much better position to articulate the action plan for Europe.

Id. ¶ 56 (emphasis omitted).

When an analyst asked Walker whether European margins could match North American margins, Walker deferred his response until the following quarter:

> We do have a number of issues, which affect the margins.  We have the launch of the programs in Russia.  We had some electronics launch issues, as well as we had [sic] some underperforming divisions.  We also have very good operations here, so I'm spending the next month here going through the

divisions, the group Presidents have [been] involved, as well, so I can give you more detail at the next quarterly call.

Id. ¶ 60 (emphasis omitted).

In response to an analyst's request for "a rough idea of the magnitude of the drag [Europe was] putting on" the Company's operations, Galifi, like Walker, deferred his answer to the following quarter:

> [W]hen we look at some of the operations that [Walker] referred to, they're in the red and they're a drag on profitability, but in terms of quantifying that I'm not going to do that for you. Our focus, as [Walker] talked about, is developing plans to focus on improving overall efficiencies and operating performance and see those operations start to generate some bottom-line results for us. And the plans are still being worked on. We're right in the middle of business plans and a number of decisions need to be made from a production standpoint or otherwise. I think we're going to be in a better position in the next -- I'd say probably next two to three months and the target of giving you an update as we speak through our outlook for 2011.

Id. ¶ 61 (emphasis omitted).

On November 5, 2010, Magna's stock price increased by $2.93 (or 6.26 percent) to $49.73 per share. Id. ¶ 62. Once again, plaintiff imputes this increase to defendants' alleged "assurances to the market that any problem experienced by the European operations was not materially affecting Magna's financial results." Id. Plaintiff alleges that certain statements referenced above -- e.g., Walker's representation that Magna had "many operating units" that were "generating

15

profits and reasonable returns" -- were misleading in the absence of any disclosures concerning the alleged extent and magnitude of problems facing the interior/exterior facilities. Id. ¶ 63.   In addition, plaintiff maintains that defendants downplayed these problems by, inter alia, coupling the representation that Magna "had some underperforming divisions" with the statement that it also had "very good operations," id. ¶ 64, and by conveying the message that the Company "had a handle" on these problems, id. ¶ 66.

### c. *January 12, 2011*

On January 12, 2011, Magna issued a press release announcing its 2011 financial outlook.   Id. ¶ 72.  The Company reported favorable expectations, id. ¶¶ 72-73, including a "net increase in total production sales to be split approximately equally among [the Company's] North America, Europe and Rest of World segments," id. ¶ 73 (emphasis omitted).

That same date, Walker and Galifi presented at the Deutsche Bank Securities Inc. Global Auto Industry Conference (the "Global Auto Industry Conference").   Id. ¶ 76.   In his prepared remarks, Galifi acknowledged that Magna's European segment had "underperform[ed] recently."   Id. ¶ 77; see also Stern Decl. Ex. J, at 4 (Galifi stating:  "In Europe, while we have returned to profitability, margins in total have not met our expectations.").   However, Galifi indicated that the

16

Company was "taking some actions" to improve its results in Europe, and discussed "four broad elements" that were part of the Company's plan. AC ¶ 77.

As pertinent here, Galifi stated that the Company planned "operational improvements" consisting of the same "basic blocking and tackling" that the Company utilized in North America.  Id.  Galifi noted that, as a result of the Company's planned course of action, he expected to "see some improvements" in Europe "in '11 and in the coming years."  Id. Galifi closed his remarks by stating that Magna's "global position [was] as strong as it [had] been," and that the "outlook [was] positive in all key markets."  Id. ¶ 78 (emphasis omitted).

In response to an analyst's question concerning the parity between North American and European margins, Galifi stated:

> If you . . . look at our production division, and you compare some of our good operating divisions in Europe to some good operating divisions in North America, margins are about the same -- some better, some worse, but pretty well in line.
>
> And so, I think the question you're asking -- can you get to North American margins?  If the mix of business is identical in Europe, I don't think there's any reason why we can't get there.  I think it's going to take us some time, and it's not going to happen in '11.  It's not going to happen in '12.  It won't happen in '13. . . . But over time, we certainly believe there's significant improvement possible in our European production division. . . . So if you add up pluses and minuses, overall, we're expecting European margins to improve '11 versus '10.

17

Stern Decl. Ex. J, at 6-7; <u>see also</u> AC ¶¶ 80-81 (quoting the first paragraph and last sentence only).  Walker added:

> We grew a lot in Europe through acquisitions of relatively weak companies, and the footprint's probably not optimal.  So, we have a number of things that we're going to have to improve over there.  It'll be difficult in the foreseeable future to get North American margins, but we can certainly improve them over there. . . .
>
> [W]e're not saying that we can get Europe to the same margins in North America in three years.  We will give some guidance in awhile.  But we can certainly move them up.
>
> And I think it's -- we need probably another six months to nine months to really see what we're going to do from a footprint, from restructuring, and -- what the improvements could be in Europe, but we can certainly go up.

Stern Decl. Ex. J, at 7-8; <u>see also</u> AC ¶ 81 (quoting the first sentence only).

According to plaintiff, the foregoing statements "did not provide enough detail" about the operational problems facing the underperforming interior/exterior business units.  AC ¶ 83. Plaintiff maintains that defendants misled the investing public by representing, among other things, that European margins could reach North American margins, <u>id.</u>, and by failing to disclose that the relevant operational problems "presented the most significant" barrier to achieving this end, <u>id.</u> ¶ 85.

### d. *February 23, 2011*

On February 23, 2011, Magna issued a press release regarding its financial results for the fourth quarter of 2010 and year end.  Id. ¶ 87.  The Company reported that its net income for such periods totaled $216 million and $973 million, respectively, id., and that "EBIT in Europe increased $0.5 billion to $0.1 billion for 2010 compared to a loss of $0.4 billion for 2009," reflecting a $201 million quarterly increase.  Id. ¶ 88.

Magna explicitly noted that the increase in EBIT in Europe was "partially offset" by, inter alia, "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities"; "higher costs incurred related to launches at [the Company's] components business"; "increased commodity costs"; "higher warranty costs"; and "net customer price concessions subsequent to 2009."  Id. ¶ 89; see also id. ¶ 93 (quoting Galifi as reiterating that positive factors affecting gross margins were "partially offset" by "operational inefficiencies" at certain interior/exterior facilities in Europe).

During a conference call with analysts and investors, Walker stated that there was "significant earnings opportunity for improving [Magna's] financial performance in Europe."  Id. ¶ 92.  Walker indicated that he expected to see such

improvements "as a result of the actions" the Company was taking "over the next few quarters, including the closure and consolidation of a facility in the first half of the year." Stern Decl. Ex. L, at 5; see also AC ¶ 92 (quoting the first clause only).  However, Walker warned:

> For some other facilities -- for instance where we have operational inefficiencies and poor pricing -- the fix is going to be longer term.  However, we are dedicated to taking the necessary steps to achieve continued and steady improvement in operating results in Europe over the next couple years.

Stern Decl. Ex. L, at 5-6; see also AC ¶ 92 (quoting language in the first sentence only).

In response to an analyst's question concerning Magna's overall margins, Galifi noted that "the direction for operating margin" in Europe "[was] up."  AC ¶ 96 (emphasis omitted); see also id. ¶¶ 96-97 (quoting Galifi as stating that European margins were "heading in the right direction," and that it was "directionally accurate" that European margins would rise (emphasis omitted)).  Galifi noted that Magna had "some actions in place in Europe," and expected to see "step-by-step improvement in margins."  Id. ¶ 96 (emphasis omitted).  However, Galifi emphasized that these improvements would not "happen overnight."[4]  Id.

---

[4]    The amended complaint erroneously attributes the foregoing statements to Walker.  See AC ¶ 96; see also Stern Decl. Ex. L, at 16-17.

During the earnings call, an analyst noted that "one of the items [Galifi] cited as a negative was the exterior and interior businesses." Stern Decl. Ex. L, at 27. The analyst asked Galifi whether he was "suggesting that those businesses actually deteriorated in 2010 versus 2009[.]" <u>Id.</u> Galifi replied:

> There's [sic] a couple facilities and when you look at them it's a combination of launch costs, it's a combination of new programs where pricing is not appropriate. . . . So we're talking about . . . a couple of facilities in Europe . . . . So we had some inadequate pricing. And we have a bunch of new business coming on so we're having some operational inefficiencies as we launch those programs. You know, as a result of that we're outsourcing some work.
>
> So what the team's focused on right now is to improve the operational efficiencies that flow through into the facilities. We'll start to in-source some of the work which should help. And over time we're going to have to try to deal with pricing.
>
> But the pricing situation isn't going to be resolved in the short term. It's going to be a longer term matter to try to deal with that.

Stern Decl. Ex. L, at 27-28; <u>see also</u> AC ¶ 98.

Another analyst noted that the Company had previously categorized the "challenges" facing its European operations in "three of four buckets," including "eliminating the losses in the interior/exterior facilities." Stern Decl. Ex. L, at 37-38. The analyst asked Walker to provide "a prospective progress report on where [those] items [would] be at 12/31/11." <u>Id.</u>, at 38. Walker stated, in pertinent part:

> [W]e still have a number of losing divisions [and] we
> have some inefficiencies expense.  So we have some
> launch issues [and] we've out sourced some work and I
> think we're getting arms around that.
>
> And by the end of the year I would hope that for the
> most part we'll have a pretty good handle on them[.]
> [S]ome of them will probably . . . go into 2012 but I
> think it will make steady progress for the year.

Id., at 38-39; see also AC ¶ 99 (quoting excerpts, excluding

"some of them will probably . . . go into 2012").   In response

to a follow-up question, Walker added:

> I think in the middle of '012 we're still going to
> have lingering issues I expect.  But I would think by
> the middle of '012 we probably would have been able to
> achieve most of what we wanted to in some of the
> losing divisions.

Stern Decl. Ex. L, at 39.

On February 24, 2011, Magna's stock price decreased by

$5.43 (or 9.7 percent) to $50.42 per share.   AC ¶ 103.

Plaintiff attributes this decrease to defendants "partial

disclosure" concerning the "problems facing [the Company's]

interiors/exteriors business" in Europe.   Id.  Despite these

disclosures, plaintiff maintains that defendants continued to

mislead investors by discussing the upward direction of

European margins when defendants knew, or should have known,

that the operational issues facing the interior/exterior

facilities were adversely affecting the Company's margins.   Id.

¶ 104.   Plaintiff alleges that defendants shifted the focus

away from this problem to other, comparably less significant matters. Id. ¶¶ 104-05.

      **e. *March 31, 2011***

On or about March 31, 2011, Magna issued its Annual Report and Form 40-F for the year ended December 31, 2010.[5] Id. ¶ 106. In the "Chairman's Message" section of the Annual Report, Stronach noted that he was stepping down as the Company's Chairman, a position he had held "for nearly 40 years." Id. ¶ 107. In connection with his departure, Stronach remarked that he was "proud" of the "strong management team that [he had] cultivated." Id. In addition, Stronach stated that he "firmly believe[d] that Magna [would] continue to do well provided that the Company adheres to the operating principles and unique corporate culture that are the foundation of [its] success." Id. In closing, Stronach thanked the management team "for steering the Company through a very turbulent period" and commented that "Magna is well positioned to rebound strongly now that the automotive industry is recovering." Id. ¶ 108 (emphasis omitted).

---

[5]    The Annual Report contained cautionary language regarding forward-looking statements. See Stern Decl. Ex. D, at 40. Similarly, the Form 40-F disclosed various "Risk Factors." See Stern Decl. Ex. M, at 26-33. The Form 40-F specifically disclosed that Magna was "working to turn around financially underperforming divisions; however, there is no guarantee that we will be successful in doing so with respect to some or all such divisions." Id., at 28.

In the "Management's Message to Shareholders" section of the Annual Report, Walker and Galifi represented:

> Magna entered 2011 riding a wave of momentum that started in 2010 and has continued to build as the global automotive industry experiences a solid recovery in vehicle production and sales. Despite recent world events, we are confident that 2011 will be another strong year for our industry.

Id. ¶ 109; see also id. ¶ 111 (quoting Walker and Galifi as stating they were "confident that Magna [would] post strong results again in 2011" (emphasis omitted)). Walker and Galifi noted that Magna would "remain focused on increasing [its] profitability in Europe," "improving certain underperforming operations and increasing the competitiveness of [the Company's] manufacturing footprint in Europe." Id. ¶ 111.

According to plaintiff, the foregoing statements "conveyed the misleading message that the Company had weathered the economic downturn without incident, despite the operational problems that plagued the European interiors/exteriors business."[6] Id. ¶¶ 108, 112.

### f. April 20, 2011

On April 20, 2011, Galifi presented at the Bank of America Merrill Lynch New York Auto Summit (the "New York Auto Summit"). Id. ¶ 118. During his presentation, Galifi noted

---

[6] In the amended complaint, plaintiff also quotes portions of the Form 40-F's discussion of the Company's disclosure controls and internal controls over financial reporting, see AC ¶¶ 113-15, and alleges that these controls "were not, in fact, effective," id. ¶ 117.

that Magna's "European segment [had] underperformed recently," that the Company was "taking actions to improve results," and that Galifi expected such improvements "to commence this year." Stern Decl. Ex. N, at 4; see also AC ¶ 119 (quoting excerpts). Galifi noted that, although the European operations had "returned to profitability," the "margins in total" did not meet the Company's "expectations." Stern Decl. Ex. N, at 4.

Galifi outlined the same four-element plan to improve Magna's results in Europe that he described during his presentation on January 12, 2011. AC ¶ 119; see also supra Section II(A)(2)(c). Specifically, Galifi stated:

> [O]perational improvements are planned in a number of European facilities. This represents basic blocking and tackling that we have done in a number of our North American operations in past years to improve results. It takes time but can add up to significant improvements in results.

Stern Decl. Ex. N, at 5.

When an analyst asked Galifi about the Company's overall margins, Galifi replied, in pertinent part:

> [W]e have talked a lot about Europe. Europe is underperforming and we continue to have inefficiencies. We continue to have some pricing issues. We have moved to a global structure. We have made some management changes. I am pleased with reactions, plans that have been put in place, but we are really not going to start [to] see the benefit of that until the later half of 2011 and 2012 and 2013.

Id., at 7; see also AC ¶ 119 (quoting excerpts, excluding,

inter alia, "we are really not going to start see the benefit of that until the later half of 2011 and 2012 and 2013").

In the amended complaint, plaintiff alleges that Galifi's remarks failed to present an "accurate portrayal" of the factors affecting the Company's financial operations and results. AC ¶ 121. Plaintiff submits that Galifi's remarks misleadingly conveyed the message that the four-element plan Magna developed in January 2011 was still effective in April 2011. Id. According to plaintiff, "that plan failed to directly address the issues facing the interiors/exteriors business that were the central source of Magna's problems in Europe." Id.

### g. *May 4, 2011*

On May 4, 2011, Magna issued a press release announcing its financial results for the first quarter of 2011. Id. ¶ 122. The Company reported quarterly net income of $322 million and adjusted EBIT in Europe of $29 million. Id. ¶¶ 122-23. The Company noted that EBIT in Europe increased $27 million as compared to the first quarter of 2010 "primarily as a result of," among other things, "increased margins earned on higher sales as a result of higher vehicle production volumes" and "productivity and efficiency improvements at certain facilities." Id. ¶ 123. As before, Magna stated that these factors were "partially offset" by, inter alia, "operational

26

inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities"; "higher commodity costs"; and "net customer price concessions." Id. ¶ 124.

During an earnings call with analysts and investors, Walker noted that Magna had "generated increased earnings in [its] European segment." Id. ¶ 125. However, Walker said:

> [W]e also continue to have significant underperformance in certain divisions. Recall that we have indicated that some of the issues in certain of our facilities will not be fixed overnight, but we expect to make steady progress over the next couple of years.

Id. (emphasis omitted).

In his prepared remarks, Walker provided further detail on the problems facing the interior/exterior business. Specifically, Walker stated:

> In the first quarter, 4 facilities in our Interiors, Exteriors unit generated a combined loss of approximately $50 million. [One] of those facilities has been closed. In addition, we expect the run rate of the loss of those facilities to decrease by almost half by the fourth quarter of this year. Our European results in 2011 are also being negatively impacted by increased commodity costs, as well as a new facility cost I referenced earlier. We have facilities under way, and we are adding a number of new facilities in Europe over the next 2 years. We continue to believe our European operating results will steadily improve over the next 2 years, and [Galifi] will elaborate on our European results later.

Id. ¶ 126.

In turn, Galifi stated that "[g]ross margin in the quarter was 12.2% compared to 12.7% in the first quarter of 2010."  Id. ¶ 127.   Galifi  attributed  this  decline  to,  inter alia, "operational  inefficiencies  and  other  costs  of  certain facilities, in particular, at certain Exterior and Interior system facilities in Europe that [Walker] discussed earlier." Id.   Galifi  acknowledged  that  there  was  "much  room  for improvements in [Magna's] European results."  Id. ¶ 128.   He stated that, although the Company was "not happy" about its "operating  performance  in  Europe,"  the  business  was "profitable"  overall.    Id.  (emphasis omitted).   Galifi explained that "some" of the "business units" in Europe ran "at good  operating  margins  and  returns  on  capital,"  and  that "simply getting the under performing units . . . back to breakeven[] would add more than a full percentage point to [the Company's] European operating margin."  Id. (emphasis omitted); see also id. ¶ 132 (quoting Galifi as stating that "getting [the four underperforming units] to breakeven [would] help[]," but that the real objective was to "generate a positive margin on them").

During the question-and-answer portion of the conference call, Walker provided further detail on the underperforming interior/exterior facilities.  Specifically, Walker said:

We talked about 3 significant underperforming divisions. We had another one which we've dealt with just in the past month. The issues are a number of different issues. One is that we have some business that was under priced so we have the need to go back and fix the pricing or work it out. Another one of the issues was we were over-booked on production so we have had some difficult launches. We've had some excess scrap, premium freight, we've had to outsource some business and we're going through some more launches right now and some of those facilities. So, it's a combination of inefficient operations, higher costs being associated with outsourcing product, high scrap rates, a lot of things that we can get our arms around but doesn't happen overnight. And some clarity on what the loss[es] were, what we expect them to be at the end of the year. So, I think from a time line standpoint, [Galifi] already talked about what the loss was in Q1. We expect to cut that essentially in half by the end of the year. By next year I would hope by the middle of next year, hopefully we've got them all back to breakeven but I've really only got clarity at this point in time with the action plans we have in place, take us out to the end of this year.

Id. ¶ 131 (emphasis omitted).

In response to an analyst's questions, Walker described

his expectations concerning future prospects:

We have a lot of operations in Europe that are quite good, good management teams, they've got good control of their business. We had a number of divisions that for whatever reason didn't properly quote or book business or get ready for the launch. I'm not sure whether that's because we cut some of the overhead out to effectively launch this business but we certainly had -- we've had some issues. We've done a pretty deep dive across the plants. I'll never say never but I'm not anticipating any brand-new issues coming out of the woodwork. We've been back up. Production's picked backup for awhile now. We do have a lot of new launches going on which hopefully is good. So, I don't anticipate anything major beyond what we're already working on there. As I say, a lot of the divisions are quite good, good technology, they're

> running well.  So, it's a handful of about 10, 11
> divisions that we're really focused on.  We talked
> about the 3 -- the 4 -- 3 big ones and the 1 that's
> already been dealt with.

Id. ¶ 134 (emphasis omitted).

On May 5, 2011, Magna's stock price declined by $1.14 (or 2.2 percent) to $50.25 per share.  Id. ¶ 135.  According to plaintiff, the decrease was due to defendants' "partial disclosure" concerning the problems facing the four interior/exterior facilities.  Id.  Plaintiff maintains that, in spite of these disclosures, defendants continued to downplay the alleged significance of the operational problems by representing, among other things, that the interior/exterior business was "profitable" overall.  Id. ¶ 136.  Plaintiff acknowledges that defendants' description of the operational inefficiencies was "more detailed" in the May 2011 disclosures than in previous public statements.  Id.  However, plaintiff maintains that the May 2011 disclosures were "incomplete and thus misleading in the absence of additional information regarding the scope and magnitude of the problems, and, by extension, how those problems were reasonably likely to affect the Company's financial results and future earnings."  Id.

### h. *August 5, 2011*

Finally, on August 5, 2011, the last day of the putative class period, Magna announced its financial results for the

second quarter of 2011.  Id. ¶ 147.  The Company reported net income of $282 million and adjusted EBIT in Europe of negative $13 million, representing decreases of $12 million and $96 million, respectively, from the year-earlier period.  Id. ¶¶ 147-48.  Magna attributed the decrease in EBIT in Europe to factors including, but not limited to, "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities."  Id. ¶ 148.

In the press release, the Company disclosed the following relevant details concerning its results:

> Despite the increase in total sales, our operating income decreased $5 million to $362 million in the second quarter of 2011, compared to $367 million in the second quarter of 2010.  Operational inefficiencies and other costs, in particular at our exteriors and interiors systems business in Europe, higher commodity costs, new facility costs incurred to support our growth around the world, as well as the favourable settlement of certain commercial items during the second quarter of 2010 were the primary factors behind the decrease, more than offsetting the operating income earned on the increased sales in the second quarter of 2011 combined with the net positive impact from the unusual items in the second quarters of 2010 and  2011.
>
> Our top priority continues to be the improvement of our underperforming operations in Europe.

Id. ¶ 150.

During a conference call with analysts and investors, Walker noted that Magna's "Europe segment under performed again

in the second quarter, missing [the Company's] internal forecast for the quarter." Id. ¶ 151. Walker explained:

> The exteriors and interiors facilities that lost approximately $50 million in the first quarter, lost even more in the second quarter on higher sales. . . . Improving results at our underperforming divisions in Europe remains our number one priority and we are taking appropriate steps to address the issues. Specifically, we announced today that we reached an agreement to sell one of these 3 remaining facilities, one of these three significant underperforming exterior and interior operations. The purchaser will assume the business effective July 1, and we will incur a charge of approximately $100 million in the transaction. The sale is expected to close later this quarter. The year-to-date sales of the operation to be sold were over $100 million, and the year-to-date loss amounted to approximately $25 million.

Id. ¶¶ 151-52 (emphasis omitted); see also id. ¶ 157 (quoting Galifi as stating that Magna expected to lose between $20 million and $25 million at the two remaining facilities as late as the fourth quarter).

In his prepared remarks, Galifi confirmed that "[t]he largest factor negatively impacting [Magna's] EBIT sequentially was the under performance of certain facilities, particularly in [the Company's] exteriors, interiors businesses." Id. ¶ 153; see also id. (quoting Galifi as stating that the interior/exterior facilities "identified last quarter lost approximately $50 million in Q1 and about $60 million in Q2"). Moreover, Galifi noted that "[t]he deterioration in margin"

from the Company's "prior outlook" was "attributable entirely to Europe." Id. ¶ 155.

In response to an analyst's question, Walker acknowledged that the underperforming interior/exterior facilities had experienced operational problems for at least "three or four months." Id. ¶ 157. Furthermore, Walker disclosed that one of the remaining facilities handled carpet, while the other two handled molding and paint. Id.

When an analyst asked Walker to provide more "color" on the problems plaguing the interior/exterior facilities, Walker stated, in pertinent part:

> [I]n the downturn, there was an effort . . . to try and keep our plants full . . . . [W]e've got some under priced product in a number of our plants. So that's the number one reason. And then we've got some raw material increases which doesn't help.
>
> We've also, because the market came back faster and stronger than people had anticipated a couple of years ago, we've actually got a couple of plants where we've got more than 100% capacity and they are mainly in the couple of plants that -- painting. So we've had some quality problems, we haven't been able to meet the expectations of some customers and that's driven a downward spiral.
>
> So if you have quality issues getting containment, containment, mean we have outside people checking the parts, you have two or three people looking at it which means scrap rates go up, which means you have to repaint, throws your schedule off. We've had to outsource because of that, that's a very expensive piece price standpoint and transportation standpoint, extra handling. So in a paint job, you're either sort of continually improving or going in a downward spiral. We've been in a downward spiral in a couple

> of our facilities.  I think we are getting our arms
> around it.  We're having a lot of discussion with
> customers, looking at battery samples, trying to
> reduce the logistics, trying to . . . get the product
> back inside our plants and it's a staggering amount of
> money and a lot of extra people, so that is the
> biggest single factor in the major facilities we've
> been talking about.

Id. ¶ 156 (emphasis omitted).  In closing, Walker noted that

"it was a tough quarter" in Europe.  Id. ¶ 158.  However,

Walker indicated that the Company would "continue to address

the under performers" and expected to "improve [its] results in

Europe going forward."  Id.

On August 5, 2011, Magna's common stock price dropped

$4.82 per share (or 10.9 percent) to $39.42.  Id. ¶ 159.

Plaintiff attributes the decrease to defendants' "disclosure of

the extent and magnitude of the problems affecting Magna's

interiors/exteriors operations in Europe and the financial

impact associated with those problems."  Id.

     **i. *Summary***

August 6, 2010:  In a press release dated August 6, 2010,

the Company indicated that positive factors influencing

increased EBIT in Europe were "partially offset" by

"operational inefficiencies and other costs at certain

facilities."  Id. ¶ 40.  During a conference call with analysts

and investors, Walker stated that there was "no fundamental

reason" why European margins could not match North American

margins.  Id. ¶ 45.  However, Walker noted that there were "operating issues in Europe," and that these issues would "take[] a while" to resolve.  Id.  Accordingly, Walker stated that he did not believe European margins would reach North American margins "in the near-term."  Id.

November 4, 2010:  In a quarterly press release, Magna once again reported that positive factors influencing increased EBIT in Europe were "partially offset" by "inefficiencies and other costs at certain facilities, in particular at certain electronics, and exteriors and interiors systems facilities." Id. ¶ 53.  During an earnings call, Walker stated that the Company's "largest area of underperformance in Europe" was in the "interiors/exteriors operating unit."  Id. ¶ 56.  In fact, Walker noted that "a few" of those facilities had "generat[ed] significant losses."  Id.; see also id. ¶ 61 (quoting Galifi as stating that the underperforming interior/exterior facilities were "in the red" and "a drag on profitability").

During the same earnings call, Walker stated that he would personally "visit[] a number of" the interior/exterior facilities "to better understand the nature of" their problems. Id. ¶ 56 (emphasis omitted).  Walker noted that the "interiors and exteriors team" was "getting a handle" on these issues and had "developed a plan of action" for Europe.  Id.  Walker stated that he would be in "a much better position to

articulate" that plan of action early in "the New Year."   Id.

In the meantime, Walker and Galifi both declined to provide specific forecasts concerning European margins.   See id. ¶ 60 (quoting Walker:  "I can give you more detail at the next quarterly call."); id. ¶ 61 (quoting Galifi: "We're right in the middle of business plans and a number of decisions need to be made . . . . I think we're going to be in a better position in the next . . . two to three months and the target of giving you an update as we speak through our outlook for 2011.").

January 12, 2011: On January 12, 2011, Walker and Galifi gave presentations at the Global Auto Industry Conference.   Id. ¶ 76.  There, Walker and Galifi again acknowledged Magna's underperformance in Europe, id. ¶ 77; Stern Decl. Ex. J, at 4, and provided further detail concerning the Company's plan of action and expectations for the region, see AC ¶ 77; Stern Decl. Ex. J, at 6-8.  With respect to the Company's strategy, Galifi described "four broad elements," including "operational improvements" in a number of the European facilities.  AC ¶ 77. Galifi stated that, as a result of these actions, he expected to "see some improvements" in Europe "in '11 and in the coming years."   Id.

Galifi and Walker both noted that they did not anticipate European margins reaching North American margins in the

foreseeable future.   See Stern Decl. Ex. J, at 6 (Galifi stating:  "I think it's going to take us some time, and it's not going to happen in '11.  It's not going to happen in '12. It won't happen in '13."); id., at 7 (Walker stating that "[i]t'll be difficult in the foreseeable future to get North American margins" in Europe).   In addition, Walker indicated that the Company would need another six to nine months to "really see" what the "improvements" in Europe "could be." Id., at 8.

February 23, 2011:  In a press release dated February 23, 2011, Magna once again reported that increased EBIT in Europe was "partially offset" by "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities."   AC ¶ 89; see also id. ¶ 93 (quoting Galifi as reiterating the same).   During a conference call with analysts and investors, Walker stated that he expected to see improvements in Magna's financial performance in Europe "as a result of the actions" the Company was taking "over the next few quarters."   Id. ¶ 92.  However, Walker noted that "the fix" would be "longer term" in certain European facilities, including those experiencing "operational inefficiencies and poor pricing."   Id.

In response to an analyst's questions concerning the Company's overall margins, Galifi noted that "the direction for

operating margin" in Europe "[was] up," and that he expected to see "step-by-step improvement."   Id. ¶ 96 (emphasis omitted). However, Galifi emphasized that the improvement would not "happen overnight."   Id.   Galifi noted that there were "a couple of facilities in Europe" that were experiencing "operational inefficiencies" and "inadequate pricing."   Stern Decl. Ex. L, at 28.   Galifi stated that the operational inefficiencies resulted in the "outsourcing of some work," and that the pricing situation would not "be resolved in the short term."   Id.

April 20, 2011:   On April 20, 2011, Galifi presented at the New York Auto Summit.   AC ¶ 118.   During his presentation, Galifi acknowledged that Magna's European segment had "underperformed recently," id. ¶ 119, and that regional "margins in total" did not meet the Company's "expectations," Stern Decl. Ex. N, at 4.   As before, Galifi stated that the Company was working toward "operational improvements" as part of a four-element plan to enhance European results.   Id. Galifi noted that the operational improvements would "take[] time."   Id.   In addition, Galifi stated that the Company did not expect "to see the benefit" of the plans it put in place "until the later half of 2011 and 2012 and 2013."   Id., at 7.

May 4, 2011:   In a press release dated May 4, 2011, Magna reported, for the fourth time since the beginning of the

putative class period, that increased EBIT in Europe was "partially offset" by "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities." AC ¶ 124; <u>see also</u> <u>id.</u> ¶ 125 (quoting Walker as stating that the Company "continue[s] to have significant underperformance in certain divisions" (emphasis omitted)); <u>id.</u> ¶ 127 (quoting Galifi as attributing a decline in gross margin to "operational inefficiencies and other costs of certain facilities, in particular, at certain Exterior and Interior system facilities in Europe").

During a conference call with analysts and investors, Walker reported that four interior/exterior facilities had generated quarterly losses of approximately $50 million, resulting in the closure of one of the facilities. <u>Id.</u> ¶ 126. Walker attributed these losses to "under priced" business, "inefficient operations," outsourcing costs, and increased scrap rates. <u>Id.</u> ¶ 131 (emphasis omitted).

Walker expressed his belief that the Company would "get [its] arms around" these issues, but not "overnight." <u>Id.</u> (emphasis omitted); <u>see also</u> <u>id.</u> ¶ 125 (quoting Walker as stating that "some of the issues in certain of our facilities will not be fixed overnight"). Walker stated that he expected the Company to cut the losses generated by the interior/exterior facilities "essentially in half by the end of

the year." Id. ¶ 131.  In addition, Walker expressed hope that the underperforming interior/exterior facilities would be "back to breakeven" by "the middle of" 2012.  Id.

August 5, 2011:  On the final day of the class period, Magna reported that its adjusted EBIT in Europe had decreased "primarily as a result of" factors including "operational inefficiencies and other costs at certain facilities, in particular at certain exteriors and interiors systems facilities."  Id. ¶ 148; see also id. ¶ 153.  During an earnings call, Walker and Galifi reported that the underperforming interior/exterior facilities had generated combined losses of approximately $60 million, id. ¶ 153, and that the Company would sell one of the three remaining facilities, id. ¶ 152.  Walker attributed these losses to "under priced product," "raw material increases," plants that reached "more than 100% capacity," "quality problems," and outsourcing expenses.  Id. ¶ 156 (emphasis omitted).

### 3. *Analysis*

Despite the foregoing, plaintiff maintains that defendants downplayed and concealed the full extent of the operational problems facing the four European interior/exterior facilities. Specifically, plaintiff alleges that defendants misled Magna investors by making "positive statements" about the Company's "European operations and financial results," as well as

40

"incomplete statements regarding the problems that plagued the interiors/exteriors business."[7]   Pl.'s Opp'n 9-10.   According to plaintiff, the alleged misstatements and omissions "wrongly conveyed" that Magna's "operational issues were publicly known and manageable (if not under control)."  Id. 10.

However, contrary to plaintiff's contention, the allegations in the amended complaint, stripped of their verbiage and ellipses, clearly demonstrate that defendants made a cascade of disclosures concerning (1) the existence and nature of the operational inefficiencies and (2) the Company's outlook and progress in addressing those problems.  In this circumstance, it is hard to fathom precisely what more information defendants could have disclosed to render their statements not misleading.

### a. *Disclosures Concerning the Existence and Nature of the Operational Inefficiencies*

Suffice it to say, defendants made numerous disclosures concerning the existence of the interior/exterior problems.[8]  See, e.g., AC ¶¶ 53, 89, 124, 148 (quarterly press releases

---

[7]    Plaintiff also alleges that defendants made "misstatements regarding the effectiveness of Magna's internal controls."  Pl.'s Opp'n 10; see also supra n.6.   However, this claim is predicated on plaintiff's general allegation that defendants "knew or recklessly disregarded that problems affecting Magna's European interiors/exteriors business were more significant than were previously represented."  AC ¶ 116.  We address, and ultimately discredit, the underlying allegation in Section II(B), infra.

[8]    Moreover, the investing public was aware of the underperformance of the European interior/exterior business units, as evidenced by the questions analysts asked during earnings calls.  See, e.g., Stern Decl. Ex. L, at 37-38 (analyst asking for "a prospective progress report" on the "losses in the interior/exterior facilities").

disclosing that EBIT in Europe was affected by "operational inefficiencies" at "exteriors and interiors systems facilities"); Stern Decl. Ex. L, at 28 (Galifi stating, on February 23, 2011, that "a couple of facilities in Europe" were experiencing "operational inefficiencies," resulting in the "outsourcing of some work"); AC ¶ 126 (Walker reporting, on May 4, 2011, that the underperforming interior/exterior facilities generated quarterly losses of approximately $50 million during the first quarter of 2011).

Nevertheless, plaintiff maintains that "defendants' reference to other issues affecting European operations" rendered these disclosures "misleading, even if not technically false." Pl.'s Opp'n 13; see also id. 10 (arguing that "defendants misrepresented the magnitude and extent of the problems facing the interiors/exteriors unit . . . by referencing 'operational inefficiencies' in quarterly press releases as one of several factors (as many as eight per quarter) that 'offset' European results" (internal footnote and citations omitted)); id. 12 (stating that "defendants consistently cited a raft of issues that impacted the European business, without addressing the interiors/exteriors production issues that posed the greatest threat"); AC ¶ 131 (alleging that Walker "downplayed the issues involving the interiors/exteriors business" during a conference call on May

4, 2011 "by shifting the focus to 'a number of different issues'").

However, contrary to plaintiff's suggestion, the allegations in the amended complaint demonstrate that defendants were transparent about the relative significance of the interior/exterior problems. For example, as early as November 4, 2010, Walker reported that "operational inefficiencies" plagued the interior/exterior facilities, AC ¶ 53, and that these business units accounted for the Company's "largest area of underperformance in Europe," id. ¶ 56; see also id. (Walker disclosing that certain interior/exterior facilities in Europe were "generating significant losses"); id. ¶ 61 (Galifi noting that the interior/exterior units were "in the red" and "a drag on profitability").

Yet even in the absence of such disclosures, plaintiff has failed to allege precisely why defendants' statements concerning the "raft" of other issues were misleading when made. 15 U.S.C. § 78u-4(b)(1). Plaintiff does not deny that other problems existed, and, indeed, the allegations in the amended complaint reveal that many of these problems (e.g., increased commodity costs, see AC ¶¶ 40, 89, 124) adversely affected European results throughout the putative class period, see, e.g., Stern Decl. Ex. Q, at 4 (describing "higher

43

commodity costs" as a "primary factor[]" behind Magna's poor results during the second quarter of 2011); see also infra n.9.

In the absence of any non-conclusory allegations that defendants foresaw the losses the interior/exterior facilities would generate, plaintiff's ex post facto contention that the operational problems presented the "most significant" threat to Magna's European operations, id. ¶ 85, amounts to nothing more than an assertion of fraud by hindsight. However, "[c]orporate officials need not be clairvoyant," and "they are only responsible for revealing those material facts reasonably available to them." Novak, 216 F.3d at 309; see also Slayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir. 2010) (noting that "plaintiffs may not plead fraud by hindsight").

Perhaps sensing this reality, plaintiff also contends that defendants did not provide enough "detail regarding the production issues" and "did not come clean" about these problems until "their impact was too great to continue to hide." Pl.'s Opp'n 17; see also AC ¶ 156 (alleging that it was not until the last day of the putative class period that defendants "finally confirmed that the most significant problem affecting the interiors/exteriors businesses concerned quality control issues, brought about by an overabundance of 'underpriced product' that Magna could not properly process").

44

However, the Court cannot decipher -- and plaintiff has not adequately explained -- how the purported "details" Magna disclosed on August 5, 2011 were meaningfully different from the information the Company provided earlier in the putative class period.[9]  See SRM Global Fund L.P. v. Countrywide Fin. Corp., 09 Civ. 5064 (RMB), 2010 WL 2473595, at *8 (S.D.N.Y.

_____

[9]    As a natural corollary, it is similarly unclear how defendants' purported "revelation" concerning the interior/exterior problems caused a "profound and immediate decline in Magna's stock price" given the other disclosures of financial issues facing the Company. Pl.'s Opp'n 19. On the final day of the putative class period, Magna disclosed that operational inefficiencies -- as well as "higher commodity costs, new facility costs [and] the favourable settlement of certain commercial items during the second quarter of 2010" -- all constituted "primary factors" behind the Company's decrease in operating income. Stern Decl. Ex. Q, at 4. Furthermore, the decline in Magna's share price was generally consistent with the Dow Jones Industrial Average, as demonstrated below:



MSN   Money,   http://investing.money.msn.com/investments/charts?symbol=US:MGA (last visited August 20, 2013); see also Fed. R. Evid. 201(b)(2).  Despite the foregoing, plaintiff disingenuously attributes the decrease in Magna's share price substantially (if not solely) to defendants being "forced to come clean" about the allegedly undisclosed information.  Pl.'s Opp'n 17. However, a more balanced assessment is that the operational inefficiencies represented one of many elements contributing to Magna's losses, and that the decrease in stock price was reflective of the general market's overall poor performance.

June 17, 2010) ("[T]here can be no omission where the allegedly omitted facts are disclosed." (internal quotation marks omitted)). When the Company allegedly "came clean" about the production issues, Walker indicated that the underperforming interior/exterior facilities generated combined losses of $60 million as a result of underpriced business, overbooked production, quality control issues, increased labor and outsourcing expenses, and high scrap and freight costs. AC ¶ 156. Approximately three months earlier, the disclosures were strikingly similar: defendants reported that the underperforming interior/exterior units incurred combined losses of $50 million, id. ¶ 126, attributable to underpriced business, overbooked production, increased outsourcing expenses, and scrap and freight costs.[10] Id. ¶¶ 126, 131.

However, even assuming, arguendo, that these disclosures materially differed, plaintiff has failed to allege any particularized facts supporting the conclusion that defendants knew or had access to information that either contradicted their public descriptions of the production problems, or permitted them to expound upon these issues earlier than they did. To the contrary, the allegations in the amended complaint

---

[10]    Notably, analysts interpreted the only new "detail" that Magna disclosed on August 5, 2011 -- namely, quality control issues, AC ¶ 156 -- as an underlying cause of the excess scrap costs that the Company reported on May 4, 2011, id. ¶ 131. See id. ¶ 168 (Canaccord Genuity writing: "It appears that these plants have quality issues, which are resulting in excess scrap and poor first-time yield.").

demonstrate that defendants were working to "better understand" the interior/exterior problems, id. ¶ 56 (emphasis omitted), and disclosed what they knew, when they knew it, compare id. ¶ 53 (Magna reporting on November 4, 2011 that increased EBIT in Europe was "partially offset" by "operational inefficiencies" in "exteriors and interiors systems facilities") with id. ¶ 126 (Walker providing further detail on the operational inefficiencies approximately six months later).

Therefore, any purported "lack of detail" in the disclosures cannot form the basis of an actionable securities fraud claim. See, e.g., In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 364 (S.D.N.Y. 2011) ("[M]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." (quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 53 (2d Cir. 1995) (internal quotation marks omitted)); see also In re Agnico-Eagle Mines Ltd. Sec. Litig., No 11. Civ. 7968 (JPO), 2013 WL 144041, at *21 (S.D.N.Y. Jan. 14, 2013) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal." (quoting Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 761 (7th Cir. 2007) (internal quotation marks omitted)).

**b.** *Disclosures Concerning the Company's Progress in Addressing the Operational Inefficiencies*

Throughout the class period, defendants candidly updated Magna's investors on the progress (or lack thereof) that the Company had made in addressing the interior/exterior problems.[11] See supra Section II(A)(2)(i). Nevertheless, plaintiff maintains that defendants misleadingly assured investors that they "had a handle" on the problems plaguing the interior/exterior facilities, Pl.'s Opp'n 10, and that "those operations were performing well, despite certain restructuring efforts," id.; see also id. 7 (arguing that defendants' statements "convinced investors and analysts to focus on the positive aspects of Magna's results"); id. 10 (complaining that "Magna reported four consecutive quarters of increasing financial results in its European segment," thus obscuring the interior/exterior problems).

---

[11]     For instance, on November 4, 2010, Walker reported: "Our interiors and exteriors team is getting a handle on the issues and developed a plan of action for the[] [underperforming] divisions." Id. ¶ 56. Walker stated that the Company would be in a "better position to articulate" the plan of action early in "the New Year," id., which is precisely what occurred. On January 12, 2011, Galifi described "four broad elements . . . to improve [Magna's] results in Europe," which elements included, among other things, "operational improvements" consisting of the same "basic blocking and tackling" that the Company utilized in North America. Id. ¶ 77
        Plaintiff maintains that the "operational improvements" Galifi discussed on January 12, 2011 (and then again on April 20, 2011) were unrelated to the operational inefficiencies plaguing the European interior/exterior facilities. Id. ¶¶ 77, 121; Pl.'s Opp'n 5. However, the analysts apparently believed otherwise. See Stern Decl. Ex. L, at 37-38 (analyst asking Walker for a "prospective progress report" on the "challenges" the Company previously categorized in "three of four buckets," including "eliminating the losses in the interior/exterior facilities").

48

Once again, however, plaintiff's claims find no support in the facts or the law. Far from guaranteeing that the operational inefficiencies were "under control," defendants repeatedly warned investors that these problems would "take[] time" to resolve. Stern Decl. Ex. N, at 5; see also AC ¶ 92 (Galifi stating: "[W]here we have operational inefficiencies and poorer pricing, the fix is going to be longer-term."); Stern Decl. Ex. N, at 7 (Galifi indicating that the Company would not "start to see the benefit" of the "plans . . . put in place" in Europe "until the later half of 2011 and 2012 and 2013"); AC ¶ 131 (Walker expressing his belief that the Company could "get [its] arms around" the issues plaguing the underperforming European operations, but not "overnight" (emphasis omitted)).

Defendants were similarly forthcoming about the Company's financial prospects in Europe. As plaintiff contends, defendants indicated that there were "some strong performing divisions" in Europe, AC ¶ 56 (emphasis added), and that European margins were "heading in the right direction," id. ¶ 96. However, defendants consistently tempered these statements with acknowledgements that the underperforming facilities represented "a drag on profitability," id. ¶ 61, and a "longer-term" fix, id. ¶ 92; see also Stern Decl. Ex. N, at 7 (Galifi stating the Company did not expect "to see the benefit"

of the plans to improve European results "until the later half
of 2011 and 2012 and 2013"); AC ¶ 131 (Walker expressing hope
that the underperforming interior/exterior facilities would be
"back to breakeven" by "the middle of" 2012).  Therefore, while
defendants represented that there was "no fundamental reason"
why European margins could not reach North American margins, AC
¶ 45, defendants were simultaneously clear that such parity was
"not going to happen" in 2011, 2012, or even 2013, Stern Decl.
Ex. J, at 6; see also AC ¶ 45 (Walker stating, on the first day
of the putative class period, that he did not believe European
margins would match North American margins "in the near-term"
because of "operating issues in Europe"); id. ¶ 96 (Walker
stating that the Company's financial improvement in Europe
would not "happen overnight").

   However, even absent these disclosures, plaintiff's claim
fails for the far more basic reason that the allegations in the
amended complaint do not endeavor to demonstrate, let alone to
substantiate, that any of the foregoing statements were
premised on falsehoods or otherwise inaccurate when made.  To
the extent plaintiff claims to have identified any
misrepresentations, they are limited to defendants' optimism
about the Company's future results.  Even if defendants were
ultimately wrong about the interior/exterior units'
performance, "misguided optimism is not a cause of action, and

does not support an inference of fraud." <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1129 (2d Cir. 1994); <u>see also Stevelman v. Alias Research Inc.</u>, 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."); <u>Rombach</u>, 355 F.3d at 174 (emphasizing that "companies must be permitted to operate with a hopeful outlook").

In a final attempt to find fraud where none exists, plaintiff takes aim at the remarks Stronach made upon his retirement. In the Annual Report, Stronach thanked management "for steering the Company through a very turbulent period," stating: "Magna is well positioned to rebound strongly now that the automotive industry is recovering." AC ¶ 108 (emphasis omitted); <u>see also</u> <u>id.</u> ¶ 107 (Stronach stating that he "firmly believe[d] that Magna will continue to do well provided that the Company adheres to the operating principles and unique corporate culture that are the foundation of our success"). According to plaintiff, Stronach's statements "conveyed the misleading message" that Magna "had weathered the economic downturn without incident, despite the operational problems that plagued the European interiors/exteriors business." <u>Id.</u> ¶ 108. Plaintiff submits that Stronach "could not have reasonably or genuinely believed his optimistic

statements," which were allegedly "contradicted by" the production problems plaguing the interior/exterior units. Opp'n 21-22.

However, contrary to plaintiff's contention, Stronach's remarks represent a quintessential Swan song and contain no apparent misrepresentations or omissions. In any event, the statements convey Stronach's opinion concerning Magna's strength and future outlook, and plaintiff has failed to plead any non-conclusory facts demonstrating that the remarks were subjectively or objectively false when made. Cf. Rombach, 355 F.3d at 174 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." (quoting Shields, 25 F.3d at 1129-30) (internal quotation marks omitted)).

### c. *Conclusion*

In sum, the allegations in the amended complaint demonstrate that defendants (1) candidly discussed the operational inefficiencies affecting the four European interior/exterior facilities, (2) warned investors that these problems would take a number of years to resolve, (3) balanced positive statements about the Company's overall results with recognition of these offsetting factors, and (4) answered

analysts' questions concerning the problems affecting the underperforming divisions.

In the face of these disclosures, plaintiff launches a barrage of criticism that finds zero support in the facts or law. Plaintiff does not direct this Court's attention to any specific standard, regulatory or otherwise, that defendants have violated. Instead, plaintiff predicates this action on defendants' optimism and purported lack of detail. However, federal securities laws simply does not require the pessimism or granular information that plaintiff's theory demands. See, e.g., In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 397 (S.D.N.Y. 2006) ("[D]isclosure requirements are not intended to attribute to investors a child-like simplicity." (internal quotation marks omitted)). Thus, we conclude that the amended complaint does not allege any actionable misrepresentations or omissions, much less with the specificity that the PSLRA requires.

**B. Even Assuming, Arguendo, that Plaintiff Adequately Alleged Actionable Misrepresentations or Omissions, Plaintiff Has Nonetheless Failed to Plead Scienter**

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The requisite state of mind in a Section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or

defraud.'"   ECA & Local 134 IBEW Joint Pension Trust v. J.P.
Morgan Chase Co. ("ECA"), 553 F.3d 187, 198 (2d Cir. 2009)
(quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.
308, 319 (2007)).   To establish a strong inference of scienter,
a plaintiff may allege "either (1) that defendants had the
motive and opportunity to commit fraud, or (2) strong
circumstantial evidence of conscious misbehavior or
recklessness."   Capital Mgmt. Select Fund Ltd. v. Bennett, 680
F.3d 214, 225 (2d Cir. 2012) (internal quotation marks
omitted).

In assessing whether the plaintiff has satisfied this
burden, a court must analyze "whether all of the facts alleged,
taken collectively, give rise to a strong inference of
scienter, not whether any individual allegation, scrutinized in
isolation, meets that standard."   Slayton, 604 F.3d at 774
(quoting Tellabs, 551 U.S. at 322-23) (internal quotation marks
omitted).   The complaint will survive "only if a reasonable
person would deem the inference of scienter cogent and at least
as compelling as any opposing inference one could draw from the
facts alleged."   Matrixx, 131 S.Ct. at 1324 (quoting Tellabs,
551 U.S. at 324) (internal quotation marks omitted).   Applying
that standard here, we find that plaintiff has failed to
demonstrate that defendants had any cognizable motive to commit
securities fraud, see Section II(B)(1), or consciously or

recklessly disregarded the accuracy of their representations, see Section II(B)(2).

1. *Motive and Opportunity*

In its effort to demonstrate defendant's alleged motive to "downplay" the interior/exterior problems, plaintiff alleges that eight insiders, including Stronach and Walker, sold 18,977,104 shares of stock over seven months of the putative class period, AC ¶ 177, as demonstrated below:



Pl.'s Opp'n 1.[12]   According to plaintiff, Stronach sold approximately $907 million of his Magna shares "in connection with his exit from the Company" id. ¶ 3, and Walker and the

---

[12]   We have omitted portions of plaintiff's chart to enhance its readability.

other non-party executives exercised employee stock options and sold their newly-acquired shares, see Stern Decl. Exs. T-Z, with Walker receiving approximately $7.4 million in net proceeds, see id. Ex. Y.  As plaintiff's chart illustrates, Stronach and Walker completed these sales at various points during the class period, and at times when the trading price was high, low, and at points in-between.

Nonetheless, plaintiff alleges that these sales departed from defendants' pre-class trading activity.  AC ¶ 180. Specifically, plaintiff submits that six of the eight insiders, including Stronach, did not make any sales in 2010 other than those depicted above, see id. ¶ 178(a)-(c), (e)-(f), (h), and that the other two insiders, including Walker, made fewer sales in 2010 than they did during the putative class period, see id. ¶ 178(d), (g).  According to plaintiff, these facts demonstrate that the circumstances and timing of defendants' sales were "extraordinarily unusual," thus supporting the conclusion that defendants were motivated to defraud.  Pl.'s Opp'n 26.  We disagree.

Insider trading gives rise to a strong inference of scienter "only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  Sec. & Exch. Comm'n v. Rorech, 720 F. Supp. 2d 367, 414 (S.D.N.Y. 2010)

(quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)) (internal quotation marks omitted); see also Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) (explaining that "[a] corporate insider may sell stock" for various non-culpable reasons, such as "to fund major family expenses, diversify his portfolio, or arrange his estate plan").   "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 420 (S.D.N.Y. 2011) (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001)) (internal quotation marks omitted).

In this case, we find nothing suspicious about the circumstances of defendants' transactions.   As plaintiff contends, Stronach liquidated "most, if not all of his shares" during the putative class period.   Pl.'s Opp'n 28.   Although such divestiture, standing on its own, may appear "unusual for a corporate officer," In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010),[13] the allegations in the amended

---

[13]   See also In re Scholastic Corp., 252 F.3d at 74-75 (finding allegations sufficient to establish motive and opportunity when an individual defendant sold "80 percent of his holdings within a matter of days").

complaint provide a compelling, non-culpable explanation for Stronach's trading activity: his retirement. As plaintiff concedes, Stronach sold his stock in conjunction with a publicly-disclosed plan to "exit from the Company," AC ¶ 3, and to finance "other business prospects, including the buyout of a real estate and racetrack company," id. ¶ 68; see also id. ¶¶ 140, 143 (quoting articles describing Stronach's other business pursuits). Notably, Stronach planned his retirement approximately five months prior to the commencement of the putative class period, see Kasner Decl. Ex. C, at 7, and resigned as the Company's Chairman approximately three months before the class period ended, see AC ¶ 10.

Under these circumstances, the most plausible inference is that Stronach sold his stock as a "normal and expected" consequence of his retirement, In re Carter-Wallace, Inc. Sec. Litig., No. 94 Civ. 5704 (KTD), 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999), aff'd 220 F.3d 36 (2d Cir. 2000), not as part of an unsubstantiated conspiracy to defraud, see, e.g., id. (finding no inference of scienter where the defendant sold stock "upon his retirement"); In re Avon Prods., Inc. Sec. Litig., No. 05 Civ. 6803 (LAK)(MHD), 2009 WL 848017, at *21 (S.D.N.Y. Feb. 23, 2009) (finding the alleged inference of scienter "undercut[]" when the defendant "disposed of a significant portion of shares shortly before his retirement");

<u>Feasby v. Industri-Matematik Int'l Corp.</u>, 99 Civ. 8761 (HB), 2000 WL 977673, at *4 n.5 (S.D.N.Y. July 17, 2000) (holding that a defendant's stock sales did not satisfy the scienter requirement when the defendant "sold his shares at the time he resigned from [the company], a frequent occurrence when a former executive no longer has a say in the management of the company"); <u>In re Health Mgmt. Sys., Inc. Sec. Litig.</u>, No. 97 Civ. 1865 (HB), 1998 WL 283286, at *6 n.3 (S.D.N.Y. June 1, 1998) (finding a lack of scienter where a defendant sold 81.9 percent of his holdings "most likely on account of the fact that he resigned" as a company director and "was divesting himself of his shares").

The other individual defendants' trading activity does not compel an alternative conclusion.   Galifi did not sell any stock during the putative class period.   <u>See</u> AC ¶ 177. Although Walker sold approximately 50,000 shares, <u>id.</u> ¶ 178(g), he retained the overwhelming majority of his stake in the Company, <u>see</u> Stern Decl. Ex. Y.   Moreover, the timing of Walker's transactions was tied to the predetermined expiration of his employee stock options.   <u>See</u> Stern Decl. Ex. BB, at 51 (listing an option expiration date of July 31, 2011).   The fact that Walker exercised the expiring options and sold his newly-purchased shares does not, in and of itself, demonstrate a motive to defraud.   <u>Cf.</u> <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d

185, 206 (1st Cir. 1999) (stating that insider trading is "not unusual" when the selling defendants "have a limited period of time to exercise their company stock options"); <u>Gaylinn v. 3Com Corp.</u>, 185 F. Supp. 2d 1054, 1067 (N.D. Cal. 2000) (finding that a defendant's sale of 100 percent of his individual holding did not give rise to a strong inference of scienter when the defendant "had to exercise his stock options" or "forfeit them").

Finally, we note that, even if plaintiff had demonstrated suspicious or unusual circumstances surrounding defendants' trading activity, the allegations in the amended complaint would nonetheless fail to persuasively show that the <u>timing</u> of those sales was "calculated to maximize the personal benefit from undisclosed inside information." <u>Rorech</u>, 720 F. Supp. 2d at 414 (quoting <u>In re Silicon Graphics</u>, 183 F.3d at 986) (internal quotation marks omitted).   Neither Stronach nor Walker sold his stock "at the end of the putative class period, when insiders would have 'rushed to cash out.'" <u>City of Brockton Ret. Sys. v. Shaw Grp. Inc.</u>, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008).   Instead, these defendants sold their shares throughout the class period, and at times when the trading price was low.   <u>See</u> <u>supra</u> Section II(B)(1) (providing chart of insider sales).   The fact that Magna's share price rose shortly after the last insider sale further rebuts any inference that

defendants acted with the intent to defraud.  <u>City of Brockton</u>, 540 F. Supp. 2d at 476 (citing <u>Ronconi</u>, 253 F.3d at 435). Accordingly, we conclude that plaintiff has failed to establish any cognizable motive to commit securities fraud.

### 2. *Conscious Misbehavior or Recklessness*

Plaintiff next contends that defendants consciously or recklessly disregarded the accuracy of their representations. In support of this position, plaintiff notes that Walker and Galifi visited the problematic interior/exterior facilities, AC ¶ 56, expressed familiarity with detail concerning these facilities, <u>id.</u> ¶ 134, and acknowledged that Magna had grappled with production issues for months before the end of the putative class period, <u>id.</u> ¶¶ 133, 172.  According to plaintiff, "[t]hese facts strongly suggest that defendants either consciously or recklessly disregarded the severity and impact of the interiors/exteriors production problems, and, by extension, the accuracy of their representations concerning the interiors/exteriors facilities and the European operations." Pl.'s Opp'n 30.  Once again, we disagree.

Where, as here, a plaintiff fails to allege scienter through motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater." <u>ECA</u>, 553 F.3d at 198-99 (quoting <u>Kalnit v. Eichler</u>, 264 F.3d 131, 142 (2d Cir. 2001)) (internal quotation marks omitted).

To demonstrate recklessness, a plaintiff must allege, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 202-03 (quoting Kalnit, 264 F.3d at 142) (internal quotation marks omitted). "Sufficient evidence of recklessness exists if the factual allegations demonstrate that defendants (1) possessed knowledge of facts or access to information contradicting their public statements, or (2) 'failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.'" Van Dongen v. CNinsure Inc., -- F. Supp. 2d --, No. 11 Civ. 7320 (VM), 2013 WL 3270327, at *8 (S.D.N.Y. June 24, 2013) (quoting Novak, 216 F.3d at 308).

In this case, plaintiff does not specifically identify any contemporaneous data or information that defendants either possessed and disregarded, or failed to consider despite a duty to monitor. See supra Section II(A)(3). To the contrary, the allegations impermissibly assert "fraud by hindsight" and rely upon defendants' purported failure to provide an "overly gloomy or cautious picture of current performance and future prospects." Novak, 216 F.3d at 309 (internal quotation marks omitted); see also supra Section II(A)(3)(b).

In a last-ditch effort to concoct an inference of scienter, plaintiff invokes the core operations doctrine. See Pl's Opp'n 30 ("[B]ecause Europe was one of three reporting segments and the interiors/exteriors unit constituted a material aspect of the European operations, knowledge of adverse information concerning the interiors/exteriors unit is appropriately imputed to the individual defendants."). However, any allegation that four interior/exterior facilities constituted a core operation of Magna -- a global company with approximately 286 manufacturing facilities worldwide -- is, like many of plaintiff's other allegations, fanciful on its face. See, e.g., Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) ("[C]ourts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'"). Accordingly, we conclude that the allegations fail to give rise to a strong inference of scienter, providing an independent ground for dismissal.

III. **Section 20(a) of the Exchange Act**

Section 20(a) establishes a cause of action against "[e]very person who, directly or indirectly, controls any person" or entity that violates the Exchange Act. 15 U.S.C. § 78t(a). To establish a prima facie case of control person liability, a plaintiff must allege, inter alia, "a primary

violation by the controlled person." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  Because plaintiff has failed to state a primary violation of section 10(b) or Rule 10b-5, plaintiff's claim under section 20(a) must likewise be dismissed.  See Slayton, 604 F.3d at 778.

## IV.   Section 20A of the Exchange Act

Section 20A provides that any person who violates the Exchange Act "by purchasing or selling a security while in possession of material, nonpublic information" is liable "to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) . . . securities of the same class." 15 U.S.C. § 78t-1(a).  To state a claim under section 20A, a plaintiff must plead, among other things, "a predicate insider trading violation of the Exchange Act." In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011) (internal quotation marks omitted).  In this case, plaintiff's failure to allege a violation of the Exchange Act precludes plaintiff's recovery under section 20A. Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703-04 (2d Cir. 1994).

<u>CONCLUSION</u>

For the foregoing reasons, defendants' motions to dismiss (docket nos. 21 and 24) are granted.  In closing, we wish to

emphasize that the length of this Memorandum and Order should not be misinterpreted to reflect the Court's view that the amended complaint has any merit whatsoever. To the contrary, we have extensively quoted the disclosures to highlight the total lack of even arguable merit to plaintiff's claims.

Dated:    New York, New York
          August 22, 2013

                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Lead Counsel and Attorneys for Plaintiff**

Samuel H. Rudman, Esq.
Joseph Russello, Esq.
William J. Geddish, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747

**Attorneys for Defendants Magna International Inc., Donald J. Walker, and Vincent J. Galifi**

Andrew W. Stern, Esq.
Nicholas P. Crowell, Esq.
Cameron Moxley, Esq.
James O. Heyworth, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**Attorneys for Defendant Frank Stronach**

Jay B. Kasner, Esq.
Rachel J. Barnett, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522